## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RAUL CLARK; BRUCE CLARK AND IRAIDA CLARK, | : | CIVIL ACTION NO. |
| | : | |
| Plaintiffs, | : | JURY TRIAL DEMANDED |
| vs. | : | |
| MICHAEL T. CONAHAN; MARK A. CIAVARELLA; THE LUZERNE COUNTY JUVENILE PROBATION DEPARTMENT; SANDRA BRULO; ROBERT J. POWELL; PA CHILD CARE, LLC; WESTERN PA CHILD CARE, LLC; ROBERT K. MERICLE; MERICLE CONSTRUCTION, INC.; GREGORY ZAPPALA; PINNACLE GROUP of JUPITER, LLC; BARBARA CONAHAN; CINDY CIAVARELLA; BEVERAGE MARKETING OF PA, INC.; VISION HOLDINGS, LLC; MID ATLANTIC YOUTH SERVICES CORP.; POWELL LAW GROUP, P.C.; JOHN DOE DEFENDANTS NOS. 1-10 and JOHN DOE ENTITIES NOS. 1 through 10, | : | COMPLAINT |
| | : | |
| Defendants. | : | |

And now, Plaintiffs Raul Clark, Bruce Clark and Iraida Clark, by and through their attorneys, Eckert Seamans Cherin & Mellott, LLC, and Riker Danzig Scherer Hyland & Perretti LLP, by way of Complaint against the Defendants hereby allege the following:

{L0396039.1}

## INTRODUCTION

In the years 2002-2003, Plaintiff Raul Clark ("Raul") was a 14 year old child who felt the full brunt of the randomness, cruelty and constitutional deprivations of the juvenile justice system under Judge Mark A. Ciavarella of the Court of Common Pleas of Luzerne County, Pennsylvania and his (Ciavarella's) co-conspirators.   Raul was arrested and charged with a misdemeanor offense and appeared before Judge Ciavarella for a delinquency proceeding.   Unbeknownst to Raul, Judge Ciavarella had conspired with numerous others to send as many youths as possible to detention facilities rather than issue the non-custodial sentences that they deserved.

Raul spent more than six months in various detention facilities as a victim of this nefarious conspiracy.   His deaf parents paid thousands of dollars of their meager income to cover detention and probation "expenses."   This Court cannot undo the wrong that has been done to Raul and other children, but it has the obligation, both moral and legal, to offer redress.

## PARTIES

1.    Plaintiff Raul Clark is presently a 21 year old man who resides in White Haven, Pennsylvania.

2.    Plaintiffs Bruce Clark ("Mr. Clark") and Iraida Clark ("Mrs. Clark") are a married couple who also reside in White Haven, Pennsylvania.   Both Mr. and Mrs. Clark are hearing impaired and cannot communicate except by sign language or written communications.   In 2002 through 2004, Mr. Clark worked as an auto mechanic. During that time, Mrs. Clark worked as a cashier at Karibe, Inc.

3.    Defendant Michael T. Conahan ("Defendant Conahan") is an adult individual residing at 301 Deer Run Road, Mountain Top, Pennsylvania. Defendant Conahan, at all relevant times was a Judge on the Court of Common Pleas of Luzerne County and owner, officer, shareholder, operator, and beneficiary of Defendants Pinnacle Group of Jupiter, LLC, and Beverage Marketing of PA, Inc. Between 2002 and 2007, Defendant Conahan was the President Judge for Luzerne County. On February 11, 2009, Defendant Conahan agreed to enter a guilty plea to criminal charges of receiving kickbacks.

4.    Defendant Mark A. Ciavarella ("Defendant Ciavarella") is an adult individual residing at 585 Rutter Avenue, Kingston, Pennsylvania, and was at all relevant times a Judge on the Court of Common Pleas of Luzerne County. Defendant Ciavarella was also the owner, officer, shareholder, operator, and beneficiary of Defendants Pinnacle Group of Jupiter, LLC, and Beverage Marketing of PA, Inc. On February 11, 2009, Defendant Ciavarella agreed to enter a guilty plea to charges of having received kickbacks.

5.    Defendant Luzerne County Juvenile Probation Department (the "Department") is a department of Luzerne County with offices located at the Luzerne County Courthouse, 200 North River Street, Wilkes-Barre, Pennsylvania. The Department is responsible for, among other things, monitoring juvenile proceedings in Luzerne County.

6.    Defendant Sandra Brulo ("Ms. Brulo") is a Pennsylvania resident who resides at 96 Allenberry Drive, Hanover Township, Pennsylvania. Ms. Brulo was the

deputy director of forensic programs at the Department until February 22, 2009, when she was indicted for obstruction of justice.

7.    Defendant Robert J. Powell ("Mr. Powell") is an adult individual who resides at 10 Fox Run Road, Drums, Pennsylvania, and at all times relevant was an owner, officer, shareholder, and operator of Defendants PA Child Care, LLC, Western PA Child Care, LLC., Vision Holdings LLC, Mid Atlantic Youth Services Corp., and Powell Law Group, P.C.   Mr. Powell has publicly admitted to paying bribes to Defendants Conahan and Ciavarella.

8.    Defendant PA Child Care, LLC ("PACC") is a Pennsylvania limited liability company with a registered office address of 520 Walnut Street, P.O. Box 8581, Reading, Pennsylvania.  PACC was owned by Messrs. Powell and Zappala until June 2008, when Mr. Powell sold his interest.

9.    Defendant Western PA Child Care, LLC ("WPACC") is a Pennsylvania limited liability company with a registered office address of 1105 Berkshire Boulevard, Suite 320, Wyomissing, Pennsylvania.  WPACC was owned by Messrs. Powell and Zappala until June 2008, when Mr. Powell sold his interest.

10.    Defendant Robert K. Mericle ("Mr. Mericle") is an adult individual residing at 100 Baltimore Drive, Wilkes-Barre, Pennsylvania, and was at all times relevant an owner, shareholder, officer, and operator of Mericle Construction, Inc.  On July 31, 2009, Defendant Mericle agreed to enter a guilty plea to criminal charges of filing a false tax return.

11.    Defendant Mericle Construction, Inc. ("Mericle Construction") is a Pennsylvania Close Corporation with a registered office address at 33 Beekman Street,

Wilkes-Barre, Pennsylvania. Upon information and belief, Mericle Construction is owned by Mr. Mericle.

12.    Defendant Gregory Zappala ("Mr. Zappala") is an adult individual residing at 1212 Cliffview Drive, Monroeville, Pennsylvania, and was at all times relevant an owner, shareholder, officer, and operator of Defendants PA Child Care, LLC, Western PA Child Care, LLC., and Mid Atlantic Youth Services Corp.

13.    Defendant Pinnacle Group of Jupiter, LLC ("Pinnacle") is a Florida limited liability company with a registered address at 301 Deer Run Drive, Mountain Top, Pennsylvania. Upon information and belief, Pinnacle was owned and operated by Defendants Barbara Conahan ("Mrs. Conahan") and Cindy Ciavarella ("Mrs. Ciavarella").

14.    Defendant Mrs. Conahan is an adult individual and upon information and belief the wife of Defendant Michael Conahan who resides at 301 Deer Run Road, Mountain Top, Pennsylvania. At all times relevant hereto Defendant Mrs. Conahan was either the owner, officer, shareholder, operator and/or beneficiary of Defendant Pinnacle.

15.    Defendant Mrs. Ciavarella is an adult individual and upon information and belief the wife of Defendant Mark A. Ciavarella who resides at 585 Rutter Avenue, Kingston, Pennsylvania. At all times relevant hereto Defendant Mrs. Ciavarella was either the owner, officer, shareholder, operator and/or beneficiary of Defendant, Pinnacle.

16.    Defendant Beverage Marketing of PA, Inc. ("Beverage") is a Pennsylvania corporation with a registered address of P.O. Box 17, Pottsville Road, Seltzer, Pennsylvania.

17.    Defendant Vision Holdings LLC ("Vision") is a Cayman Islands company with a principal address in the Cayman Islands that is unknown at this time, but that was owned and operated by, *inter alia*, Mr. Powell.

18.    Defendant Mid Atlantic Youth Services Corp. ("MAYS") is a Pennsylvania corporation with a registered office address at 701 Sathers Drive, Pittston Township, Pennsylvania.

19.    Defendant Powell Law Group, P.C. ("Powell Law") is a Pennsylvania Professional Corporation with a registered office address at 10 Fox Run Road, Drums, Pennsylvania.    Defendants Mr. Powell, Powell Law Firm, Mr. Mericle, Mericle Construction, Mr. Zappala, Vision, PACC and WPACC are collectively referred to herein as the "Detention Facility Defendants."

20.    John Doe Defendants Nos. 1 through 10 are fictitious names for other individuals who participated in and/or benefited from the illegal schemes involving Defendants Ciavarella and Conahan.

21.    John Doe Entities Nos. 1 through 10 are fictitious names of business entities that participated in and/or benefited from the illegal schemes involving Defendants Ciavarella and Conahan.

## **JURISDICTION**

22.    Plaintiffs repeat the allegations of the foregoing paragraphs and repeat same as if set forth at length herein.

23.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331, because this action arises under the laws of the United States and under 28 U.S.C. § 1964(c), because this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 et seq.

24.    This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

25.    This Court has venue over this action pursuant to 28 U.S.C. § 1391 (b) and (c) and 18 U.S.C. § 1965.

26.    Upon information and belief, Defendants Conahan, Ciavarella, the Luzerne County Probation Department, Sandra Brulo, PA Child Care, LLC, Robert J. Powell, Robert Mericle, Mericle Construction, Inc., Barbara Conahan, Cindy Ciavarella, Beverage Marketing of PA, Inc., Vision Holdings, LLC, Powell Law Group, P.C., Pinnacle Group of Jupiter, LLC, and Mid Atlantic Youth Services Corp., reside in this Judicial District.

27.    Further, a substantial part of the events and omissions giving rise to the claims alleged in the Complaint occurred in this Judicial District.

## FACTUAL BACKGROUND

### The Safeguards Imposed By The United States Constitution And The Pennsylvania Constitution To Protect Juvenile Defendants

28.    Plaintiffs repeat the allegations of the foregoing paragraphs and repeat same as if set forth at length herein.

29.    Because of their special need for protection, youths in delinquency proceedings are entitled to virtually all of the due process rights guaranteed to adult criminal defendants.

30.    The United States Supreme Court has stated that "[a]mong [the due process rights provided in a juvenile proceeding] are the rights to appropriate notice, to counsel, to confrontation and to cross-examination and the privilege against self-incrimination.

31.    Included also is the standard of proof beyond a reasonable doubt. McKeiver v. Pennsylvania, 403 U.S. 528, 533 (1971).

32.    These long-recognized tenets of our highest laws exist to ensure a fair hearing and to protect Pennsylvania's children from the very abuse that robbed so many of their childhood in Luzerne County.

33.    More than forty years ago, in Application of Gault, 387 U.S. 1 (1967), the United States Supreme Court expressly confirmed that defendants in juvenile proceedings possess a constitutional right to counsel.

34.    Pennsylvania law has expressly codified the right of children to legal counsel at each stage of the juvenile proceeding. 42 Pa. Cons. Stat. § 6337.

35.    The right to counsel thus extends to pre-trial motions and hearings, adjudication, disposition, post-disposition and probation.

36.    In order to protect children and safeguard their rights, Pennsylvania has created a statewide infrastructure to oversee juvenile justice.

37.    The stated purpose of Pennsylvania's statutorily-created juvenile justice system is "[t]o provide for the care, protection, safety and wholesome mental and physical development of children coming within the provision of [the Act]." 42 Pa. Cons. Stat. § 6301(1).

38. That state-created system failed the children and parents of Luzerne County.

39. Consistent with that purpose, placement of juveniles in a detention facility is intended to be a last resort and is to be used "only when necessary for [the child's] welfare, safety or health or in the interests of public safety." 42 Pa. Cons. Stat. § 6301(3).

40. As is now clear, these principles were willfully disregarded in order to line the pockets of judges and benefit the owners and builders of private youth prisons, all at the expense of the most vulnerable members of our society.

### Defendants Ciavarella And Conahan, With The Assistance Of Others, Rig The Juvenile Justice System To Deprive Juveniles Of Their Rights

41. Plaintiffs repeat the allegations of the foregoing paragraphs and repeat same as if set forth at length herein.

42. Defendants Ciavarella and Conahan both served as judges on the Pennsylvania Court of Common Pleas at all times relevant to this Complaint.

43. Defendant Conahan served as the President Judge of Luzerne County from January 2002 through June 2007.

44. As President Judge, Defendant Conahan enjoyed unique influence over juvenile detention contracts in Luzerne County.

45. Defendant Ciavarella oversaw juvenile matters between 2000 and 2007, in which capacity he acted as judge and jury for thousands of juvenile matters and exercised nearly unfettered discretion over delinquency determination, parole determination matters and the selection of juvenile detention centers to which children would be sentenced.

46. In addition, he served as the President Judge of Luzerne County from June 2007 through January 2009.

47. In approximately June 2000, Defendant Ciavarella met with defendant Mr. Powell about Mr. Powell's desire to construct a privately-owned juvenile detention facility in Luzerne County.

48. Mr. Powell was a local attorney who regularly practiced in Luzerne County's courts.

49. Defendant Ciavarella introduced Mr. Powell to Mr. Mericle, who was a friend and business associate of Defendant Ciavarella, to assist with the juvenile detention facility idea.

50. Mr. Mericle and his company Mericle Construction agreed to build a juvenile detention facility on land that Mr. Powell and his partner, Mr. Zappala, were to acquire.

51. The financial success of the private youth prison that Messrs. Powell and Zappala sought to operate and that Mr. Mericle hoped to construct would be assured if they could enter into a contract with Luzerne County for the sending of as many juveniles as possible to their facility.

52. At all times prior to 2000, Luzerne County operated its own juvenile detention center, to which it sent many of the juveniles adjudged delinquent in Luzerne County.

53. That facility would directly compete with Mr. Powell's proposed facility.

54.    Upon information and belief, the publicly-owned Luzerne County detention facility was adequate to meet the legitimate needs of Luzerne County for a juvenile detention facility.

55.    There existed no legitimate basis for the abandonment by Luzerne County of the Luzerne County juvenile detention facility and the construction of a new facility.

56.    In exchange for kickbacks from the Detention Facility Defendants, Defendants Conahan and Ciavarella sought to funnel Luzerne County's youths to Detention Facility Defendants' private institution.

57.    In order to demonstrate that the Luzerne County juvenile detention facility was inadequate and to assure the success of their co-conspirators' facilities, Defendants Conahan and Ciavarella needed to dramatically increase the number of juveniles who were sentenced to custodial detention instead of receiving a non-custodial alternative sentence for relatively minor offenses.

58.    Beginning at least as early as 2002 and possibly earlier and continuing thereafter, Defendants Ciavarella and Conahan routinely sentenced juveniles to custodial detention despite the requirements of Pennsylvania law that placement in detention away from a child's family should be a last resort.

59.    Defendants Ciavarella and Conahan accomplished their goal of incarcerating large numbers of juveniles by systematically stripping juveniles of their constitutional rights by denying them due process and a fair hearing.

60.    Those hearings were fundamentally flawed because the trier of fact and law was secretly "on the take" having accepted bribes from the institution that benefited from their determination.

61.    In addition, Defendants Ciavarella and Conahan routinely conducted hearings in which juveniles were railroaded through a sham proceeding in which they were systematically inadequately represented by counsel or had no counsel at all, and had not been advised of either their right to counsel or the consequences of their waiver of the right to counsel.

62.    Defendants Ciavarella and Conahan also systemically pressured children to enter guilty pleas or adjudicated cases in the absence of a plea without advising the children or their parents of their fundamental right to due process, notice of charges, confirmation and calling of witnesses, privileges against self-incrimination, the consequences of their decision to waive the right to trial and other fundamental rights.

63.    Perhaps the most egregious aspect of their reprehensible cash-for-kids scheme was the brutal sentencing phase.

64.    Acting on their virtually unfettered yet fundamentally-biased discretion, Defendants Ciavarella and Conahan handed down terribly draconian sentences for hundreds of first-time offenders of youthful indiscretions as well as puzzlingly benign offenses, all to line the Judges' pockets.  Examples now made public have shocked the conscience.

65.    All of this took place in plain view of the representatives of the juvenile justice system designed to protect children.

66.    Although juvenile proceedings are confidential, Ms. Brulo, the representatives of the Department and the Luzerne County Public Defenders' Office watched silently as Defendants Ciavarella and Conahan's kangaroo court systemically imprisoned thousands of Luzerne County's youth.

67.    The system that Defendants Ciavarella and Conahan had set up at the behest of the Detention Facility Defendants and with the approval of the County was not designed to properly adjudicate juvenile cases but, instead, merely to increase the population at juvenile detention facilities to further the pecuniary goals of defendants.

68.    Upon information and belief, Defendants Ciavarella and Conahan's actions had the desired effect in rendering the Luzerne County juvenile detention facility overcrowded and inadequate.

69.    The actions of Defendants Ciavarella and Conahan in sentencing juveniles to detention facilities for minor offenses had the effect of convincing Luzerne County to enter into contracts with private facilities in which the Detention Facility Defendants had an interest.

70.    On January 29, 2002, Defendant Conahan, acting as President Judge of Luzerne County signed a Placement Guaranty Agreement between PACC and the Court of Common Pleas for Luzerne County to house juvenile offenders at the PACC facility.

71.    The Agreement provided a guaranteed annual fee from Luzerne County to PACC of $1,314,000.

72.    Unsatisfied with $1.3 million dollar commitment, the Defendants conspired to close the public Luzerne County detention facility and enter into a $58 million, 20-year lease with PACC.

73.    During 2002, the steps began and by November 2002 Luzerne County rushed through the $58 million, 20-year lease even as state auditors attempted to stop the agreement based on their ongoing review of PACC.

74.    As a further part of the scheme and artifice to defraud, Defendant Conahan entered into agreements guaranteeing placement of juvenile offenders with PACC and took official action to remove funding from the Luzerne County budget for the Luzerne County juvenile detention facility, effectively closing a county-run youth detention center.

75.    Defendants Conahan and Ciavarella, through their actions, facilitated the construction of juvenile detention facilities and an expansion to one of those facilities by PACC and WPACC and directed that juvenile offenders be lodged at juvenile detention facilities operated by PACC and WPACC.

76.    Through their actions, Defendants assisted PACC and WPACC to secure agreements with Luzerne County worth tens of millions of dollars for the placement of juvenile offenders, including an agreement in late 2004 worth approximately $58,000,000.

77.    By December 2002, Defendant Conahan had removed all funding from the publicly-owned Luzerne County juvenile detention facility and effectively closed the facility, requiring all juveniles to be moved to other facilities, including PACC.

78.    Over the next six years, Defendants Conahan and Ciavarella steered hundreds of Luzerne County youths to PACC, including plaintiff Raul Clark.

79.    Due to the success of the private youth prison operated in Luzerne County, Messrs. Powell and Zappala and his partner, doing business as WPACC, constructed a second private youth prison in western Pennsylvania.

80.    Mr. Mericle, the same contractor who built the facility in Luzerne County, was employed to construct the WPACC facility.

81.    Defendant Ciavarella, through his administrative discretionary decision-making authority, adopted procedures for a specialty court that facilitated an increased number of juvenile offenders to be sent to the juvenile detention facilities of PACC and WPACC.

82.    Defendant Ciavarella took these actions without disclosing to the parties before the court his conflict of interest and the financial relationship that existed between the Defendants.

83.    Upon information and belief, the Department, Ms. Brulo and others actively participated with the scheme perpetrated by Defendants Conahan and Ciavarella in return for illicit payments.

84.    The Department, Ms. Brulo and others, at the instance of Ciavarella and Conahan, frequently recommended that juveniles be detained or placed in rehabilitation facilities rather than placed on probation in order to "legitimize" the placements made by Defendants Conahan and Ciavarella.

85.    Upon information and belief, members of the Department, at the instance of Ciavarella and Conahan, also routinely altered their recommendation to favor placement in detention facilities at the instruction of Defendants Conahan and Ciavarella.

86.    Upon information and belief, members of the Department made these alterations in return for kickbacks from, among others, Defendants Conahan and Ciavarella.

87.    Upon information and belief, the Department, Ms. Brulo and others routinely falsified the results of drug tests or concocted bogus probation violations in

order to have children on probation placed into and/or further detained at detention facilities.

88.    The Department received payment of probation expenses from parents of children who were sentenced to detention facilities or placed on probation.

89.    The actions of the Department, Ms. Brulo and others in recommending detention where it was not warranted, in altering recommendations to favor detention over probation and in falsifying drug tests to warrant probation violations all had the effect of increasing the amount of payments from parents and guardians to pay for the costs of their children's incarceration and probation and increased the number of children sent back to PACC and WPACC.

90.    Among other things, public defenders in juvenile proceedings in Luzerne County systemically failed to provide any effective assistance to juveniles that they had been appointed to represent, including failing to even speak in their client's defense or object to the deprivation of their constitutional rights.

91.    Annual reports that were prepared by the Administrative Office of Pennsylvania Courts ("AOPC") demonstrate the catastrophic effects of the scheme of Defendants Ciavarella and Conahan.

92.    The AOPC received annual reports from all counties in Pennsylvania that stated the percentage of juvenile delinquency proceedings that resulted in detention of the juvenile in a detention center or treatment facility.

93.    Between 2001 and 2002, the number of juveniles in Luzerne County who were placed in detention facilities increased by a staggering 131%. Overall, the number of placements in the Commonwealth of Pennsylvania declined from 2001 to 2002.

94.    In 2002, 21.5% of children who appeared in juvenile proceedings in Luzerne County were placed in detention facilities.    This represented the highest proportion of placements of any county in Pennsylvania.

95.    Between 2003 and 2006, the Luzerne County Juvenile Court handled 5,160 delinquency dispositions.

96.    Twenty-two percent of those dispositions resulted in placement of juveniles outside the home; a figure that was approximately double the state average for that time period.

97.    Between 2003 and 2006, approximately 5% of all juvenile defendants statewide waived their right to counsel.

98.    However, in Luzerne County during the same period, approximately 18% to 19% of juveniles "waived" their right to counsel.

99.    Further, according to statistical information published by the AOPC, children who waived their right to counsel in Luzerne County were far more likely to be placed in detention facilities than children making the same waiver elsewhere in the state.

100.    In 2003, 7% of children in Pennsylvania who waived their right to counsel were sentenced to a detention facility.

101.    In contrast, in Luzerne County approximately 59% of children who waived their right to counsel were placed in detention.

### Raul And Mr. and Mrs. Clark Are Brought Into The Corrupt Justice System Created By The Defendants

102.    Plaintiffs repeat the allegations of the foregoing paragraphs and repeat same as if set forth at length herein.

103.    In October 2002, Raul was a 14 year old high school freshman living in Luzerne County.

104.    He had never had any significant contact with the law and he lived at home with his parents.

105.    Both Mr. and Mrs. Clark are deaf and they communicate primarily by sign language.

106.    They relied substantially upon Raul for assistance in communicating with the outside world with respect to their day-to-day affairs.

107.    Raul helped around the house, spoke to creditors of Mr. and Mrs. Clark and helped his father order parts for an auto repair business.

108.    Raul attended Coughlin High School in October 2002.

109.    In or about October 2002, the local police arrested Raul, along with other children, and charged him with two misdemeanors offenses: (1) violation of the town's 10:00 p.m. curfew; and (2) possession of drug paraphernalia (a small pipe).

110.    The police did not find any drugs or drug residue in the pipe.

111.    Raul was told to appear before Defendant Ciavarella on or about November 4, 2002.

112.    Raul and his parents attended the November 4, 2002 proceeding before Defendant Ciavarella.

113.    Also present at the hearing was a public defender who had been appointed by the Court to represent Raul.

114.    The public defender had not contacted Raul prior to the November 4, 2002 hearing.

115.  At the outset of the November 4, 2002 hearing, Defendant Ciavarella read the so-called "charges."

116.  Defendant Ciavarella stated, falsely, that Raul had been charged with being intoxicated and possession of marijuana.

117.  Defendant Ciavarella never explained to Raul, who was only 14 years old, what was about to happen.

118.  Defendant Ciavarella did not provide Raul with the opportunity to enter a plea to the charges against him.

119.  Instead, Defendant Ciavarella merely asked Raul whether he "did it."

120.  Defendant Ciavarella never explained to Raul that he had a right to a trial or the consequences of a waiver of the right to trial.

121.  Defendant Ciavarella disposed of Raul's case by finding him delinquent.

122.  Subsequent to this disposition, Defendant Ciavarella instructed Raul to look out the courtroom window.

123.  When Raul did so, Defendant Ciavarella asked Raul how many birds he saw on the window ledge.  Raul said "six."

124.  Defendant Ciavarella then sentenced Raul to six months of custodial detention.

125.  Incredibly, the number of months of the sentence was based on the number of birds on the Courtroom windowsill.

126.  Defendant Ciavarella's cavalier conduct demonstrates that what took place before him was nothing more than theater for the amusement of Defendant Ciavarella.

127. That Defendant Ciavarella would sentence Raul to custodial detention was a foregone conclusion before Raul and his family ever stepped foot in the courtroom.

128. Courtroom deputies placed shackles on Raul and led him out of the courtroom.

129. Raul was not even afforded the opportunity to say goodbye to his parents before being led off.

130. Raul was sent to the Luzerne County Detention Center and was placed in an approximately 6 x 6 foot cell.

131. He was kept at Luzerne County Detention Center for a few weeks during which time he received no education from the State.

132. When Defendant Conahan ordered the Luzerne County facility closed, Raul was hauled back before Defendant Ciavarella.

133. No counsel was provided to Raul for this event.

134. Raul was summarily transferred to the Lackawanna County Detention Facility.

135. No reason for the transfer was ever provided to Raul.

136. Raul was confined to his cell at the Lackawanna County Detention Facility for 23 hours per day. He was only allowed out of his cell for one hour per day.

137. After spending one week at the Lackawanna County Detention Facility, Raul was brought back before Defendant Ciavarella on or about December 16, 2002.

138. Raul's parents were not told that Raul would be appearing in court before Defendant Ciavarella. They were not present for Raul's December 2002 proceeding.

139.    In violation of his constitutional rights, Raul was not represented by counsel at the December 2002 proceeding before Defendant Ciavarella.

140.    Defendant Ciavarella summarily stated at the December 2002 proceeding that Raul was to be transferred to the Adelphoi Treatment Facility in Allegheny County.

141.    This facility was more than a hundred miles from Raul's home and his parents.

142.    Raul was led out of Defendant Ciavarella's courtroom in shackles.

143.    The next day, Raul was transported nearly four hours away to the Adelphoi Treatment Facility.

144.    Raul was strip searched and forced to take a lice bath upon his arrival at Adelphoi.

145.    He remained incarcerated, far from home, for six weeks.

146.    His parents, unable to speak by telephone and too far away to regularly visit, were kept from Raul.

147.    In or around February 2003, Raul was again shipped back across the State to attend a proceeding before Defendant Ciavarella.

148.    In violation of his constitutional rights, Raul was not represented by counsel at this proceeding.

149.    A counselor from Adelphoi did attend Raul's February 2003 proceeding.

150.    She told Defendant Ciavarella that Raul had been a model detainee.

151.    Nevertheless, Defendant Ciavarella, without explanation, told Raul at the February 2003 proceeding that he was sending him to Clearbrook Lodge.

152.    The counselor told Raul that he had been "screwed."

153. Raul was shackled and transported to Clearbrook Lodge.

154. Raul served three months at Clearbrook Lodge.

155. In May 2003, Raul was again brought before Defendant Ciavarella.

156. In violation of Raul's constitutional rights, Defendant Ciavarella told Raul at this proceeding that he did not require an attorney.

157. Defendant Ciavarella released Raul from custodial detention and placed him on probation.

158. Thereafter, Raul missed a single 8:00 p.m. curfew.

159. As a result of this single missed curfew, Defendant Ciavarella summarily signed an order immediately remanding Raul to PACC—the facility to which he had been paid millions to place children.

160. Raul served three days at PACC—the entity owned by Messrs. Powell and Zappala.

161. In early 2004, Raul's probation officer, Officer Bliche, took a urine sample from Raul at his school.

162. This urine sample was one of dozens that the probation officer took at the school that day.

163. Shortly thereafter, Raul was advised that he had failed the drug test and that PCP and methamphetamines had been found in his urine.

164. Raul had not ingested the drugs that were allegedly found in his urine.

165. Defendant Ciavarella again summarily ordered Raul to PACC—the entity owned by Messrs. Powell and Zappala.

166.    Upon information and belief, the Department switched urine samples and/or falsely reported the test findings in order to incarcerate Raul and to obtain more money from the Detention Facility Defendants and Raul's parents.

167.    Between November 2002 and 2005, Raul's parents paid $3,837.50 to Luzerne County to pay for Raul's incarceration and probation.

168.    Luzerne County even garnished Mrs. Clark's wages and unemployment benefits.

169.    On or about October 27, 2009, the Luzerne County Court of Common Pleas entered an Order expunging Raul's juvenile record.

170.    Raul has suffered great emotional distress and financial harm as a result of the actions of the Defendants.

**The Detention Facility Defendants Make Millions of Dollars in Illicit Payments to Defendants Conahan and Ciavarella**

171.    Plaintiffs repeat the allegations of the foregoing paragraphs and repeat same as if set forth at length herein.

172.    Between 2000 and 2007, defendants Messrs. Powell, Mericle, Zappala, PACC and WPACC paid Defendants Conahan and Ciavarella at least $2.6 million.

173.    Defendants Conahan and Ciavarella have admitted to receipt of these funds in a guilty plea entered on February 12, 2009.

174.    Defendants Conahan and Ciavarella engaged in various artifices to hide their receipt of millions of dollars in payments, including having money received by their spouses and Beverage and Pinnacle.

175.    Between approximately June of 2000 and January 1, 2007, Defendants Conahan and Ciavarella abused their positions and violated the fiduciary duty they owed to Raul and the citizens of the Commonwealth of Pennsylvania and to the Judiciary of the Commonwealth of Pennsylvania by secretly deriving more than $2,600,000 in income, in addition to the compensation to which they were lawfully entitled, in exchange for official actions and anticipated official actions.

176.    The actions from which they derived improper income included, but were not limited to: entering into agreements guaranteeing placement of juvenile offenders with PACC; taking official action to remove funding from the Luzerne County budget for the Luzerne County juvenile detention facility; facilitating the construction of juvenile detention facilities and an expansion to one of those facilities by PACC and WPACC; directing that juvenile offenders be lodged at juvenile detention facilities operated by PACC and WPACC; summarily granting motions to seal the record and for injunctive relief in a civil case related to PACC; and, through their actions, assisting PACC and WPACC to secure agreements with Luzerne County worth tens of millions of dollars for the placement of juvenile offenders, including an agreement in late 2004 worth approximately $58,000,000.

177.    The Defendants together employed a number of schemes in an attempt to hide the transfer of the income forwarded to Defendants Conahan and Ciavarella, including, but not limited to, causing income to pass through intermediaries including but not limited to some of the Defendants herein, and causing false records to be created.

178.   The United States Attorney's Office for the Middle District of Pennsylvania filed on January 26, 2009, a Bill of Information alleging two counts of fraud against Mark A. Ciavarella, Jr., then President Judge in Luzerne County, and former President Judge Michael T. Conahan, also of Luzerne County, *United States of America v. Michael T. Conahan and Mark A. Ciavarella, Jr.*, No. 3:09-LR-028, United States District Court for the Middle District of Pennsylvania.

179.   The Bill of Information, to which both Judges agreed to plead guilty, described, *inter alia*, a conspiracy among the judges and other unnamed parties believed and averred to be Defendants and others as yet unknown to conceal $2.6 million in payments to the judges from Defendants and others as yet unknown in exchange for referring children who appeared before Defendant Ciavarella to these juvenile correctional facilities.

180.   The Detention Facility Defendants participated in the payment of approximately $2.6 million to Defendants Conahan and Ciavarella and to disproportionately sentence juveniles in Luzerne County to detention prior to delinquency determinations and after delinquency determinations.

181.   In or before January of 2003, Defendants Conahan and Ciavarella received a payment in the amount of $997,600 in connection with the roles they played as Judges in furthering the construction of the PACC juvenile detention facility.

182.   In order to conceal the $997,600 payment to Defendants Conahan and Ciavarella, Messrs. Powell and Mericle signed a written "Registration and Commission Agreement" prepared by Mr. Mericle and backdated to February 19, 2002, which

purported to be an agreement for Mr. Mericle to pay a broker's fee of $997,600 to Mr. Powell.

183.  In fact, however, a large portion of the money was intended to be paid to Defendants Conahan and Ciavarella.

184.  Defendants Conahan and Ciavarella engaged in a series of financial transactions designed to conceal the $997,600 payment made to them.

185.  On January 21, 2003, $610,000 was wire-transferred by Mr. Mericle to an attorney trust account of an attorney, namely John Doe Defendant No. 1.

186.  The remaining $387,600 was wire-transferred by Mr. Mericle to a bank account under the control of Mr. Powell.

187.  Thereafter, on January 28, 2003, the $610,000 in the attorney trust account of John Doe Defendant No. 1 was wire-transferred to a bank account of Beverage, a business entity controlled by Defendant Conahan.

188.  In a series of financial transactions thereafter, a portion of the $610,000 payment was passed from Defendant Conahan to Defendant Ciavarella.

189.  For example, on or about January 28, 2003, Defendant Conahan directed that $330,000 of the $610,000 be wire-transferred to a bank account controlled by Defendant Ciavarella.

190.  On or about April 30, 2003, Defendant Conahan directed that an additional $75,000 of the $610,000 be wire-transferred to a bank account controlled by Defendant Ciavarella.

191.  On or about July 15, 2003, Defendant Conahan directed that an additional $75,000 of the $610,000 be wire-transferred to a bank account under the control of Defendant Ciavarella.

192.  On or about August 13, 2003, Defendant Conahan directed that an additional $25,000 of the $610,000 be wire-transferred to a bank account under the control of a third party.

193.  On or about August 20, 2003, Defendant Conahan directed that an additional $105,000 of the $610,000 be transferred to a bank account under the control of Defendant Conahan.

194.  To conceal the payments to Defendants Conahan and Ciavarella, Defendant Conahan directed that false entries be made in the books and records of Beverage.

195.  To further conceal the $997,600 payment made to Defendants Conahan and Ciavarella, a portion of the $387,600 wire transfer made by Mr. Mericle to Mr. Powell on January 28, 2003, was paid to Defendants Conahan and Ciavarella in a series of financial transactions which occurred over time.

196.  One of those transactions occurred on or about August 29, 2003, when a check in the amount of $326,000, drawn on a bank account under the control of Mr. Powell, was deposited into a bank account maintained in the name of another person but under the control of Defendant Conahan.

197.  In July of 2005, upon completion of construction, a $1,000,000 payment was made by Mr. Powell to Defendants Conahan and Ciavarella.  To conceal the

payment, it was made to Pinnacle, a business entity owned by other persons but controlled by Defendants Conahan and Ciavarella.

198.    In order to conceal the payment to Defendants Conahan and Ciavarella, Messrs. Powell and Mericle signed a written "Registration and Commission Agreement" prepared by Mr. Mericle, which purported to be an agreement for Mr. Mericle to pay a broker's fee of $1,000,000 to Mr. Powell.

199.    In fact, however, the money was wire-transferred by Mr. Mericle to a bank account of Pinnacle, a business entity owned by other persons but controlled by Defendants Conahan and Ciavarella.

200.    Upon information and belief, Mr. Powell and his partner, Mr. Zappala, doing business as PACC, constructed an addition to the juvenile detention facility in Luzerne County.

201.    Defendant Mericle Construction, the same contractor who built the facility, was employed to complete the expansion project and, in February of 2006, upon completion of construction of the addition, a $150,000 payment was made to Defendants Conahan and Ciavarella.

202.    To conceal the payment, it was made to Pinnacle, a business entity owned by other persons but controlled by Defendants Conahan and Ciavarella.

203.    In order to conceal the payment to Defendants Conahan and Ciavarella, Messrs. Powell and Mericle signed a written "Registration and Commission Agreement" prepared by Mr. Mericle, which purported to be an agreement for Mr. Mericle to pay a broker's fee of $150,000 to Mr. Powell.

204.   In fact, however, the money was wire-transferred by Mr. Mericle to a bank account of Pinnacle, a business entity owned by other persons but controlled by Defendants Conahan and Ciavarella.

205.   Some of the payments were made by checks drawn on one or more bank accounts under the control of Mr. Powell and were made payable to Pinnacle.

206.   The payments included, but were not necessarily limited to, the following:

$18,000 paid on or about January 13, 2004;
$52,000 paid on or about January 13, 2004;
$78,000 paid on or about February 15, 2004;
$75,000 paid on or about February 15, 2004;
$47,000 paid on or about February 15, 2004;
$75,000 paid on or about April 30, 2004; and
$25,000 paid on or about April 30, 2004.

207.   To conceal the payments to Defendants Conahan and Ciavarella, Mr. Powell made false notations on the checks and Defendants Conahan and Ciavarella directed that false entries be made in the books and records of Pinnacle.

208.   In addition to payments by check, some of the payments were made by wire transfers made from one or more bank accounts under the control of Mr. Powell and were transferred to an account under the control of Pinnacle.

209.   The payments included, but were not necessarily limited to, the following: $120,000 transferred on July 12, 2004; and $100,000 transferred on September 23, 2004.

210.   On or about each date listed below, in the Middle District of Pennsylvania and elsewhere, Defendants Conahan and Ciavarella, aided and abetted by each other, for the purpose of executing the above-described material scheme and artifice to defraud and deprive the citizens of Luzerne County and of the Commonwealth of Pennsylvania

of their right to the honest services of Defendants Conahan and Ciavarella, transmitted and caused to be transmitted by means of wire communication in interstate commerce, the following writings, signals, and sounds in violation of Title 18, United States Code, §§ 2, 1341, and 1346:

| Date | Wire Transmission |
|------|-------------------|
| July 12, 2004 | Electronic funds transfer of $120,000 transferred from an account of Vision Holdings, Inc., to an account of Pinnacle Group of Jupiter, LLC. |
| September 23, 2004 | Electronic funds transfer of $100,000 transferred from an account of Vision Holdings, Inc., to an account of Pinnacle Group of Jupiter, LLC. |
| July 15, 2005 | Electronic funds transfer of $1,000,000 transferred from an account of Mericle Construction, Inc., to an account of Pinnacle Group of Jupiter, LLC. |
| February 3, 2006 | Electronic funds transfer of $ 150,000 transferred from an account of Mericle Construction, Inc. to an account of Pinnacle Group of Jupiter, LLC. |

211.   In furtherance of the conspiracy, and to affect the objects thereof, the following overt acts, among others, were committed by Defendants in the Middle District of Pennsylvania and elsewhere:

A.   On or about January 21, 2003, Defendants caused Mr. Mericle and/or Mericle Construction to wire-transfer $610,000 to the bank account of an attorney;

B.   On or about January 28, 2003, Defendants caused John Doe attorney in Schuylkill County, Pennsylvania to wire-transfer $610,000 to an account of Beverage;

C.   On or about January 28, 2003, Defendant Conahan caused $330,000 to be wire-transferred from a bank account of Beverage to a bank account under the control of Defendant Ciavarella;

D.   On or about April 30, 2003, Defendant Conahan caused $75,000 to be wire-transferred from a bank account of Beverage to a bank account under the control of Defendant Ciavarella;

E.    On or about July 15, 2003, Defendant Conahan caused $75,000 to be wire-transferred from a bank account of Beverage to a bank account under the control of Defendant Ciavarella;

F.    On or about August 13, 2003, Defendant Conahan caused $25,000 to be wire-transferred from a bank account of Beverage to a bank account under the control of a third party;

G.    On or about August 13, 2003, Defendant Conahan caused $25,000 to be wire-transferred from a bank account of Beverage to a bank account under the control of a third party;

H.    On or about August 20, 2003, Defendant Conahan caused $105,000 to be wire-transferred from a bank account of Beverage to a bank account under the control of Defendant Conahan;

I.    To conceal the payments to Defendants Conahan and Ciavarella, Defendant Conahan directed that false entries be made in the books and records of Beverage between on or about January 1, 2002, and on or about April 15, 2007;

J.    On or about January 20, 2004, Defendants caused $18,000 to be deposited in a bank account of Pinnacle which was falsely characterized as "Rent Prepay";

K.    On or about January 20, 2004, Defendants caused $52,000.00 to be deposited in a bank account of Pinnacle which was falsely characterized as "Rent Marine Prepay";

L.    On or about February 24, 2004, Defendants caused $47,000 to be deposited into a bank account of Pinnacle which was falsely characterized as "Slip Rental Fees";

M.    On or about February 24, 2004, Defendants caused $78,000 to be deposited into a bank account of Pinnacle which was falsely characterized as "Reserving Lease";

N.    On or about February 24, 2004, Defendants caused $75,000 to be deposited into a bank account of Pinnacle which was falsely characterized as "Rental Feb, Mar, Apr";

O.    On or about May 3, 2004, Defendants caused $75,000 to be deposited into a bank account of Pinnacle which was falsely characterized as "Lease Expenses April May June";

P.    On or about May 3, 2004, Defendants caused $25,000 to be deposited into a bank account of Pinnacle which was falsely characterized as "Dock Expenses Related April May June";

Q.    On or about July 12, 2004, Defendants caused $120,000 to be wire-transferred to a bank account of Pinnacle;

R.    On or about September 23, 2004, Defendants caused $100,000 to be wire-transferred to a bank account of Pinnacle;

S.    On or about July 15, 2005, Defendants caused $1,000,000 to be wire-transferred to a bank account of Pinnacle;

T.    On or about February 3, 2006, Defendants caused $150,000 to be wire-transferred to a bank account of Pinnacle;

U.    Between on or about January 1, 2002, and on or about April 15, 2007, Defendants Conahan and Ciavarella provided information to their respective tax return preparers that contained material omissions and misclassifications;

V.    Between on or about April 15, 2004, and on or about May 21, 2007, Defendants Conahan and Ciavarella caused to be prepared, subscribed to, and filed with the Internal Revenue Service, materially false tax returns, namely, IRS forms 1040 and 1040X relating to tax years 2003 through 2006.

212.    Defendants used numerous mail and interstate wire communications to create, execute, manage and further their fraudulent scheme, as described above.

213.    Defendants' use of the mails and wires to perpetrate their fraud involved transfers of funds as described above, communication with plaintiffs via email, telephone, sent through the U.S. mails and over the internet including communications concerning the fraudulent scheme to deprive juvenile offenders of their basic civil rights.

214.    Defendants, through various overt acts described above, entered into an agreement between themselves to illegally deprive juvenile defendants of their basic civil rights for their own personal enrichment and profit.

215.    Defendants implemented said agreement and conspiracy, in concert of action, and each aiding and abetting the other, such that defendants are jointly and severally liable for the resulting damages to plaintiffs.

216.    On January 26, 2009, the United States Attorney's Office for the Middle District of Pennsylvania filed a Bill of Information alleging two counts of fraud against Defendants Ciavarella and Conahan.

217.    The Bill of Information describes, *inter alia*, a conspiracy among Defendants Ciavarella and Conahan and at least two other unnamed parties, believed to be Messrs. Powell and Mericle, to conceal $20 million in payments to Defendants Ciavarella and Conahan from unnamed parties, believed to be Messrs. Powell and Mericle, in exchange for referring children who appeared before Defendant Ciavarella to juvenile detention facilities.

218.    On or about February 12, 2009, Defendants Ciavarella and Conahan agreed to plead guilty to these two counts.

219.    On February 11, 2009, the Pennsylvania Supreme Court assumed plenary jurisdiction and granted an application filed by the Juvenile Law Center for the exercise of King's Bench Power or extraordinary jurisdiction arising out of Defendant Ciavarella's denial of the constitutional rights of juveniles.

220.    Pursuant to that Order and based upon the recently entered Bills of Information and guilty pleas of Defendants Ciavarella and Conahan, the Pennsylvania Supreme Court appointed Special Master, the Honorable Arthur E. Grim, Senior Judge Berks County Court of Common Pleas, to act on its behalf.

221.    The Court authorized Judge Grim to review all juvenile court adjudications and dispositions affected by the recently revealed criminal charges and to make recommendations to the Court concerning appropriate remedial relief including, among other things, the possible expungement of criminal records.

222. Pursuant to an Order dated October 27, 2009, Judge Grim ordered that Raul's juvenile record be expunged.

223. On or about February 21, 2009, the United States Attorney for the Middle District of Pennsylvania charged Ms. Brulo with a single count of obstruction of justice for allegedly altering official juvenile criminal records.

224. Ms. Brulo has pled guilty to this single count.

## CAUSES OF ACTION

### COUNT I

**(ACTION UNDER 42 U.S.C. § 1983 FOR VIOLATION OF PLAINTIFF'S CONSTITUTIONAL RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS AGAINST DEFENDANTS CONAHAN, CIAVARELLA, THE LUZERNE COUNTY PROBATION DEPARTMENT, AND MS. BRULO)**

225. Plaintiffs repeat the allegations of the foregoing paragraphs and repeat same as if set forth at length herein.

226. Defendants Conahan, Ciavarella, the Department, and Ms. Brulo are persons within the meaning of 42 U.S.C. § 1983.

227. Defendants Ciavarella, Conahan, the Department, and Ms. Brulo were acting under color of state law pursuant to 42 U.S.C. § 1983.

228. Defendants Ciavarella and Conahan intentionally and maliciously deprived Raul of his constitutional rights by, prior to November 4, 2002 and continuing thereafter, establishing a system in Luzerne County where in return for illicit payments, the guilt of Raul and other juveniles who appeared before Defendant Ciavarella was pre-judged, constitutional safeguards were removed and the sentence imposed was tainted by bribery, in order to benefit the Detention Facility Defendants.

229. Specifically, Defendant Ciavarella intentionally and maliciously deprived Raul of his constitutional rights by, *inter alia*, using his administrative discretionary decision-making authority to adopt procedures for a specialty court that facilitated an increased number of juvenile offenders to be sent to the juvenile detention facilities of PACC and WPACC.

230. Additionally, Defendant Conahan intentionally and maliciously deprived Raul of his constitutional rights by, *inter alia*, signing a Placement Guaranty Agreement between PACC and the Court of Common Pleas for Luzerne County to house juvenile offenders at the PACC facility.

231. Upon information and belief, Defendants Ciavarella and Conahan also instructed members of the Department, including Ms. Brulo, to alter their recommendation to favor placement with one of the Detention Facility Defendants.

232. Upon information and belief, the Department and Ms. Brulo intentionally and maliciously deprived Raul of his constitutional rights by, *inter alia*, (1) recommending that Raul and other juveniles be detained or placed in rehabilitation facilities in order to "legitimize" the placements made by Defendants Conahan and Ciavarella; (2) altering probation reports and drug tests in order to have Raul and other children on probation placed in further detention; and (3) concocting bogus probation violations to ensure that Raul and other children were placed in and/or further detained with one of the Detention Facility Defendants.

233. Raul was deprived of his constitutional rights and, as a result, he and Mr. and Mrs. Clark have been injured by the actions of Defendants Conahan, Ciavarella, the Department and Ms. Brulo.

WHEREFORE, plaintiffs Raul Clark, Bruce Clark and Iraida Clark demand judgment against Defendants Conahan, Ciavarella, the Department and Ms. Brulo, jointly and severally, for:

     a.     Compensatory damages;

     b.     Punitive damages;

     c.     Interest;

     d.     Costs of suit;

     e.     Attorney's fees; and

     f.     Such other relief as the Court deems just and proper.

### COUNT II

### (ACTION UNDER 42 U.S.C. § 1983 FOR VIOLATION OF PLAINTIFF'S CONSTITUTIONAL RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS AGAINST THE DEPARTMENT)

234.   Plaintiffs repeat the allegations of the foregoing paragraphs and repeat same as if set forth at length herein.

235.   The Department is a person within the meaning of 42 U.S.C. § 1983.

236.   At all relevant times, the Department acted under color of state law pursuant to 42 U.S.C. § 1983.

237.   Defendant, the Department, willfully, and/or with deliberate indifference to the conditional rights of Raul and other juveniles in delinquency proceedings in Luzerne County adopted policies, procedures and customs that deprived juveniles of their rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

238.   The unconstitutional policies, procedures and customs included the participation in the scheme by Defendants Conahan and Ciavarella to place Raul and

other children in detention facilities to deprive them of their right to due process, a fair trial and to counsel, and to inflict cruel and unusual punishments and excessive fines upon them.

239.    Among other things, the policy, procedure and custom of the Department was to routinely recommend detention instead of probation for juveniles charged with minor offenses.

240.    The Department with deliberate indifference to the rights of juveniles also ignored evidence of systemic constitutional violations taking place in the courtroom of Defendants Conahan and Ciavarella, including the denial of a right to a fair trial, the right to counsel and the infliction of excessive punishments.

241.    The Department benefited from the constitutional deprivations by, among other things, receiving payments of expenses from parents of juveniles, like Mr. and Mrs. Clark.

242.    The actions of the Department as set forth above deprived Raul and Mr. and Mrs. Clark of their constitutional rights.

243.    Raul has suffered emotional distress and injury as a result of the action of the Department.

244.    Mr. and Mrs. Clark have been injured, among other things, in the amount of the payments that they made to the Department for Raul's placement.

WHEREFORE, plaintiffs Raul Clark, Bruce Clark and Iraida Clark demand judgment against the Department for:

a.    Compensatory damages;

b.    Punitive damages;

c.    Interest;

d.    Costs of suit;

e.    Attorney's fees; and

f.    Such other relief as the Court deems just and proper.

### COUNT III

**(ACTION UNDER 42 U.S.C. § 1983 FOR VIOLATION OF PLAINTIFF'S CONSTITUTIONAL RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS AGAINST ROBERT J. POWELL, PA CHILD CARE, LLC, WESTERN PA CHILD CARE LLC, ROBERT K. MERICLE, MERICLE CONSTRUCTION , INC., GREGORY A. ZAPPALA, PINNACLE GROUP OF JUPITER, LLC, BARBARA CONAHAN, CINDY CIAVARELLA, BEVERAGE MARKETING OF PA, INC., VISION HOLDINGS, LLC, MID-ATLANTIC YOUTH SERVICES CORP. AND POWELL LAW GROUP, P.C.)**

245.    Plaintiffs repeat the allegations of the foregoing paragraphs and repeat same as if set forth at length herein.

246.    All above-named defendants are persons within the meaning of 42 U.S.C. § 1983.

247.    At all relevant times, the above-named defendants acted under color of state law under 42 U.S.C. § 1983.

248.    All the above-named Defendants, while acting under color of state law, unlawfully and/or intentionally, unreasonably, willfully, maliciously and/or with deliberate and/or reckless indifference to Raul violated 42 U.S.C. § 1983 and deprived plaintiff Raul of rights guaranteed to him by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, similar provisions of the Pennsylvania Constitution, federal and state law and local law in that these Defendants without lawful basis conspired with Defendants Conahan and Ciavarella to:

a.    Participate in bribery schemes as alleged above;

b.    Create a juvenile justice system where Raul and other juveniles were routinely placed into detention facilities for minor offenses regardless of their guilt or innocence;

c.    Create a system where Raul and other juvenile defendants were not told of their right to trial or the consequences of waiving their right to trial;

d.    Create a system where Raul and other juvenile defendants were not offered a meaningful right to counsel either because they were made to waive their right to counsel or because they were purposely provided with ineffective counsel; and

e.    Interfere with the juvenile probation department's ability to recommend probation rather than detention.

249.    Raul and Mr. and Mrs. Clark have suffered emotional distress and financial injury as a result of the actions of Defendants.

WHEREFORE, plaintiffs Raul Clark, Bruce Clark and Iraida Clark demand judgment against Robert J. Powell, PA Child Care, LLC, Western PA Child Care LLC, Robert K. Mericle, Mericle Construction, Inc., Gregory A. Zappala, Pinnacle Group of Jupiter, LLC, Barbara Conahan, Cindy Ciavarella, Beverage Marketing of PA, Inc., Vision Holdings, LLC, Mid-Atlantic Youth Services Corp., Powell Law Group, P.C. and John Doe Defendants 1 through 10, jointly and severally, for:

a.    Compensatory damages;

b.    Punitive damages;

c.    Interest;

d.    Costs of suit;

e.    Attorney's fees; and

f.    Such other relief as the Court deems just and proper.

## COUNT IV

**(VIOLATION OF 18 U.S.C. § 1962 AGAINST MICHAEL T. CONAHAN, MARK A. CIAVARELLA, LUZERNE COUNTY PROBATION DEPARTMENT, SANDRA BRULO, ROBERT J. POWELL, PA CHILD CARE, LLC, WESTERN PA CHILD CARE LLC, ROBERT K. MERICLE, MERICLE CONSTRUCTION , INC., GREGORY A. ZAPPALA, PINNACLE GROUP OF JUPITER, LLC, BARBARA CONAHAN, CINDY CIAVARELLA, BEVERAGE MARKETING OF PA, INC., VISION HOLDINGS, LLC, MID-ATLANTIC YOUTH SERVICES CORP. AND POWELL LAW GROUP, P.C.)**

250.    Plaintiffs repeat the allegations of the foregoing paragraphs and repeat same as if set forth at length herein.

251.    Defendants Conahan, Ciavarella, Mr. Powell, PACC, WPACC, Mr. Mericle, Mericle Construction, Mr. Zappala, Pinnacle, Mrs. Conahan, Mrs. Ciavarella, Beverage, Vision, MAYS and Powell Law Group (the "RICO Defendants") are persons within the meaning of 18 U.S.C. § 1961(3).

252.    The RICO Defendants formed an enterprise within the meaning of 18 U.S.C. § 1961(4).

253.    The RICO Defendants engaged in a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

254.    Each of the Defendants' fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(4). Collectively these violations are a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

255.   Defendants' criminal acts of racketeering had the same pattern and similar purposes.  Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims including Raul Clark and Mr. and Mrs. Clark.

256.   Defendants' fraudulent activities were part of their ongoing business and constitute a continuing threat to the property of Mr. and Mrs. Clark.

257.   Defendants were an association of individuals, partnerships, and corporations joined in purpose of conspiring to commit honest services fraud.

258.   The association employed a number of schemes in an attempt to hide the income they received including, but not limited to, causing income to pass through intermediaries and causing false records to be created, thereby hiding said income from the United States Internal Revenue Service.

259.   Defendants were organized in a consensual decision-making manner in which to hide and distribute the monies among the conspirators.

260.   Defendants engaged in said association and actions between 2002 and 2009 in violation of 18 U.S.C. §1961.

261.   As a result of Defendants' violations of RICO, Plaintiffs had wages garnished and were otherwise forced to pay for the wrongful incarceration of the juvenile offenders.

262.   By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and severally liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the costs of this suit including reasonable attorneys' fees.

WHEREFORE, Plaintiffs Raul Clark and Mr. and Mrs. Clark demand judgment against Defendants Conahan, Ciavarella, Mr. Powell, PACC, WPACC, Mr. Mericle, Mericle Construction, Mr. Zappala, Mrs. Conahan, Mrs. Ciavarella, MAYS and Powell Law, jointly, and/or jointly and severally for compensatory and treble damages, together with interest, costs of suit, attorneys' fees and such other relief as the court deems just and proper.

## COUNT V

### (FOR CONSPIRACY TO VIOLATE RICO)

263.    Plaintiffs repeat the allegations of the foregoing paragraphs and repeat same as if set forth at length herein.

264.    Defendants conspired with one another to commit the violations of 18 U.S.C. § 1962 alleged herein.

WHEREFORE, Plaintiffs Raul Clark and Mr. and Mrs. Clark demand judgment against Defendants Conahan, Ciavarella, Mr. Powell, Mr. Mericle, Mericle Construction, PACC, WPACC, Mr. Zappala, Pinnacle, Mrs. Conahan, Mrs. Ciavarella, Beverage, MAYS, Powell Law and John Doe Defendants 1-10, individually, jointly, and/or jointly and severally for compensatory and treble damages together with interest, costs of suit, attorneys' fees and such other relief as the court deems just and proper.

## COUNT VI

### (FALSE IMPRISONMENT AGAINST DEFENDANTS CIAVARELLA, CONAHAN, THE DEPARTMENT, MS. BRULO, MR. POWELL, PACC, MR. MERICLE, MERICLE CONSTRUCTION, MR. ZAPPALA, PINNACLE, MRS. CONAHAN, MRS. CIAVARELLA, BEVERAGE, VISION, MAYS, POWELL LAW, and JOHN DOE NOS. 1 through 10)

265.    Plaintiffs repeat the allegations of the foregoing paragraphs and repeat same as if set forth at length herein.

266.    Defendants Ciavarella, Conahan, the Department, Ms. Brulo, Mr. Powell, PACC, WPACC, Mr. Mericle, Mericle Construction, Mr. Zappala, Pinnacle, Beverage, Mrs. Conahan, Mrs. Ciavarella, Vision, MAYS, Powell Law, and John Does Nos. 1 through 10 and John Doe Entities Nos. 1 through 10 conspired to falsely imprison Raul.

267.    Raul and Mr. and Mrs. Clark have suffered injury as a result of Raul's false imprisonment.

WHEREFORE, Plaintiffs Raul Clark, Bruce Clark and Iraida Clark demand judgment against the above-named defendants, jointly and severally, for:

a.    Compensatory damages;

b.    Punitive damages;

c.    Interest;

d.    Costs of suit;

e.    Attorney's fees; and

f.    Such other relief as the Court deems just and proper.

## COUNT VIII

### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS)

268. Plaintiffs repeat the allegations of the foregoing paragraphs and repeat same as if set forth at length herein.

269. Defendants' actions were designed to and did intentionally inflict emotional distress on Plaintiffs.

WHEREFORE, Plaintiffs Raul Clark, Bruce Clark and Iraida Clark demand judgment against the above-named defendants, jointly and severally, for:

a.    Compensatory damages;

b.    Punitive damages;

c.    Interest;

d.    Costs of suit;

e.    Attorney's fees; and

f.    Such other relief as the Court deems just and proper.

Respectfully Submitted,

Date:  December 24, 2009

s/Bridget E. Montgomery
Bridget E. Montgomery, Esquire Pa. I.D. 56105
David J. Schertz, Esquire Pa. I.D. 81925
Eckert Seamans Cherin & Mellott, LLC
213 Market Street
8th Floor
Harrisburg, Pennsylvania 17101-2132

Michael O'Mullan, Esquire
Pending Pro Hac Vice Admittance
Riker Danzig Scherer Hyland & Perretti LLP
One Speedwell Avenue
Morristown, New Jersey, 07962
Counsel for Plaintiffs