| | |
|---|---|
| RAUL CLARK; BRUCE CLARK and IRAIDA CLARK,<br><br>  Plaintiffs,<br><br>vs.<br><br>MICHAEL T. CONAHAN; MARK A. CIAVARELLA; THE LUZERNE COUNTY JUVENILE PROBATION DEPARTMENT; SANDRA BRULO; ROBERT J. POWELL; PA CHILD CARE, LLC; WESTERN PA CHILD CARE, LLC; ROBERT K. MERICLE; MERICLE CONSTRUCTION, INC.; GREGORY ZAPPALA; PINNACLE GROUP of JUPITER, LLC; BARBARA CONAHAN; CINDY CIAVARELLA; BEVERAGE MARKETING OF PA, INC.; VISION HOLDINGS, LLC; MID ATLANTIC YOUTH SERVICES CORP.; POWELL LAW GROUP, P.C.; JOHN DOE DEFENDANTS NOS. 1-10 and JOHN DOE ENTITIES NOS. 1 through 10,<br><br>  Defendants. | UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA<br><br>Civil Action No. 3:09-CV-02535-ARC<br><br>JURY TRIAL DEMANDED<br><br>ORAL ARGUMENT REQUESTED |

### RESPONSIVE BRIEF IN OPPOSITION TO DEFENDANT MARK A. CIAVARELLA'S MOTION TO DISMISS THE COMPLAINT PURSUANT TO MIDDLE DISTRICT LOCAL RULE 7.6

Bridget E. Montgomery, Esquire
Pa. I.D. 56105
David J. Schertz, Esquire
Pa. I.D. 81925
Eckert Seamans Cherin & Mellott, LLC
213 Market Street
8th Floor
Harrisburg, Pennsylvania 17101-2132

Michael O'Mullan, Esquire
Pending Pro Hac Vice Admittance
Riker Danzig Scherer Hyland
& Perretti LLP
One Speedwell Avenue
Morristown, New Jersey, 07962
Counsel for Plaintiffs

I. **COUNTER STATEMENT OF FACTS**

   A. **Ciavarella and Others Conspire to Deprive Juveniles of Their Constitutional Rights for Personal Profit.**

Defendant Ciavarella served as a judge on the Pennsylvania Court of Common Pleas of Luzerne County. He oversaw juvenile matters between 2000 and 2007, in which capacity he acted as judge and jury for thousands of juvenile matters and exercised nearly unfettered discretion over delinquency determinations, parole determination matters and the selection of juvenile detention centers to which children would be sentenced. In addition, he served as the President Judge of Luzerne County from June 2007 through January 2009.

Ciavarella conspired with several individuals and entities to implement a scheme to profit off juveniles sent to certain detention centers, thereby reaping huge profits for him and his co-conspirators. The individuals and entities alleged to be involved in the scheme include the other defendants in this action.

Ciavarella initiated the scheme when, in approximately June 2000, he met with Robert J. Powell about Mr. Powell's desire to construct a privately-owned juvenile detention facility in Luzerne County. Mr. Powell was a local attorney who regularly practiced in Luzerne County's courts. Ciavarella introduced Mr. Powell to Robert K. Mericle, who was a friend

1

and business associate of Ciavarella, to assist with the juvenile detention facility idea. Mr. Mericle and his company, Mericle Construction, Inc., agreed to build a juvenile detention facility on land that Mr. Powell and his partner were to acquire.

In order for the facility to be successful, Ciavarella and his co-conspirators needed juveniles to fill it. But Luzerne County already operated its own juvenile detention facility which, upon information and belief, was adequate to meet the county's needs. In order to demonstrate that the Luzerne County juvenile detention facility was inadequate and to assure the success of their co-conspirators' facilities, Ciavarella and fellow judge Michael T. Conohan, needed to dramatically increase the number of juveniles who were sentenced to custodial detention instead of receiving a non-custodial alternative sentence for relatively minor offenses.

Beginning at least as early as 2002 and possibly earlier and continuing thereafter, Ciavarella and Conahan routinely sentenced juveniles to custodial detention for minor offenses. In doing so, Ciavarella and Conahan systematically stripped the juveniles of their constitutional rights by denying them due process and a fair hearing. The actions of Ciavarella and Conahan in sentencing juveniles to detention facilities for minor offenses had the effect of convincing Luzerne County to enter into contracts

with the private facilities in which Mr. Powell, Mr. Mericle, Mericle Construction, PA Child Care, LLC (PACC) and Powell Law Group, LLC, all had an interest.

On January 29, 2002, Conahan, acting as President Judge of Luzerne County, signed a Placement Guaranty Agreement between PACC and the Court of Common Pleas for Luzerne County to house juvenile offenders at the PACC facility. The agreement provided a guaranteed annual fee from Luzerne County to PACC of $1,314,000.00. As a further part of the scheme and artifice to defraud, Conahan entered into agreements guaranteeing placement of juvenile offenders with PACC, including a $58 million, 20-year lease with PACC, and took official action to remove funding from the Luzerne County budget for the Luzerne County juvenile detention facility, effectively closing a county-run youth detention center. Over the next six years, Conahan and Ciavarella steered hundreds of Luzerne County youths to PACC, including Raul. Neither Ciavarella nor Conahan disclosed their relationship with the other defendants.

Beyond adjudicating and sentencing juveniles to detention, Ciavarella facilitated the increase in juveniles to PACC through several nonjudicial acts. Ciavarella, through his administrative discretionary decision-making authority, adopted procedures for a specialty court that

3

{L0400849.1}

facilitated an increased number of juvenile offenders to be sent to the juvenile detention facilities of PACC and Western Pennsylvania Child Care Center ("WPACC"). Ciavarella also insisted that the Department recommend placement rather than probation for juveniles brought before him, even insisting that members of the County Juvenile Department alter their recommendations in favor of placement.

For their efforts, Ciavarella and Conahan received $2.6 million through a complicated series of transactions detailed in the complaint. Ciavarella and Conahan were finally brought to justice when they pled guilty on February 12, 2009 to a Bill of Information alleging two counts of fraud for their efforts to conceal payments made to them in exchange for referring children who appeared before Ciavarella to juvenile detention facilities. They have since withdrawn their guilty pleas.

### B.     Raul Clark Becomes a Victim of Defendants' Scheme

In October 2002, Raul was a 14 year old high school freshman living in Luzerne County and attending Coughlin High School. He lived at home with his parents. Both Mr. and Mrs. Clark are deaf and they communicate primarily by sign language. They relied substantially upon Raul for assistance in communicating with the outside world with respect to their day-to-day affairs. Raul helped around the house, spoke to creditors of

Mr. and Mrs. Clark and helped his father order parts for an auto repair business.

In or around October 2002, the local police arrested Raul, along with other children, and charged him with two misdemeanors offenses: (1) violation of the town's 10:00 p.m. curfew; and (2) possession of drug paraphernalia (a small pipe). The police did not find any drugs or drug residue in the pipe. Raul was told to appear before Ciavarella on or about November 4, 2002.

Raul and his parents attended the November 4, 2002 proceeding before Ciavarella. At the outset of the hearing, Ciavarella read so-called "charges." Ciavarella stated, falsely, that Raul had been charged with being intoxicated and possession of marijuana. Ciavarella never explained to Raul what was about to happen. Ciavarella did not provide Raul with the opportunity to enter a plea to the charges against him. Instead, Ciavarella merely asked Raul whether he "did it." Ciavarella never explained to Raul that he had a right to a trial or the consequences of a waiver of the right to trial. Ciavarella disposed of Raul's case by finding him delinquent.

Subsequent to this disposition, Ciavarella instructed Raul to look out the courtroom window. When Raul did so, Ciavarella asked Raul how many birds he saw on the window ledge. Raul said "six." Ciavarella

then sentenced Raul to six months of custodial detention. Incredibly, the number of months of the sentence was based on the number of birds on the courtroom windowsill. Courtroom deputies then placed shackles on Raul and led him out of the courtroom. Raul was not even afforded the opportunity to say goodbye to his parents before being led off.

During the next few months, Raul was shuttled to various detention centers around the state. Each time he was moved, Raul was brought back before Ciavarella without counsel. He first served time in the Luzerne County Detention Center, where he received no education from the state for the few weeks he was housed there. He was then transferred to Lackawanna County Detention Facility, where he was confined to his cell for 23 hours a day. Raul was then transferred to the Adelphoi Treatment Facility in Allegheny County, a facility that was more than a hundred miles from Raul's home and his parents, too far for his parents to make regular visits. Despite being a model detainee at Adelphoi, he was sent to Clearkbook Lodge in February 2003, prompting a counselor from Adelphoi, who attended the hearing before Ciavarella, to remark to Raul that he had been "screwed."

In May 2003, Raul was again brought before Ciavarella. In violation of Raul's constitutional rights, Ciavarella told Raul at this

{L0400849.1}

proceeding that he did not require an attorney. Ciavarella released Raul from custodial detention and placed him on probation. Thereafter, Raul missed a single 8:00 p.m. curfew. As a result of this single missed curfew, Ciavarella summarily signed an order immediately remanding Raul to PACC. Raul served three days at PACC.

In early 2004, Raul's probation officer, Officer Bliche, took a urine sample from Raul at his school. This urine sample was one of dozens that the probation officer took at the school that day. Shortly thereafter, Raul was advised that he had failed the drug test and that PCP and methamphetamines had been found in his urine. Raul had not ingested the drugs that were allegedly found in his urine. Ciavarella again summarily ordered Raul to PACC. Upon information and belief, the Department switched urine samples and/or falsely reported the test findings in order to incarcerate Raul and to obtain more money from Mr. and Mrs. Clark.

Both Raul and Mr. & Mrs. Clark have been damaged by Ciavarella's actions. Between November 2002 and 2005, Mr. and Mrs. Clark paid $3,837.50 to Luzerne County to pay for Raul's incarceration and probation. Luzerne County even garnished Mrs. Clark's wages and unemployment benefits. More importantly, Raul has suffered great

emotional distress and financial harm as a result of the actions of the Defendants.

On or about October 27, 2009, the Luzerne County Court of Common Pleas entered an Order expunging Raul's juvenile record. Plaintiffs thereafter filed a complaint in the Middle District of Pennsylvania alleging violations of plaintiffs' constitutional rights pursuant to 42 U.S.C. § 1983, civil RICO claims pursuant to 18 U.S.C. § 1962, and common law claims for false imprisonment and intentional infliction of emotional distress. Ciavarella now moves to dismiss the complaint against him on the grounds of absolute judicial immunity.

## II. COUNTER STATEMENT OF QUESTION PRESENTED

Should Defendant Ciavarella be denied judicial immunity for the acts alleged in the Complaint?

Suggested Answer: Affirmative.

## III. LEGAL ARGUMENT

### A. Standard Of Review.

Rule 12(b)(6) permits a court to dismiss a complaint for "failure of the pleading to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A court will not dismiss an action so long as the pleading contains "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d

8

Cir. 2008). When considering the motion, the court is "required to accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997). "The inquiry is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims." In re Rockefeller Ctr. Props., Inc. Sec. Litig., 311 F.3d 198, 215 (3d Cir. 2002).

### B.  Ciavarella is Not Entitled to Judicial Immunity For The Acts Alleged in the Complaint.

Ciavarella's assertion that all claims against him should be dismissed on the basis of judicial immunity is incorrect. Ciavarella argues that plaintiffs "have failed to allege facts that they were injured by Ciavarella when he was acting outside the scope of his judicial function or acting in the absence of jurisdiction," thereby entitling him to judicial immunity. (Def. Br. 8.) However, this Court has already found that Ciavarella allegedly engaged in nonjudicial conduct that is not immune from suit.

While judges are generally immune from suits for monetary damages, not all conduct by a judge is subject to immunity. See Mireles v. Waco, 502 U.S. 9, 9 (1991). The Supreme Court has articulated two exceptions which will allow judicial immunity to be overcome. "First, a judge is not immune from liability for

nonjudicial actions, i.e., actions not taken in the judge's judicial capacity. " Id. at 11 (citing Forrest v. White, 484 U.S. 219, 227-29 (1988); Stump v. Sparkman, 435 U.S. 349, 360 (1978)). "Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." Id. at 12 (citing Stump, 435 U.S. at 356-57; Bradley v. Fisher, 13 Wall 335, 351 (1872)). The burden of proving judicial immunity applies is on the party asserting the immunity. Burns v. Reed, 500 U.S. 478, 486 (1991).

Courts have developed a two-part test for determining if an act by a judge is a "judicial" act. First, the court considers the "the nature of the act itself, i.e., whether it is a function normally performed by a judge." Stump, 435 U.S. at 362. Second, the court considers "the expectations of the parties, i.e., whether they dealt with the judge in his judicial capacity." Id. Not all acts that a judge performs are judicial acts. The court must examine the "nature of the function performed, not the identity of the actor who performed it," to determine if judicial immunity applies to a particular act. Forrest, 484 U.S. at 229. For example, in Forrest v. White, the Court held that a judge's decision to demote and discharge a probation officer was not entitled to absolute immunity. Id. at 230. The Court reasoned that the act of discharging an employee was not a judicial or adjudicative decision even though the decision was necessary for providing a judicial system. Id. at 229. The Court noted that "[s]uch decisions, like personnel decisions made by judges, are

10

often crucial to the efficient operation of public institutions (some of which are at least as important as the courts), yet no one suggests that they give rise to absolute immunity from liability in damages under § 1983." Id. In Wallace v. Powell, No. 09-286, 2009 U.S. Dist. LEXIS 109163 (M.D. Pa. Nov. 20, 2009), this Court noted that "[o]ther actions such as sending a fax, or hiring and firing subordinates, have been found to be administrative, rather than judicial, acts." Id. at *39. Thus, the Court must examine each fact alleged to determine if it is a judicial act.

This Court has already ruled that certain acts by Ciavarella in furtherance of the scheme were nonjudicial acts not shielded from immunity. In Wallace v. Powell, Ciavarella moved to dismiss the complaints in that action on the ground of absolute judicial immunity. Like this case, plaintiffs in Wallace have alleged a conspiracy whereby "Conahan and Ciavarella used their influence as judicial officers to select PACC and WPACC as detention facilities, and that they intentionally filled those facilities with juveniles to earn the conspirators excessive profits." Wallace, 2009 U.S. Dist. LEXIS 109163, *19. In that case, plaintiffs allege:

> Ciavarella sentenced thousands of juveniles to detention in violation of their constitutional rights such as the right to counsel, the right to an impartial tribunal, and the right to a free and voluntary guilty plea. Ciavarella acted 'in his administrative capacity' when he began discussions with Powell about constructing a new facility. Conahan and Ciavarella also pressured court probation officers to make recommendations in favor of incarcerating juvenile offenders,

11

{L0400849.1}

> even when they would have otherwise recommended release. Conahan and Ciavarella also executed a number of schemes to conceal the unlawful proceeds of this conspiracy. They failed to disclose their financial relationship to the other Defendants, and knowingly and intentionally filed materially false annual statements of financial interests.

Id. at *20-21. Ciavarella "accept[ed] compensation in return for favorable judicial determinations." Id. at *19.

The Court granted Ciavarella's motion in part and denied his motion in part. The Court ruled that Defendant's "juvenile delinquency determinations and the sentences he imposed" were subject to judicial immunity."[1] Id. at *45. But the Court also held that "[a]s to the remaining allegations against [Ciavarella], the doctrine of judicial immunity does not shield [Ciavarella] from liability, because the other allegations relate to non-judicial acts." Id. This distinction was specifically set forth in the Court's order:

> Defendant Mark Ciavarella's Motion to Dismiss (Doc. 210) is **GRANTED IN PART** and **DENIED IN PART** as follows:
> a. As to judicial immunity for courtroom adjudications and sentences imposed, the motion is **GRANTED**.
> b. As to the remainder the motion is **DENIED**.

---

[1] Plaintiffs acknowledge the Court's holding in the Wallace case regarding Ciavarella's immunity from suit for his acts of adjudicating and sentencing juvenile defendants in Luzerne County. Plaintiffs conformed their arguments based upon the Court's rulings. Plaintiffs expressly reserve the right to assert that Ciavarella's judicial acts are not immune from suit should the Court's holding in Wallace be modified and/or reversed at a later date.

(Court's Nov. 20, 2009 order in Wallace v. Powell). The Court noted that certain acts by Ciavarella were not judicial acts, including, but not limited to, (1) making budget requests to the Luzerne County Commissioners and (2) coercing probation officers to change their recommendations regarding placement of youth defendants. Id. at *41. The Court found these types of acts were nonjudicial in nature and that Ciavarella was not immune from suit for these acts.

Here, the Complaint sets forth several allegations of nonjudicial conduct by Ciavarella. For example, Ciavarella met with Mr. Powell to discuss construction of a new juvenile facility and introduced Mr. Powell to Mr. Mericle. (Compl. ¶ 47-50.) Ciavarella also insisted that the Department recommend placement rather than probation for juveniles brought before him, even insisting that members of the Department alter their recommendations in favor of placement. (Compl. ¶¶ 84-85.) Additionally, Ciavarella failed to disclose his relationship with the other defendants. (Compl. ¶ 82.) To conceal payments for his wrong doing, Ciavarella engaged in a series of transactions designed to conceal the payments made for his part in sentencing juveniles to detention, including payments by Mr. Powell, Mr. Mericle and PACC to persons and entities controlled by Ciavarella including his spouse, Beverage and Pinnacle. (Compl. ¶¶ 177-215.) Ciavarella also filed a false tax return to conceal his conduct. (Compl. ¶ 211.) Ciavarella is also

13

not immune for his administrative acts as a judge, including developing a specialty court to facilitate the increase in the number of juveniles placed in detention and any administrative act by Ciavarella in his role as President Judge. (Compl. ¶ 46.) Thus, the complaint contains ample allegations of nonjudicial acts to allow the claims against Ciavarella to proceed.

Ciavarella erroneously claims that the alleged harm to Plaintiffs was only by his judicial conduct in adjudicating Raul and sentencing him to detention. (Def. Br. 5.) Ciavarella also erroneously claims that "the nature and functions of the acts taken by Judge Ciavarella demonstrates that the alleged activity stems from Judge Ciavarella's role as a judicial officer and from the minor Plaintiff's involvement with Judge Ciavarella in his judicial capacity." (Def. Br. 5-6.) However, as the Supreme Court has stated, the court must examine the "nature of the function performed, not the identity of the actor who performed it," to determine if judicial immunity applies to particular act. Forrest, 484 U.S. at 229. The fact that Ciavarella was a judge means that only his judicial acts would be subject to immunity. He is still liable for any nonjudicial acts he committed. As discussed above, there are ample allegations in the complaint, which the Court must assume to be true, which demonstrate the nonjudicial conduct of Ciavarella violated Plaintiffs' constitutional rights and caused Plaintiffs harm. It is these nonjudicial acts upon which the claims against Ciavarella may proceed because

{L0400849.1}

these act are not subject to judicial immunity. As a result, the Court should deny his motion to dismiss.

## IV. CONCLUSION

For the foregoing reasons, the Court should deny Ciavarella's motion to dismiss the Complaint against him.

Respectfully Submitted
**ECKERT SEAMANS CHERIN & MELLOTT, LLC**


/s/Bridget E. Montgomery
Bridget E. Montgomery, Esquire
PA I.D. No. 56105
ECKERT SEAMANS CHERIN & MELLOTT, LLC
213 Market Street, Eighth Floor
Harrisburg, Pennsylvania 17101
Attorney for Raul Clark

Date:   02/17/10

{L0400849.1}

# CERTIFICATE OF SERVICE

I, David J. Schertz, Esquire, hereby certify that on the 17th day of February, 2010, I served a true and correct copy of the foregoing document upon the following individuals in the following manner:

<u>Via ECF</u>

John G. Dean, Esquire
Timothy T. Myers, Esquire
Debora H. Simon, Esquire
Elliot Greenleaf & Dean
201 Penn Avenue, Suite 202
Scranton, PA 18503
***Attorneys for The Luzerne County Juvenile Probation Department***

Scott D. McCarroll, Esquire
Attorney I.D. No. 92985
P.O. Box 999
305 N. Front Street
Harrisburg, PA 17108-0999
***Attorney for Sandra Brulo***

Nicole Bednarek, Esquire
Palissery Law Offices
26 Pierce Street
Kingston, PA 18704
***Attorney for Pinnacle Group of Jupiter, LLC***

Edward P. McNelis, Esquire
Stephen D. Rhoades, Esquire
The Law Offices of Edward P. McNelis
19 East Broad Street
Hazleton, PA 18201
***Attorney for Defendants Barbara Conahan and Cindy Ciavarella***

<u>Via U.S. Mail, Postage Prepaid</u>

Philip Gelso, Esquire
Briechle & Gelso, LLC
63 Pierce Street
Kingston, PA 18704
***Attorney for Michael T. Conahan and Beverage Marketing of PA, Inc.***

Mark A. Ciavarella
585 Rutter Avenue
Kingston, PA 18704

Robert J. Powell
10 Fox Run Road
Drums, PA 18222

Powell Law Group, PC
10 Fox Run Road
Drums, PA 18222

Bernard M. Schneider, Esquire
Brucker Schneider & Porter
300 Weyman Road, Suite 320
Pittsburgh, PA 15236
***Attorney for PA Child Care, LLC***

Kimberly D. Borland, Esquire
Ruth S. Borland, Esquire
Borland & Borland, LLP
69 Public Square, 11th Floor
Wilkes-Barre, PA 18701-2597
***Attorneys for Robert K. Mericle and Mericle Construction, Inc.***

Vision Holdings, LLC
123 Warren Street
West Hazelton, PA 18202

/s/David J. Schertz
David J. Schertz, Esquire