| | |
|---|---|
| RAUL CLARK; BRUCE CLARK and IRAIDA CLARK, | UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA |
| Plaintiffs, | Case Action No. 09-cv-2535 |
| vs. | Hon. A. Richard Caputo |
| MICHAEL T. CONAHAN; MARK A. CIAVARELLA; THE LUZERNE COUNTY JUVENILE PROBATION DEPARTMENT; SANDRA BRULO; ROBERT J. POWELL; PA CHILD CARE, LLC; WESTERN PA CHILD CARE, LLC; ROBERT K. MERICLE; MERICLE CONSTRUCTION, INC.; GREGORY ZAPPALA; PINNACLE GROUP of JUPITER, LLC; BARBARA CONAHAN; CINDY CIAVARELLA; BEVERAGE MARKETING OF PA, INC.; VISION HOLDINGS, LLC; MID ATLANTIC YOUTH SERVICES CORP.; POWELL LAW GROUP, P.C.; JOHN DOE DEFENDANTS NOS. 1-10 and JOHN DOE ENTITIES NOS. 1 through 10,, | |
| Defendants. | |

---

### PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT SANDRA BRULO'S MOTION TO DISMISS THE COMPLAINT

Bridget E. Montgomery, Esquire
David J. Schertz, Esquire
ECKERT SEAMANS CHERIN & MELLOTT LLC
213 Market Street, 8th Floor
Harrisburg, PA 17101
717-237-6000

Michael O'Mullan, Esquire
Harold L. Kofman, Esquire
RIKER DANZIG SCHERER HYLAND & PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
(973) 538-0800
Attorneys for Plaintiffs,
Raul Clark, Bruce Clark and Iraida Clark

{L0411926.1}

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS AND PROCEDURAL HISTORY....................................3

      A.     CIAVARELLA AND OTHERS CONSPIRE TO
           DEPRIVE JUVENILES OF THEIR CONSTITUTIONAL
           RIGHTS FOR PERSONAL PROFIT. ......................................................3

      B.     MS. BRULO'S INVOLVEMENT IN THE SCHEME ...........................6

      C.     RAUL BECOMES A VICTIM OF DEFENDANTS'
           SCHEME ................................................................................................6

      D.     PROCEDURAL HISTORY......................................................................9

LEGAL ARGUMENT..............................................................................................10

I.      STANDARD OF REVIEW ...........................................................................10

II.     THE DOCTRINE OF QUASI-JUDICIAL IMMUNITY DOES NOT APPLY TO
       MS. BRULO'S ACTIONS ............................................................................10

III.    MS. BRULO IS NOT ENTITLED TO QUALIFIED IMMUNITY FOR HER
       ACTIONS .....................................................................................................12

IV.    PLAINTIFFS HAVE SUFFICIENTLY PLEADED MS. BRULO'S
       AFFIRMATIVE ACTIONS IN VIOLATION OF SECTION 1983 .................14

V.     THE CLARKS HAVE STANDING TO ASSERT SECTION 1983 CLAIMS ...............15

VI.    MS. BRULO DOES NOT HAVE SOVEREIGN IMMUNITY FROM RAUL'S
       STATE LAW CLAIMS.................................................................................15

VII.   RAUL HAS STATED A PRIMA FACIE CLAIM FOR FALSE
       IMPRISONMENT AGAINST MS. BRULO ................................................17

i

VIII.   THE ACTIONS TAKEN AGAINST RAUL BY, AMONG OTHERS, MS.
        BRULO ARE SUFFICIENTLY OUTRAGEOUS TO SUPPORT A CLAIM FOR
        INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ....................................... 18

IX.     PLAINTIFFS HAVE SUFFICIENTLY PLED VIABLE RICO CLAIMS ....................... 20

        A.   PLAINTIFFS HAVE PROPERLY ALLEGED A RICO
             INJURY ....................................................................................................... 21

        B.   PLAINTIFFS' HAVE SUFFICIENTLY SHOWN THE
             ALLEGED   RICO   VIOLATIONS   WERE   THE
             PROXIMATE CAUSE OF THE HARM TO PLAINTIFFS ................................. 21

        C.   PLAINTIFFS HAVE SUFFICIENTLY PLED THE
             EXISTENCE OF A RICO ENTERPRISE THAT IS
             SEPARATE AND APART FROM THE PATTERN OF
             ACTIVITY IN WHICH IT ENGAGED ............................................................... 25

             1.   THE RICO ENTERPRISE IS DISTINCT FROM THE
                  RICO PERSONS ..................................................................................... 26

             2.   THE ENTERPRISE IS SEPARATE AND APART FROM
                  THE RACKETEERING ACTIVITY ........................................................ 26

CONCLUSION ............................................................................................................. 30

{L0411926.1}

# TABLE OF AUTHORITIES

## CASES

Boyle v. United States,
    129 S. Ct. 2237 (2009)............................................................27

Bridge v. Phoenix Bond Indemnity Co.,
    128 S. Ct. 2131 (2008)...................................................20, 22, 23

Butz v. Economou,
    438 U.S. 478 (1978)..........................................................10

Calloway v. Bell,
    2006 WL. 1232826 (M.D. Fla. May 8, 2006)...........................11, 12

Carter v. City of Philadelphia,
    18 F.3d 339 (3d Cir. 1999)..................................................16

Cooper v. Beard,
    2006 WL. 3208783 (E.D. Pa. November 2, 2006) ..........................14

Cozzolino v. Maricopa County,
    2006 WL. 1794761 (D. Az. June 27, 2006)...............................14

Freedom Med. Inc., v. Gillespie,
    634 F. Supp. 2d 490 (E.D. Pa. 2007) .................................27, 28

Galvan v. Garmon,
    710 F.2d 214 (5th Cir. 1983) ..............................................11

Gant v. United States Probation Office,
    994 F. Supp. 729 (W.D. Va. 1998) .........................................11

Gleeson v. Robson,
    2005 WL. 1210948 (M.D. Pa. May 6, 2005)...............................19

Gulley v. Haymaker,
    2009 WL. 763549 (W.D. Pa. March 23, 2009)...........................13

Hemi Group, LLC v. City of New York,
    130 S. Ct. 983 (2010)...................................................21, 22, 25

Holmes v. Securities Investor Protection Corp.,
    503 U.S. 258 (1992).........................................................22

<u>Keller v. Pennsylvania Board of Probation and Parole,</u>
        2006 WL. 839322 (M.D. Pa. March 29, 2006)................................................10

<u>Kelly v. County of Montgomery,</u>
        2008 WL. 3408123 (E.D. Pa. August 8, 2008)................................................13

<u>Kokindu v. Breiner,</u>
        557 F. Supp. 2d 581 (M.D. Pa. 2008)................................................17

<u>Kulwicki v. Dawson,</u>
        969 F.2d 1454 (3d Cir. 1992)................................................13

<u>Landon v. County of Orange,</u>
        2009 WL. 2191335 (S.D.N.Y. July 23, 2009)................................................13

<u>Larsen v. State Employees Retirement System,</u>
        533 F. Supp. 2d 403 (M.P. Pa. 2008)................................................16, 17

<u>Mastromatteo v. Simock,</u>
        866 F. Supp. 853 (E.D. Pa. 1994)................................................19

<u>Morse v. Lower Merion Sch. Dist.,</u>
        132 F.3d 902 (3d Cir. 1997)................................................10

<u>Phillips v. County of Allegheny,</u>
        515 F.3d 224 (3d Cir. 2008)................................................10

<u>Reedy v. Evanson,</u>
        2009 WL. 1076700 (W.D. Pa. April 20. 2009)................................................19

<u>Reeves v. Middletown Athletic Association,</u>
        866 A.2d 1115 (Pa. Super. Ct. 2004)................................................19

<u>In re Rockefeller Ctr. Props., Inc. Sec. Litig.,</u>
        311 F.3d 198 (3d Cir. 2002)................................................10

<u>Rode v. Dellaciprete,</u>
        845 F.2d 1195 (3rd Cir. 1988)................................................14

<u>Saucier v. Katz,</u>
        533 U.S. 194 (2001)................................................13

<u>Simko v. County of Allegheny,</u>
        869 A.2d 571 (Pa. Super. 2005)................................................16

<u>Snead v. Society for Prevention of Cruelty to Animals,</u>
     985 A.2d 909 (Pa. 2009 ..................................................................16

<u>Soto v. Lord,</u>
     693 F. Supp. 8 (S.D.N.Y. 1988).......................................................13

<u>South Broward Hospital District v. Medquist Inc.,</u>
     516 F. Supp. 2d 370 (D.N.J. 2007 ..................................................26

<u>Stacey v. City of Hermitage,</u>
     178 Fed. App'x 94 (3d Cir. 2004) ...................................................15

<u>United States v. Irizarry,</u>
     341 F.3d 273 (3d Cir. 2003)......................................................20, 26

<u>United States v. Pelullo,</u>
     964 F.2d  193 (3d Cir. 1992)............................................................26

<u>Vierria v. California Highway Patrol,</u>
     644 F. Supp. 2d 1219 (E.D. Cal. 2009)...........................................21

<u>Villanueva v. County of Montgomery,</u>
     1994 WL. 396368 (E.D. Pa. 1994) .................................................18

<u>Wallace v. Powell,</u>
     2009 U.S. Dist. LEXIS 109163 (M.D. Pa. November 20, 2008) ...................18

<u>Williams v. Consovoy,</u>
     333 F. Supp. 2d 297 (D.N.J. 2004 .................................................11

<u>Williams v. Fedor,</u>
     69 F. Supp. 2d 649 (M.D. Pa. 1999).................................................19

<u>Wilson v. Layne,</u>
     526 U.S. 603 (1994)..........................................................................13

<u>Wilson v. Rackmill,</u>
     878 F.2d 772 (3d Cir. 1992)..............................................................10

## STATUTES AND RULES

18 U.S.C. 1962  ...................................................................... *passim*

42 U.S.C. § 1983  .................................................................. *passim*

1 Pa. C.S. § 2310  ...................................................................15, 16

42 Pa. C.S. § 8501 ............................................................................................16

42 Pa. C.S. § 8521 ............................................................................................16

Fed. R. Civ. P. 12(b)(6) ....................................................................................10

## PRELIMINARY STATEMENT

This motion to dismiss represents an attempt by defendant Sandra Brulo ("Ms. Brulo"), a participant in Luzerne County's corrupt judicial system, to avoid the consequences of her actions and deprive her victims of compensation. Ms. Brulo was the Chief Juvenile Probation Officer of Luzerne County when former Judges Conahan and Ciavarella formed their criminal enterprise to illegally imprison thousands of children in juvenile detention facilities in return for kickbacks from the builders and developers of these facilities. Plaintiff Raul Clark ("Raul") was one of the children trapped in Ciavarella and Conahan's corrupt system. He was brought before Ciavarella when he was fourteen years old. Ciavarella denied him due process, including the right to a trial, by, among other things, failing to advise him of his right to a trial and the consequences of a guilty plea. Ciavarella then sadistically taunted Raul by imposing a sentence that was apparently based on the number of birds on the courtroom window sill. Ciavarella then removed Raul from his parents. Bruce and Iraeda Clark (collectively with Raul "Plaintiffs" or "the Clarks") and had him placed in various juvenile detention facilities for seven months. Unbeknownst to Raul, Ciavarella and others were receiving bribes from the builders and developers of juvenile detention facilities.

Raul alleges that Ms. Brulo was a knowing participant in the criminal scheme orchestrated by Ciavarella and Conahan. Among other things, Raul alleges that Ms. Brulo received kickbacks in return for making baseless sentencing recommendations to the Court, altered public records and falsified drug tests, resulting in the incarceration of children and generating further revenue for Ms. Brulo and her cohorts. Pursuant to the Complaint, the results of Raul's drug test were altered to ensure that Raul would be found to have violated the terms of his probation and be remanded to defendant Pennsylvania Child Care Center. While discovery is

1

necessary to establish the involvement by Ms. Brulo in Raul's drug test, it is a matter of public record that Ms. Brulo has falsified records to shield her involvement in wrongdoing. In February 2009, Ms. Brulo pled guilty to falsifying records.

Nevertheless, defendant Brulo seeks dismissal of Raul's claims against her. Ms. Brulo falsely claims that she is immune from liability under 42 U.S.C. § 1983 because she was performing a quasi-judicial function. There is no merit to this argument. Ms. Brulo's involvement in, among other things, falsifying the results of a drug test that her department administered to Raul does not constitute a quasi-judicial act. The alleged conduct of Ms. Brulo also does not merit qualified immunity because Ms. Brulo's intentional acts violated clearly defined rights of which Ms. Brulo was aware.

Ms. Brulo's further argument that Raul's false imprisonment claim should be dismissed because probable cause existed for Raul's arrest misapprehends both the nature of Raul's claim and the law of false imprisonment. Next, Ms. Brulo's attempts to minimize the ordeal that she and her cohorts inflicted upon Raul when he was between the ages of fourteen and sixteen by claiming that her conduct was not sufficiently outrageous to support a claim for intentional infliction of emotional distress. Such contention that what happened to Raul was "not so bad" is reprehensible. The removal of Raul from his parents, the falsification of drug tests and the actions undertaken with Ms. Brulo's connivance easily satisfy the pleading requirements for the tort of intentional inflection of emotional distress.

Finally, Raul and the Clarks have stated viable RICO claims. Contrary to Ms. Brulo's arguments, they have sufficiently alleged RICO injuries that were proximately caused by the pattern of racketeering activity. They have also properly alleged the separateness of the enterprise from both the persons comprising it and the pattern of racketeering activities.

2

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

The following facts are taken from Plaintiffs' complaint in this action.  (D.E. 1.)

**A.    Ciavarella and Others Conspire to Deprive Juveniles of Their Constitutional Rights for Personal Profit.**

Defendant Ciavarella served as a judge on the Pennsylvania Court of Common Pleas.  He oversaw juvenile matters between 2000 and 2007, in which capacity he acted as judge and jury for thousands of juvenile matters and exercised nearly unfettered discretion over delinquency determinations, parole determination matters and the selection of juvenile detention centers to which children would be sentenced.  In addition, he served as the President Judge of Luzerne County from June 2007 through January 2009.

Ciavarella conspired with several individuals and entities to implement a scheme to profit from juveniles sent to certain detention centers, thereby reaping huge profits for him and his co-conspirators.  The individuals and entities alleged to be involved in the scheme include, in addition to Ciavarella, (1) Michael T. Conahan ("Conahan"), who served as the President Judge of Luzerne County from January 2002 through June 2007; (2) Ms. Brulo, who was the deputy director of forensic programs at the Luzerne County Juvenile Probation Department; (3) Robert J. Powell ("Mr. Powell"), co-owner of PA Child Care, LLC ("PACC"); (4) PACC; (5) Robert K. Mericle ("Mr. Mericle"), owner of Mericle Construction, Inc. ("Mericle Construction"); (6) Pinnacle Group of Jupiter, LLC ("Pinnacle"), which was owned and operated by Barbara Conahan ("Mrs. Conahan") and Cindy Ciavarella ("Mrs. Ciavarella"); (7) Beverage Marketing of PA, Inc. ("Beverage"); (8) Vision Holdings LLC ("Vision"), which was owned by Mr. Powell; and (9) the Powell Law Group, P.C. ("Powell Law").

Ciavarella initiated the scheme when, in approximately June 2000, he met with Mr. Powell about Mr. Powell's desire to construct a privately-owned juvenile detention facility

3

in Luzerne County.   Mr. Powell was a local attorney who regularly practiced in Luzerne County's courts.   Ciavarella introduced Mr. Powell to Mr. Mericle, who was a friend and business associate of Ciavarella, to assist with the juvenile detention facility idea.   Mr. Mericle and his company, Mericle Construction, Inc., agreed to build a juvenile detention facility on land that Mr. Powell and his partner were to acquire.   The financial success of the private youth prison that Mr. Powell sought to operate and that Mr. Mericle hoped to construct would be assured if they could enter into a contract with Luzerne County for the sending of as many juveniles as possible to their facility.

In order for the plan to work, Ciavarella and his co-conspirators needed juveniles to fill the facility.   But Luzerne County already operated its own juvenile detention facility which, upon information and belief, was adequate to meet the county's needs.   In order to demonstrate that the Luzerne County juvenile detention facility was inadequate and to assure the success of their co-conspirators' facilities, Conahan and Ciavarella needed to dramatically increase the number of juveniles who were sentenced to custodial detention instead of receiving a non-custodial alternative sentence for relatively minor offenses.

Beginning at least as early as 2002 and possibly earlier and continuing thereafter, Ciavarella and Conahan routinely sentenced juveniles to custodial detention despite the requirements of Pennsylvania law that placement in detention away from a child's family should be a last resort.   In doing so, Ciavarella and Conahan systematically stripped the juveniles of their constitutional rights by denying them due process and a fair hearing.   The actions of Ciavarella and Conahan in sentencing juveniles to detention facilities for minor offenses had the effect of convincing Luzerne County to enter into contracts with private facilities in which the MR. Powell, Mr. Mericle, Mericle Construction, PACC and Powell Law all had an interest.

4

On January 29, 2002, Conahan, acting as President Judge of Luzerne County, signed a Placement Guaranty Agreement between PACC and the Court of Common Pleas for Luzerne County to house juvenile offenders at the PACC facility. The agreement provided a guaranteed annual fee from Luzerne County to PACC of $1,314,000. As a further part of the scheme and artifice to defraud, Conahan entered into agreements guaranteeing placement of juvenile offenders with PACC, including a $58 million, 20-year lease with PACC, and took official action to remove funding from the Luzerne County budget for the Luzerne County juvenile detention facility, effectively closing a county-run youth detention center. Over the next six years, Conahan and Ciavarella steered hundreds of Luzerne County youths to PACC, including Raul. Neither Ciavarella nor Conahan disclosed their relationship with the other defendants.

Beyond adjudicating and sentencing juveniles to detention, Ciavarella facilitated the increase in juveniles to PACC through several nonjudicial acts. Ciavarella, through his administrative discretionary decision-making authority, adopted procedures for a specialty court that facilitated an increased number of juvenile offenders to be sent to the juvenile detention facilities of PACC and Western Pennsylvania Child Care Center ("WPACC"). Ciavarella also insisted that the Department recommend placement rather than probation for juveniles brought before him, even insisting that members of the Department alter their recommendations in favor of placement.

For their efforts, Ciavarella and Conahan received $2.6 million. Through a complicated series of transactions detailed in the complaint, Mr. Powell, Mr. Mericle and PACC caused $2.6 million to be paid to entities controlled by Ciavarella and Conahan, including their spouses, Beverage and Pinnacle. Ciavarella and Conahan were finally brought to justice when

5

they pled guilty on February 12, 2009 to a Bill of Information alleging two counts of fraud for their efforts to conceal payments made to them in exchange for referring children who appeared before Ciavarella to juvenile detention facilities. They have since withdrawn their guilty pleas.

**B.      Ms. Brulo's Involvement in the Scheme**

Raul's complaint sets forth the critical and active role that Ms. Brulo played in the criminal scheme revolving around the corrupt Luzerne County juvenile justice system. Ms. Brulo was often present in Judge Ciavarella's courtroom as he conducted his kangaroo court (Complaint, ¶ 66) She allegedly received kickbacks, illicit payments from Conahan and Ciavarella in return for her active participation in their kids-for-cash scheme. (Complaint, ¶¶ 83, 86) Her participation in the scheme included issuing bogus recommendations for the placement of children in detention facilities in order to "legitimize" the placements by Conahan and Ciavarella (Complaint, ¶ 84) and the alteration of placement recommendations at the behest of Ciavarella and Conahan. (Complaint, ¶ 85) Further, the complaint further alleges that ". . . the Department, Ms. Brulo and others routinely falsified the results of drug tests or concocted bogus probation violations in order to have children on probation placed into and/or further detained at detention facilities." (Complaint, ¶ 97) These intentionally wrongful acts by Ms. Brulo had the desired effect of increasing the amount of probation expenses that parents and/or children were forced to pay. (Complaint, ¶¶ 88-89)

**C.      Raul Becomes a Victim of Defendants' Scheme**

In October 2002, Raul was a 14-year-old high school freshman living in Luzerne County and attending Coughlin High School. He lived at home with his parents. Both Mr. and Mrs. Clark are deaf and they communicate primarily by sign language. They relied substantially upon Raul for assistance in communicating with the outside world with respect to their day-to-

6

day affairs.  Raul helped around the house, spoke to creditors of Mr. and Mrs. Clark and helped his father order parts for an auto repair business.

In or around October 2002, the local police arrested Raul, along with other children, and charged him with two misdemeanors offenses: (1) violation of the town's 10:00 p.m. curfew; and (2) possession of drug paraphernalia (a small pipe).  The police did not find any drugs or drug residue in the pipe.  Raul was told to appear before Ciavarella on or about November 4, 2002.

Raul and his parents attended the November 4, 2002 proceeding before Ciavarella.  At the outset of the hearing, Ciavarella read so-called "charges."  Ciavarella stated, falsely, that Raul had been charged with being intoxicated and possession of marijuana. Ciavarella never explained to Raul what was about to happen.  Ciavarella did not provide Raul with the opportunity to enter a plea to the charges against him.  Instead, Ciavarella merely asked Raul whether he "did it."  Ciavarella never explained to Raul that he had a right to a trial or the consequences of a waiver of the right to trial.  Ciavarella disposed of Raul's case by finding him delinquent.

Subsequent to this disposition, Ciavarella instructed Raul to look out the courtroom window.  When Raul did so, Ciavarella asked Raul how many birds he saw on the window ledge.  Raul said "six."  Ciavarella then sentenced Raul to six months of custodial detention.  Incredibly, the number of months of the sentence was based on the number of birds on the courtroom windowsill!  Courtroom deputies then placed shackles on Raul and led him out of the courtroom.  Raul was not even afforded the opportunity to say goodbye to his parents before being led off.

{L0411926.1}

During the next few months, Raul was shuttled to various detention centers around that state. Each time he was moved, Raul was brought back before Ciavarella without counsel. He first served time in the Luzerne County Detention Center, where he received no education from the state for the few weeks he was housed there. He was then transferred to Lackawanna County Detention Facility, where he was confined to his cell for 23 hours a day. Raul was then transferred to the Adelphoi Treatment Facility in Allegheny County, a facility that was more than a hundred miles from Raul's home and his parents, too far for his parents to make regular visits. Despite being a model detainee at Adelphoi, he was sent to Clearbook Lodge in February 2003, prompting a counselor from Adelphoi, who attended the hearing before Ciavarella, to remark to Raul that he had been "screwed."

In May 2003, Raul was again brought before Ciavarella. In violation of Raul's constitutional rights, Ciavarella told Raul at this proceeding that he did not require an attorney. Ciavarella released Raul from custodial detention and placed him on probation. Thereafter, Raul missed a single 8:00 p.m. curfew. As a result of this single missed curfew, Ciavarella summarily signed an order immediately remanding Raul to PACC. Raul served three days at PACC.

In early 2004, Raul's probation officer took a urine sample from Raul at his school. (Complaint, ¶ 161) This urine sample was one of dozens that the probation officer took at the school that day. (Complaint, ¶ 162) Shortly thereafter, Raul was advised that he had failed the drug test and that PCP and methamphetamines had been found in his urine. (Complaint, ¶ 163) Raul had not ingested the drugs that were allegedly found in his urine. (Complaint, ¶ 164) Ciavarella again summarily ordered Raul to PACC. (Complaint, ¶ 165.) The Complaint alleges that the Department under Ms. Brulo's direction switched urine samples and/or falsely reported the test findings in order to incarcerate Raul and to obtain more money

8

from Mr. and Mrs. Clark.  (Complaint, ¶ 166)   Ms. Brulo's alleged falsification is entirely consistent with her admitted criminal behavior.   On or about February 21, 2009, the United States Attorney for the Middle District of Pennsylvania charged Ms. Brulo with obstruction of justice in connection with the alteration of an official juvenile criminal record.  (Complaint, ¶ 223.)  Ms. Brulo subsequently pled guilty to this obstruction of justice.  (Complaint, ¶ 224)

Both Raul and Mr. & Mrs. Clark have been damaged by the scheme in which Ms. Brulo was an active participant.  Between November 2002 and 2005, Mr. and Mrs. Clark paid $3,837.50 to Luzerne County to pay for Raul's incarceration and probation.  (Complaint, ¶ 167) Luzerne County even garnished Mrs. Clark's wages and unemployment benefits.  (Complaint, ¶ 168)  Further, Raul has suffered great emotional distress and financial harm as a result of the actions of the Defendants.  (Complaint, ¶ 170)

### D.     Procedural History

Plaintiffs filed their complaint against, among others, Ms. Brulo on or about December 24, 2009.  The Clarks alleged the following claims against Ms. Brulo in her individual capacity: (1) violation of 42 U.S.C. § 1983 (Count I); (2) RICO, 18 U.S.C. § 1962 (Count IV); (3) conspiracy to violate RICO (Count V); (4) false imprisonment (Count VI); and (5) intentional infliction of emotional distress (Count VII).[1]  Ms. Brulo has now filed this motion to dismiss.

---

[1] The Clarks do not assert any claims against Ms. Brulo in her official capacity.  Therefore, Ms. Brulo's arguments that the official capacity claims should be dismissed are moot.  (Brulo brief at 15-20)

{L0411926.1}

**LEGAL ARGUMENT**

## I.     STANDARD OF REVIEW

Rule 12(b)(6) permits a court to dismiss a complaint for "failure of the pleading to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A court will not dismiss an action so long as the pleading contains "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008). When considering the motion, the court is "required to accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997). "The inquiry is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims." In re Rockefeller Ctr. Props., Inc. Sec. Litig., 311 F.3d 198, 215 (3d Cir. 2002).

## II.    THE DOCTRINE OF QUASI-JUDICIAL IMMUNITY DOES NOT APPLY TO MS. BRULO'S ACTIONS

Ms. Brulo significantly overstates the scope of the doctrine of quasi-judicial immunity when she claims that it affords her absolute immunity for all actions alleged in the Complaint. (Brulo brief at 21-28) Public officials, such as probation officers, are only entitled to absolute immunity in rare circumstances. See Butz v. Economou, 438 U.S. 478 (1978). Probation officers only enjoy quasi-judicial immunity when they are performing an adjudicatory function. See Wilson v. Rackmill, 878 F.2d 772, 775-76 (3d Cir. 1992). Where a probation or parole officer acts in an executive and/or administrative capacity, quasi-judicial immunity does not apply. See Keller v. Pennsylvania Board of Probation and Parole, 2006 WL 839322 (M.D.

Pa. March 29, 2006); <u>see also</u>, <u>Williams v. Consovoy</u>, 333 F. Supp. 2d 297, 300 (D.N.J. 2004), <u>aff'd</u>, 453 F. 3d 173 (3d Cir. 2006).

Probation officers do not enjoy quasi-judicial immunity for taking action to revoke probation based upon a purported violation of the terms of probation. <u>See</u> <u>Galvan v. Garmon</u>, 710 F.2d 214 (5th Cir. 1983) <u>reh'g denied</u>, 716 F. 2d 901 (5th Cir. 1983), <u>cert</u>. <u>denied</u>, 466 U.S. 949 (1984); <u>see also</u> <u>Gant v. United States Probation Office</u>, 994 F. Supp. 729, 733 (W.D. Va. 1998) (citing cases). ("Most courts have held that a probation officer is not protected by absolute immunity for his role in initiating probation/supervised release revocation proceedings and seeking an arrest warrant"), <u>aff'd</u>, 155 F. 3d 558 (4th Cir. 1998).

The assertion that a probation officer alleged to have falsified the results of a drug test enjoys absolute immunity has already been considered and rejected in the analogous case of <u>Calloway v. Bell</u>, 2006 WL 1232826 (M.D. Fla. May 8, 2006). Plaintiff in <u>Calloway</u> alleged that defendant probation officer had falsified the results of a drug test resulting in plaintiff's incarceration. <u>Calloway</u>, 2006 WL 1232826, * 1. Defendant probation officer asserted -- as Ms. Brulo does herein -- that he was absolutely immune for his actions and entitled to dismissal of the claims against him. <u>Id.</u> at * 2. The district court held that the probation officer did not enjoy absolute immunity because the administration of the drug test was dissimilar to the preparation of a pre-sentence report. Rather, the probation officer's initiation of a revocation proceeding was investigatory and not adjudicatory. <u>Id.</u> The <u>Calloway</u> court concluded that the only immunity potentially available to the probation officer was qualified immunity. <u>Id.</u>

Application of these principles to the instant matter demonstrates that there is no basis for Ms. Brulo to claim absolute quasi-judicial immunity. First, the Clarks' claim that Ms. Brulo is liable under Section 1983 for her role in falsifying the results of Raul's drug test is not

subject to immunity. As set forth herein, a probation officer's initiation of a probation violation is not an adjudicatory action, but rather is investigatory. As in <u>Calloway</u>, absolute immunity does not apply. Next, the other conduct by Ms. Brulo alleged in the Complaint does not warrant a finding of immunity. Absolute immunity does not attach to Ms. Brulo's receipt of kickbacks or her role in a criminal conspiracy. None of the cases upon which plaintiffs rely in which a probation officer received immunity for preparation of a pre-sentence report involved allegations of corruption such as those contained in the complaint against Ms. Brulo. For this reason, none of Ms. Brulo's actions are immune.

## III.   MS. BRULO IS NOT ENTITLED TO QUALIFIED IMMUNITY FOR HER ACTIONS

Ms. Brulo bases her argument that she has qualified immunity for the allegations in the Complaint upon a fundamental misapprehension of the claims made against her. (Brulo brief at 26-28.) Contrary to Ms. Brulo's assertion, the Clarks do not seek to hold her liable under Section 1983 because she passively acceded to Ciavarella's illegal activities. (Brulo brief at 27) Thus, Ms. Brulo incorrectly asserts that "the linchpin of Plaintiffs' case against Defendant Brulo is that it was the responsibility of the Chief Probation Officer, Brulo, to ensure an impartial tribunal, and to ensure that promoting department recommendations were followed by the Court or not influenced or dictated by the Court . . ."). That is not the linchpin of the Clarks' allegations against Ms. Brulo; in fact, the Clarks make no such allegations. Instead, the Clarks allege that Ms. Brulo actively participated in a criminal conspiracy by receiving kickbacks, altering probation recommendations and falsifying results of drug tests, including a drug test that Raul submitted.

Consideration of the actual allegations of the Complaint, rather than Ms. Brulo's imagined allegations, demonstrates that qualified immunity does not exist. The qualified

12

immunity doctrine shields from liability certain administrative actions of public officials provided that their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1994); see, e.g., Gulley v. Haymaker, 2009 WL 763549, * 14-15 (W.D. Pa. March 23, 2009), The two factors necessary to overcome an official's qualified immunity claim are: (1) an alleged violation of a right clearly established by statutory and constitutional law; (2) committed by an official who should reasonably have known of the existence of the right and the violation thereof. See Saucier v. Katz, 533 U.S. 194 (2001). The district court must apply an objective standard to determine whether a reasonable official would have known that her conduct violated a known right. See Kulwicki v. Dawson, 969 F.2d 1454, 1468 (3d Cir. 1992); Kelly v. County of Montgomery, 2008 WL 3408123 (E.D. Pa. August 8, 2008).

In Soto v. Lord, 693 F. Supp. 8 (S.D.N.Y. 1988), the district court held that a probation officer's failure to establish a chain of custody for a drug test did not merit qualified immunity because the establishment of chain of custody was a known right of which the probation officer should have been aware.

Here, the allegations set forth in Plaintiffs' complaint clearly fall outside the scope of any qualified immunity. Ms. Brulo's alleged falsification of the result of Raul's drug test plainly violates a known constitutional right. A probation officer's decision to report a probation violation on the basis of an allegedly false or improper drug test constitutes a constitutional deprivation of the Plaintiff's Fourth Amendment rights to be free from unreasonable seizure. See Landon v. County of Orange, 2009 WL 2191335 * 5 (S.D.N.Y. July 23, 2009) (plaintiff's allegations that county probation officers had recommended violation of probation on the basis of an erroneous drug test satisfied requirement of showing a deprivation of

13

constitutional right.); see also Cozzolino v. Maricopa County, 2006 WL 1794761 * 2 (D. Az. June 27, 2006) (plaintiff who claimed that sheriff's officers had falsified results of drug test stated a claim under Section 1983 for deprivation of a constitutional right). There is also no doubt that Ms. Brulo reasonably should have known that falsifying the results of a drug test for failing to ensure the test was properly conducted would violate a known constitutional right. Thus, the allegations contained in the Clarks' complaint are sufficient to overcome Ms. Brulo's assertion of qualified immunity with respect to the phony drug test.

Similarly, Ms. Brulo may not invoke the doctrine of qualified immunity to avoid liability for her alleged receipt of kickbacks and participation in the criminal scheme of Ciavarella and others. Ms. Brulo's actions contributed to the wrongful deprivation of Raul's liberty interest and to the wrongful deprivation of his parents' property in the form of payments to the probation department.

## IV. PLAINTIFFS HAVE SUFFICIENTLY PLEADED MS. BRULO'S AFFIRMATIVE ACTIONS IN VIOLATION OF SECTION 1983

There is no merit to Ms. Brulo's further argument that plaintiffs' complaint amounts to an effort to impose *respondeat superior* liability upon her. (Brulo brief at 29-32) Plaintiffs seek to impose liability upon Ms. Brulo solely for her own actions. A plaintiff satisfies the requirement of showing the defendant's personal involvement in the wrongdoing either through allegations of personal direction of the challenged conduct or of actual knowledge and acquiescence in the conduct. See Rode v. Dellaciprete, 845 F.2d 1195, 1207 (3rd Cir. 1988); see also Cooper v. Beard, 2006 WL 3208783, * 13 (E.D. Pa. November 2, 2006). Plaintiffs herein have pleaded both Ms. Brulo's active involvement in the wrongdoing and her knowledge of and acquiescence in the conduct. The Clarks have identified the actions for which Ms. Brulo may be held liable as including: (1) the receipt of kickbacks (Complaint, ¶¶ 83, 86); (2) recommending

14

{L0411926.1}

placement in detention facilities where such disposition was unwarranted (Complaint, ¶ 84); (3) altering reports to conform to Ciavarella's preferred outcome (Complaint, ¶ 85); (4) falsifying drug tests and concocting bogus probation violations (Complaint, ¶¶ 88-89). The complaint further alleges that Ms. Brulo undertook such conduct in connection with the disposition of Raul's case.[2]

## V.    THE CLARKS HAVE STANDING TO ASSERT SECTION 1983 CLAIMS

The allegations that the Clarks paid the costs of Raul's detention, including the costs associated with his detention following the falsified drug test, demonstrate that they suffered a constitutional deprivation that can support a Section 1983 claim. (Complaint, ¶ 167) The Third Circuit's holding in Stacey v. City of Hermitage, 178 Fed. App'x 94 (3d Cir. 2004), establishes that such deprivations of personal property suffice to show a violation of a constitutional right. There, the court held that the son of a homeowner of a house that the city wrongfully demolished had standing to assert a Section 1983 claim against the city. Id. at 98. The court held that the son's allegation that he had personal property in his mother's destroyed house conferred standing upon him to assert a violation of Section 1983 in his own right. Similarly, the Clarks' allegation that they paid the cost for Raul's wrongful imprisonments is sufficient for them to allege a claim under Section 1983.

## VI.   MS. BRULO DOES NOT HAVE SOVEREIGN IMMUNITY FROM RAUL'S STATE LAW CLAIMS

Pennsylvania affords immunity to liability for state law causes of action to the Commonwealth and its agencies and employees when they act within the scope of their duties. 1

---

[2] Plaintiffs' reference to the Department's falsification of his drug test includes Ms. Brulo's participation in the falsifying of the results. To the extent that the Court believes that the Complaint does not sufficiently allege Ms. Brulo's actions, Plaintiffs should be permitted to amend their Complaint.

Pa. C.S. § 2310, <u>Larsen v. State Employees Retirement System</u>, 533 F.Supp. 2d 403, 420 (M.P. Pa. 2008). Only commonwealth agencies and their employees receive sovereign immunity; county agencies and employees do not. <u>See</u> <u>Carter v. City of Philadelphia</u>, 18 F.3d 339, 348-50 (3d Cir. 1999) (city district attorney was not a state actor for sovereign immunity purposes.) A "commonwealth party subject to sovereign immunity is" a commonwealth agency and any employee thereof, but only with respect to an act within the scope of his office or employment. A court looks to an entity's enabling legislation to determine whether the entity and its employees are "commonwealth parties" who should receive immunity. <u>See Simko v. County of Allegheny</u>, 869 A.2d 571 (Pa. Super. 2005), <u>appeal</u> <u>denied</u>, 597 A.2d 462 (Pa. 2005) (holding that county was not a commonwealth entity). The Pennsylvania Supreme Court recently held that "in determining whether an entity is a commonwealth agency for sovereign immunity purposes, the important factors to be considered are whether the entity was created by the state to perform a state function so that a judgment against it would, in essence, injure the state." <u>Snead v. Society for Prevention of Cruelty to Animals</u>, 985 A.2d 909, 918 (Pa. 2009), <u>appeal</u> <u>denied</u>, 992 A. 2d 890 (Pa. 2010). Ms. Brulo has not cited and counsel has not found any case where a juvenile probation department or one of its employees has been found to be a "commonwealth party" for sovereign immunity purposes. Nor has Ms. Brulo identified how a judgment against her in her individual capacity would injure the State of Pennsylvania.

Even where a commonwealth employee is involved, sovereign immunity only attaches where the employee has acted within the scope of their duties. 42 Pa. C.S. § 8501, 8521. "Conduct of an employee is within the scope of employment if it is of a kind and nature that the employee is employed to perform; it occurs substantially within the authorized time and

space limits; it is activated, at least in part, by a purpose to serve the employer . . . ." See Larsen, 553 F. Supp. 2d at 420 (citations omitted).

Ms. Brulo has completely failed to demonstrate her entitlement to sovereign immunity from the state law claims that Raul has asserted against her. As set forth above, Ms. Brulo has failed to establish that juvenile probation officers qualify as Commonwealth employees. Ms. Brulo does not argue, because she cannot, that a judgment against her would be the equivalent of a judgment against the State. Next, even assuming *arguendo* that Ms. Brulo was a state employee, she cannot establish that the acts complained of were in the scope of her duties. Specifically, Ms. Brulo cannot establish that she undertook her action to further the purposes of the Luzerne County Juvenile Probation Department. Rather, the alleged actions of Ms. Brulo, including the receipt of kickbacks and falsification of drug tests, were undertaken solely to benefit Ms. Brulo and her cohorts financially. Thus, this Court should reject plaintiff's sovereign immunity argument.

## VII.    RAUL HAS STATED A PRIMA FACIE CLAIM FOR FALSE IMPRISONMENT AGAINST MS. BRULO

The elements of a false imprisonment claim are: (1) the detention of another person; and (2) the unlawfulness of such detention. See Kokindu v. Breiner, 557 F. Supp. 2d 581 (M.D. Pa. 2008). Raul alleges in his amended complaint that Ms. Brulo unlawfully detained him both in connection with his detention in various facilities between November 2002 and May 2003 and again in 2004 when she was instrumental in the falsification of the results of Raul's drug test, which led to his incarceration at PACC.

Ms. Brulo's argument that she may not be held liable for either imprisonment of Raul because she was merely following a facially valid court order does not withstand scrutiny. (Brulo brief at 32-34) First, with respect to the falsification of the results of Raul's drug tests

17

and his subsequent placement at PACC, Ms. Brulo was not merely following orders. Rather, Raul alleges that Ms. Brulo instigated his incarceration by having her department falsely report Raul as testing positive for illegal drugs that he did not ingest. Raul alleges that this action caused Ciavarella to find a probationary violation and to send him to PACC. Thus, even if Ms. Brulo can shield herself from liability for other actions because of a "valid" court order, she cannot do so with respect to her own falsification of a drug test.

Second, Ms. Brulo may be held liable for false imprisonment both in connection with Raul's initial placement and the subsequent drug test incarceration because it is alleged that she knew that the orders that Ciavarella entered were not valid. Raul alleges that Ms. Brulo was an active participant in the scheme to incarcerate juveniles because, among other things, she received kickbacks from Ciavarella and Conahan in return for recommending placement, altering juvenile sentencing recommendations and falsifying drug test results. Those allegations place Ms. Brulo in a different legal position than the innocent officials in the cases upon which Ms. Brulo relies. See Villanueva v. County of Montgomery, 1994 WL 396368 (E.D. Pa. 1994). Similarly, Ms. Brulo may not rely upon Wallace v. Powell, 2009 U.S. Dist. LEXIS 109163, * 48 (M.D. Pa. November 20, 2008). There, the Court held that defendant Perseus House was entitled to quasi-judicial immunity as to allegations of false imprisonment because a facially valid court order directed plaintiff's incarceration. Unlike here, there was no allegation that Perseus House participated in the conspiracy to wrongfully incarcerate children.

## VIII. THE ACTIONS TAKEN AGAINST RAUL BY, AMONG OTHERS, MS. BRULO ARE SUFFICIENTLY OUTRAGEOUS TO SUPPORT A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

A plaintiff states a claim for intentional infliction of emotional distress under Pennsylvania law where he alleges conduct (1) that was intentional or negligent; (2) extreme or outrageous; (3) actually caused the distress; and (4) caused distress that was severe. See, e.g.,

18

Reeves v. Middletown Athletic Association, 866 A.2d 1115, 1122 (Pa. Super. Ct. 2004); Gleeson v. Robson, 2005 WL 1210948 (M.D. Pa. May 6, 2005) aff'd 190 Fed. Appx. 165 (3d Cir. 2006). The requirement of extreme or outrageous conduct is satisfied by conduct that "offends the very moral values of our society." See Williams v. Fedor, 69 F. Supp. 2d 649, 668 (M.D. Pa. 1999); aff'd, 211 F.3d 1263 (3d Cir. 2000). Ms. Brulo incorrectly argues that the baseless initiation of criminal prosecution can never rise to the level of outrageousness necessary to support a claim for intentional infliction of emotional distress. This assertion is incorrect. Tellingly, none of the cases upon which Ms. Brulo relies for her assertion that Raul's treatment was not sufficiently outrageous involved a juvenile. Also, none involved a participant in a corrupt judicial system. See Mastromatteo v. Simock, 866 F. Supp. 853 (E.D. Pa. 1994); Reedy v. Evanson, 2009 WL 1076700 (W.D. Pa. April 20. 2009). ("Although the initiation of a criminal prosecution without probable cause may not support a cause of action for intentional infliction of emotional distress in all cases . . . the circumstances of this case are sufficient to warrant submission of claim to a jury.") Gleeson, 20 at WL 1210948, * 31. Gleeson involved a doctor's claim against a detective who initiated numerous baseless criminal charges against him that had a devastating effect on his ability to function as a medical professional. Id.

Raul's treatment by Ms. Brulo and others far exceeds the conduct that the Gleeson court found was sufficiently outrageous. Raul was 14 years old in November 2002 when he found himself in the clutches of Ms. Brulo and her cohorts. Following a rigged hearing in which the judge sadistically played with him by, among other things, sentencing him based upon the number of birds on the courthouse windowsill, Raul was torn away from his sobbing mother and taken into custody. Thereafter, he spent the next seven months in several different detention facilities. In one of these facilities, he was left in a cell for 23 hours a day. Next, upon his

19

release and placement on probation, Raul was again removed from his parents and imprisoned because Ms. Brulo and others falsified the results of a drug test that had been administered to Raul.  This shocking treatment of a minor is rendered even more sickening by the fact that Ms. Brulo and others incarcerated Raul in order to line their pockets with the bribes flowing from the builders and developers of juvenile detention facilities.  The universal revulsion with which the revelation of the corruption in Luzerne County's juvenile justice system has been met clearly demonstrates that the behavior of Ms. Brulo and others "offends the very moral values of our society and subjects them to liability for intentional infliction of emotional distress.

## IX.    PLAINTIFFS HAVE SUFFICIENTLY PLED VIABLE RICO CLAIMS

Counts IV and V of the Complaint set forth the RICO and conspiracy to commit RICO claims applicable to this motion.  (See Compl. ¶¶ 250-264.)  "The Racketeer Influence and Corrupt Organizations Act (RICO or Act), 18 U.S.C. §§ 1961-1968, provides a private right of action for treble damages to any person injured in his business or property by reason of a violation of the Act's criminal prohibitions."  Bridge v. Phoenix Bond Indemnity Co., 128 S. Ct. 2131, 2134 (2008) (internal quotations and citations omitted).  Section 1962(c) of RICO states

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

18 U.S.C. 1962(c).  To properly plead a RICO claim under Section 1962(c), a plaintiff must show: "(1) the existence of an enterprise affecting interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated, either directly or indirectly, in the conduct or the affairs of the enterprise; and (4) that he or she participated through a pattern of racketeering activity."  United States v. Irizarry, 341 F.3d 273, 285 (3d Cir. 2003) (internal quotations and citations omitted), cert denied 590 U.S. 1140 (2004).

Racketeering activities include mail and wire fraud.  See Hemi Group, LLC v. City of New York, 130 S. Ct. 983, 987 (2010).

Ms. Brulo makes the following arguments in support of dismissal of the RICO claims: (1) Raul has not properly alleged that he suffered an injury compensable under RICO; (2) the Clarks have not alleged that the RICO enterprise is distinct from the persons comprising the entity or the pattern of racketeering activity; (3) the RICO violations purportedly did not proximately cause the injury alleged and plaintiffs cannot recover for a RICO conspiracy because they have failed to state a substantial RICO claim.  (Brulo brief at 37-47)  None of these arguments provides a basis for dismissing the Clarks' RICO claims.

**A.    Plaintiffs have properly alleged a RICO injury**

Initially, Ms. Brulo does not dispute that Raul's parents have alleged that they suffered a sufficient RICO injury in the form of the payments that they made for Raul's incarceration and probation.  Indeed, Mr. and Mrs. Clark alleged that the actions taken by the RICO conspirators led to wage garnishment.  Thus, their standing to assert RICO claims is undisputed.

Next, Raul has properly alleged that he has suffered a financial loss.  Raul's injuries include the diminution in his earning capacity based upon the education that he missed while detained in various facilities as a result of Defendants' scheme.  See Vierria v. California Highway Patrol, 644 F. Supp. 2d 1219 (E.D.Cal. 2009) (holding that loss of future earnings can constitute RICO injury.)

**B.    Plaintiffs' have sufficiently shown the Alleged RICO violations were the proximate cause of the harm to Plaintiffs**

Plaintiffs have properly alleged that the RICO acts were the proximate cause of harm to them.  Ms. Brulo mistakenly argues that the injuries alleged by Plaintiffs are too indirect

21

and remote from the alleged predicate RICO acts. (Brulo brief at 43-47) She relies on the Supreme Court's decision in Hemi Group to argue that it is insufficient to allege that purported predicate acts caused an alleged harm to the plaintiffs. Ms. Brulo further argues that the Clarks' injuries are too speculative. However, none of these arguments undermines the RICO proximate cause analysis.

A RICO plaintiff is required to show not only "but-for" causation but also proximate causation. See Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 268 (1992). Proximate cause "is a flexible concept that does not lend itself to a black-letter rule that will dictate the result in every case." Bridge, 128 S. Ct. at 2142. Proximate cause does require "some direct relationship between the injury asserted and the injurious conduct alleged." Id. (quoting Holmes, 503 U.S. at 268). As the Bridge Court explained:

> The direct-relation requirement avoids the difficulties associated with attempting to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors, prevents courts from having to adopt complicated rules of apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries and recognizes the fact that "directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.

Id. (quoting Holmes, 503 U.S. at 269-70.)(internal quotations and citations omitted).

In Bridge, the Court held that bidders at county auctions of tax liens did not need to show they relied on defendant's alleged misrepresentations to the county in order to establish a RICO claim. Cook County, Illinois had a "Single, Simultaneous Bidder Rule" which stated that each bidder must submit bids in its own name and prohibited a bidder from using an agent, employee or related entity to submit a simultaneous bid. Id. at 2135. Bidders had to sign an affidavit swearing compliance with the rule. Id. Several regular participants in the tax sales sued

22

the petitioners claiming that they violated the Single, Simultaneous Bidder Rule at auctions between 2002 and 2005 by arranging firms to bid on behalf of petitioner Sabre Group, LLC and directing them to file false affidavits of compliance with the rule. Id. at 2136. These firms collusively bid on the same properties at a 0% penalty rate (the lowest possible), and since all of the firms had the lowest bid, the county allocated the parcels to them on a rotating basis. Id. at 2135-36. These firms then transferred the certificates of purchase to Sabre Group. Id. at 2136. In this way, the petitioners colluded together to bid below market value on each property. When the petitioners evidentially had the low bid, whoever received the property on the rotational basis transferred it to Sabre Group. Thus, the petitioners excluded others from their fair share of the liens.

The Court rejected petitioners' argument that reliance was a required element of a RICO claim premised on mail fraud, or was at the very least required in order to establish proximate cause. The Court held that petitioners need not show it relied on the petitioners' misrepresentations in order to establish proximate cause. Id. at 2145. The Court found that there was a direct relationship between the loss of value of the liens and the petitioners' acts of mail fraud. Id. at 2144. The Court noted that the loss of value of the liens "was a foreseeable and natural consequence of petitioners' scheme to obtain more liens for themselves that other bidders would obtain fewer liens." Id. Further, the Court noted that "there are no independent factors that account for respondents' injury, there is no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violation, and no more immediate victim is better situated to sue." Id. Thus, all that is required to show proximate cause under Holmes is a direct relationship between the injury suffered by plaintiff and the alleged RICO activity.

23

Here, the Clarks have demonstrated in their factual pleadings how their injuries are a direct result of the mail and wire fraud alleged. Ms. Brulo and her cohorts all agreed to illegally deprive juvenile offenders of their basic rights to ensure the profitability of the detention centers and the personal enrichment of Conahan, Ciavarella and Ms. Brulo. (See Compl. ¶¶ 213-214.)  Powell and Mericle made payments to entities controlled by Ciavarella and Conahan in order to ensure their participation in the scheme. (See, e.g., Comp. ¶¶ 198-99, 208-09, 211.)  For her part, Ms. Brulo used her office to further the scheme.  She disregarded the rights of juveniles by making bogus detention recommendations and falsifying drug tests, thus creating more "clients" for the Detention Facility Defendants.  (See, e.g., Comp. ¶¶ 58-64.)  The Complaint adequately sets forth a direct relationship between the acts of mail and wire fraud and the injury to Plaintiffs.

Ms. Brulo's assertion that the Clarks cannot demonstrate proximate causation because Raul would have been sent to PACC in any event for missing curfew is nonsensical. Raul's incarceration in PACC for a curfew violation while he was on probation does not form the gravamen of plaintiffs' claims.  The complaint makes plain that the RICO violations of defendants proximately caused Raul's November 2002 placement in various detention facilities following a "trial" at which he was denied due process.  Further, Ms. Brulo completely ignores Raul's placement in PACC after the results of his drug tests were falsified by, among others, Ms. Brulo.  There can be no clearer example of a RICO violation proximately causing an injury.

There is also no merit to Ms. Brulo's argument that the Clarks are not the proper parties to assert RICO claims because they are not direct enough victims of the RICO activity. The entire purpose of the RICO enterprise in which Ms. Brulo is alleged to have participated was

{L0411926.1}

to incarcerate children and bill their parents for costs of incarceration.    Those children and parents are the proper plaintiffs in a RICO action.

Defendants' reliance on Hemi Group is misplaced because the proximate cause analysis of the plurality opinion is not controlling and, even if it was, there is no harm to third or fourth parties as there was in Hemi Group.    The proximate cause analysis was contained in a plurality opinion written by Chief Justice Roberts and joined by Justices Scalia, Thomas and Alito.  Justice Ginsburg provided the fifth vote for the majority opinion finding that the City did not have a viable RICO claim, but she joined in the plurality opinion "[w]ithout subscribing to the broader range of the Court's proximate cause analysis."  Hemi Group, 130 S. Ct. at 995. Thus, that portion of Chief Justice Roberts' opinion is not controlling.  Even if it were, this case is distinguishable from Hemi Group because there is a direct relationship between the RICO violations and the asserted injury.  In Hemi Group, "the City's theory of liability rest[ed] not just on separate actions, but separate actions carried out by separate parties."  The Court found that not only were the fraudulent acts distinct from the acts which caused the harm, but the acts that caused the harm were carried out by separate parties than those that engaged in the fraudulent acts.  Id. at 990.  Here, there is no distinction: Defendants carried out the fraudulent acts and the acts that caused the harm, and the fraudulent acts and the acts that caused the harm were one and the same.  Thus, the holding of Hemi Group, even if controlling, is not applicable to a case where a direct relationship between the RICO violation and alleged harm is shown.

**C.    Plaintiffs have Sufficiently Pled the Existence of a RICO Enterprise that is Separate and Apart from the Pattern of Activity in Which it Engaged**

Ms. Brulo next argues that the Clarks' claim pursuant to 18 U.S.C. § 1962(c) must be dismissed because the RICO enterprise is identical to the RICO persons.  (Brulo brief at 41-43)  Ms. Brulo also argues that that dismissal is appropriate because the RICO enterprise is

25

identical to the alleged pattern of racketeering activities. These arguments are incorrect. They argue that Plaintiffs failed to allege that the RICO enterprise is actually separate and distinct from the alleged RICO person. Id.

### 1.    The RICO Enterprise is Distinct From the RICO Persons

"A proper 1962(c) claim must allege the existence of two distinct entities: (1) a person; and (2) an enterprise that is not simply the same person referred to by a different name." South Broward Hospital District v. Medquist Inc., 516 F. Supp. 2d 370, 388 (D.N.J. 2007) (internal quotations omitted), aff'd 258 Fed. Appx 466 (3d Cir. 2007). "The defendant 'person' charged with violating § 1962(c) cannot be the same entity as the alleged 'enterprise.'" Id. Here, the RICO persons are defined in paragraph 251 of the Complaint; they include, among others, Ms. Brulo, all of the Detention Facility Defendants and Ciavarella and Conahan. The next paragraph of the complaint alleges that these individual persons "formed an enterprise." (Compl. ¶ 252.) In other words, the enterprise is made up of individual persons, including Ms. Brulo, Mericle, Powell, PACC, Mericle Construction, Vision, Mrs. Conahan and Mrs. Ciavarella, among others. Thus, the Complaint provides a clear delineation between the RICO persons and the enterprise which the RICO persons formed.

### 2.    The Enterprise is Separate and Apart from the Racketeering Activity

Ms. Brulo also erroneously claims that the RICO enterprise and the RICO Activities were identical. To prove the existence of a RICO enterprise, a plaintiff must show: "(1) that the enterprise is an ongoing organization with some sort of framework for making or carrying out decisions; (2) that the various associates function as a continuing unit; and (3) that the enterprise be separate and apart from the pattern of activity in which it engages." United States v. Irizarry, 341 F.3d 273, 286 (3d Cir. 2003) (quoting United States v. Pelullo, 964 F.2d

193, 211 (3d Cir. 1992). Ms. Brulo contends that there was no structure or organization to the enterprise and that the enterprise did not exist separate and apart from the pattern of racketeering activity.

Plaintiffs have sufficiently pled both of these elements. To satisfy the structural or organizational element of an enterprise, a plaintiff must plead that "some sort of structure exists within the group for the making of decisions, whether it be hierarchical or consensual or some mechanism for controlling and directing the affairs of the group on an on-going rather than ad hoc basis." Freedom Med. Inc., v. Gillespie, 634 F. Supp. 2d 490, 505 (E.D. Pa. 2007) (internal quotations omitted). The structural features must include a purpose for the enterprise, relationships with those associated in the enterprise, and longevity sufficient to allow those associated with the enterprise to implement its purpose. See Boyle v. United States, 129 S. Ct. 2237, 2244 (2009). Here, Plaintiffs allege that Ciavarella and Conahan initiated the enterprise and were at the center of enterprise -- coordinating all of the activities of the RICO persons. The purpose of the enterprise was to enrich all of the Defendants by contracting with the Detention Facility Defendants to build juvenile detention centers, providing large payments from the county for those detention centers, ensuring their success by ordering juveniles to the detention center in a manner that violated their constitutional rights, and compensating the judges for their efforts. The Complaint sufficiently alleges the role of each member of the enterprise. Conahan and Ciavarella were responsible for adjudicated juveniles in a manner which violated their constitutional rights, directed the placement of children into the Detention Facility Defendants' detention centers and directed where payments should be made to compensate them for their part of the enterprise. Ms. Brulo helped ensure the supply of juveniles by, among other things, making baseless detention recommendations and by falsifying drug tests by creating probation

{L0411926.1}

violations. The Detention Facility Defendants were responsible for constructing the detention centers and providing payments to Conahan and Ciavarella. The Spouse Defendants owned entities that concealed payments made to Conahan and Ciavarella. The pattern of activity happened over an eight-year period between June 2000 and May 2008. Thus, there was an organizational structure or hierarchy with Conahan and Ciavarella at the top.

Plaintiffs have also shown that the enterprise had an existence separate and apart from the racketeering activity. Paragraph 257 of the Complaint specifically identifies the separate nature of the enterprise and the pattern of racketeering activity. (Complaint, ¶ 257) ("Defendants were an association of individuals, partnerships and corporations joined in purpose of conspiring to commit honest services fraud.")

A plaintiff is also required to "show that the enterprise has a separate existence from the alleged pattern of racketeering activities. This does not require that the enterprise have some legitimate purpose or require that it conduct activities wholly unrelated to the acts of racketeering. Instead, it requires that the enterprise have an existence beyond that necessary to commit the predicate offences." Freedom Med. Inc, 634 F. Supp. 2d at 506. "Allegations that members of the enterprise coordinated the commission of multiple predicate offences or provided legitimate services during the period in which they were engaged in racketeering activities satisfies this element." Id. Here, plaintiffs have alleged numerous predicate acts coordinated by the enterprise. The complaint alleges at least 48 separate acts of mail, wire[3] and other types of fraud over an eight year period. (See Compl. ¶¶ 180-215.) These acts were in

---

[3] A plaintiff claiming a predicate activity based on mail or wire fraud must plead the following elements: "(1) a scheme to defraud, (2) the use of the mails or wires for the purpose of executing the scheme, and (3) fraudulent intent. United States v. Pharis, 298 F.3d 228, 234 (3d Cir. 2002) (citing United States v. Sturm, 671 F.2d 749, 751 (3d Cir. 1982)).

furtherance of several schemes: first overcrowding the Luzerne County detention facility to create the need for PACC, then filling PACC with juveniles and then creating the need for another detention facility. Additionally, there were non-predicate acts done by the enterprise in furtherance of the scheme, including adjudicating youths delinquent and placing them in PACC. All of these facts, taken together, demonstrate that the enterprise existed separate and apart from the alleged pattern of racketeering activity.[4]

---

[4] Plaintiffs' assertion that they have properly pleaded a substantive RICO violation pursuant to 18 U.S.C. § 1962(c) renders moot Ms. Brulo's argument that they cannot assert a RICO conspiracy claim. Plaintiffs have not pled a claim of civil conspiracy. Therefore, Ms. Brulo's arguments concerning the validity of a civil conspiracy claim are irrelevant.

29

## **CONCLUSION**

For the foregoing reasons, the Court should deny Ms. Brulo's motion to dismiss the Complaint against him.

Respectfully submitted,

Bridget E. Montgomery, Esquire
I.D. #56105
David J. Schertz, Esquire
I.D. #81925
Eckert Seamans Cherin & Mellott, LLC
213 Market Street, 8th Floor
Harrisburg, PA 17101

Michael O'Mullan, Esquire
Harold L. Kofman, Esquire
Riker Danzig Scherer Hyland & Perretti LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-9181

Date: June 9, 2010

30

## <u>CERTIFICATE OF WORD COUNT LIMIT</u>

Pursuant to the Court's Order dated June 8, 2010, Plaintiffs' Brief was permitted to be up to 10,000 words in length.  I hereby certify that this brief contains 9,055 words based on the word count feature of Microsoft Word.

David J. Schertz

June 9, 2010

## CERTIFICATE OF SERVICE

I, David J. Schertz, Esquire, hereby certify that on the 9th day of June, 2010, I served a

true and correct copy of the foregoing document upon the following individuals in the following

manner:

Via ECF

John G. Dean, Esquire
Timothy T. Myers, Esquire
Debora H. Simon, Esquire
Elliot Greenleaf & Dean
201 Penn Avenue, Suite 202
Scranton, PA 18503
***Attorneys for The Luzerne County Juvenile Probation Department***

Scott D. McCarroll, Esquire
Attorney I.D. No. 92985
P.O. Box 999
305 N. Front Street
Harrisburg, PA 17108-0999
***Attorney for Sandra Brulo***

Nicole Bednarek, Esquire
Palissery Law Offices
26 Pierce Street
Kingston, PA 18704
***Attorney for Pinnacle Group of Jupiter, LLC***

Edward P. McNelis, Esquire
Stephen D. Rhoades, Esquire
The Law Offices of Edward P. McNelis
19 East Broad Street
Hazleton, PA 18201
***Attorney for Defendants Barbara Conahan and Cindy Ciavarella***

{L0411926.1}

Jessica Richman Birk, Esquire
Montgomery, McCracken, Walker & Rhoads, LLP
123 South Broad Street
24th Floor
Philadelphia, PA 19109
*Attorney for Defendants Robert J. Powell and Vision Holdings, LLC*

Bernard M. Schneider, Esquire
William G. Bruckner, Esquire
Bruckner Schneider & Porter
300 Weyman Road, Suite 320
Pittsburgh, PA 15236
*Attorney for PA Child Care, LLC*

Kimberly D. Borland, Esquire
Ruth S. Borland, Esquire
Borland & Borland, LLP
69 Public Square, 11th Floor
Wilkes-Barre, PA 18701-2597

Allison Dante, Esquire
Joseph B.G. Fay, Esquire
William G. Bruckner, Esquire
Nathan J. Andrisani, Esquire
Matthew J.D. Hogan, Esquire
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103
*Attorneys for Robert K. Mericle and Mericle Construction, Inc.*

Mark B. Sheppard, Esquire
Jessica Richman Birk, Esquire
Montgomery, McCracken,
Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109
*Attorneys for Robert J. Powell and Vision Holdings, LLC*

Pro Se
Michael T. Conahan on behalf of himself and as President of Beverage Marketing of PA, Inc.
301 Deer Run Drive
Mountain Top, PA18707

{L0411926.1}

Mark A. Ciavarella
585 Rutter Avenue
Kingston, PA 18704

/s/David J. Schertz
David J. Schertz, Esquire