**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

RAUL CLARK, BRUCE CLARK, and
IRAIDA CLARK,

      Plaintiffs,

        v.

MICHAEL T. CONAHAN, et al.,

      Defendants,

CIVIL ACTION NO. 3:09-CV-2535

(JUDGE CAPUTO)

## MEMORANDUM

Presently before the Court are the Motions to Dismiss of Defendants Mark A. Ciavarella, Jr. (Doc. 24), Michael T. Conahan (Doc. 28), Sandra Brulo (Doc. 59), Robert K. Mericle and Mericle Construction, Inc. (Doc. 68), PA Child Care, LLC ("PACC") (Doc. 70), Robert J. Powell and Vision Holdings, LLC (Doc. 72), and Barbara Conahan and Cindy Ciavarella (Doc. 78). For the various reasons discussed more fully below the motions of Mr. Conahan, Mr. Ciavarella, Ms. Brulo, Mr. Mericle, Mericle Construction, PACC, Powell, and Vision will be granted in part and denied in part, and the motion of Mrs. Conahan and Mrs. Ciavarella will be granted.

## BACKGROUND

### I.    GENERAL FACTS

The facts alleged in the Complaint are as follows. Defendants Ciavarella and Conahan both served as judges for the Pennsylvania Court of Common Pleas for Luzerne County. (Compl. ¶ 42.) Conahan served as president judge from January 2002 to June 2007, and Ciavarella served as president judge from June 2007 to January 2009. (Compl. ¶¶ 43, 46.) Defendant Ciavarella oversaw juvenile matters in his role as judge between 2000 and

2007. (Compl. ¶ 45.)

In approximately June 2000, Ciavarella met with Defendant Powell, a local attorney, regarding Mr. Powell's desire to construct a new privately-owned juvenile detention facility in Luzerne County. (Compl. ¶ 47.) Ciavarella introduced Powell to Defendant Mericle, the owner of a local construction company; Mericle and his company, Mericle Construction, Inc. agreed to build a facility on land that Powell and his partner, Mr. Gregory Zappala, would later acquire. (Compl. ¶¶ 49-50.) Although the pre-existing publicly-owned juvenile detention facility served the needs of Luzerne County, Conahan and Ciavarella, in exchange for kickbacks from Defendants Powell, Powell Law Firm, Mericle, Mericle Construction, Zappala, Vision Holdings, PACC and Western PA Child Care ("WPACC"), set out to demonstrate the need for a new facility by increasing the number of juveniles who were sentenced to custodial detention. (Compl. ¶¶ 54-57.)

In order to assure a sufficiently high number of juveniles were sentenced to custodial detention, Ciavarella and Conahan regularly denied juveniles their constitutional rights by failing to allow them an impartial tribunal because of the judges' conflicts of interest, denying juveniles their right to counsel, and pressuring juveniles to take guilty pleas without advising them of their rights and ensuring a knowing and voluntary waiver of those rights. (Compl. ¶¶ 59-62.) Conahan and Ciavarella also imposed draconian sentences "for hundreds of first-time offenders of (sic) youthful indiscretions." (Compl. ¶ 64.) These actions rendered the Luzerne County juvenile detention facility overcrowded and inadequate. (Compl. ¶ 68.)

On January 29, 2002, Conahan, as president judge, signed a Placement Guaranty Agreement with PACC that agreed to house juvenile offenders in the PACC facility and provide PACC an annual fee of $1,314,000.00 from Luzerne County. (Compl. ¶¶ 70-71.) By

2

December 2002, Conahan had removed all funding from the publicly-owned facility, functionally closing that facility, and requiring all juveniles to be transferred to other facilities, including PACC. (Compl. ¶ 77.) Due to the success of PACC, Powell and Zappala constructed another juvenile detention center, WPACC, in western Pennsylvania. (Compl. ¶ 80.)

Plaintiffs also allege that Defendant Brulo, who was deputy director of forensic programs at the Luzerne County Juvenile Probation Department ("Juvenile Probation"), and other members of the Juvenile Probation staff actively participated in this scheme by routinely altering their recommendations, at the behest of Conahan and Ciavarella, to state that juvenile offenders should be placed in detention facilities, falsified drug tests, and concocted "bogus" probation violations. (Compl. ¶¶ 83-87.) In return for their cooperation, Brulo and the other members of the Juvenile Probation staff involved in this plan received kickbacks from Conahan and Ciavarella. (Compl. ¶ 86.)

Plaintiffs allege that Powell, Zappala, Mericle, PACC and WPACC paid approximately $2.6 million dollars to Conahan and Ciavarella. (Compl. ¶ 172.) In order to conceal the money received for their participation in this scheme, Conahan and Ciavarella funneled the money, via wire transfer and check, through various shell corporations and bank accounts. (Compl. ¶¶180-211.) One of these corporations, Pinnacle Group of Jupiter, LLC ("Pinnacle"), is alleged to have been owned and operated by Mrs. Conahan and Mrs. Ciavarella, but controlled by Mr. Conahan and Mr. Ciavarella. (Compl. ¶¶ 13-15, 197, 199.) Conahan and Ciavarella also used their positions to assist PACC and WPACC in securing juvenile placement agreements with Luzerne County worth approximately $58 million dollars. (Compl. ¶ 176.) This scheme deprived the citizens of Luzerne County and the Commonwealth of

Pennsylvania of their right to the honest services of Conahan and Ciavarella, and constituted wire and wire and mail fraud. (Compl. ¶ 210.)

## II.    FACTS SPECIFIC TO PLAINTIFFS

In October 2002, Plaintiff Raul Clark was arrested and charged with violation of his town's 10:00 P.M. curfew and possession of drug paraphernalia; at the time of the arrest, Raul was a fourteen-year-old high school freshman. (Compl. ¶¶ 103, 109.) On November 4, 2002, Raul appeared before Ciavarella, at which time Ciavarella falsely stated that Raul was charged with being intoxicated and possession of marijuana. (Compl. ¶¶ 112, 116.) Raul was represented by a public defender at this hearing. (Compl. ¶ 113.) Without providing Raul with an opportunity to enter a plea or explaining that Raul had a right to trial and the consequences of waiving that right, Ciavarella asked Raul if he "did it," before adjudicating Raul delinquent. (Compl. ¶¶ 118-121.) Ciavarella then asked Raul how many birds he saw on the window outside the courtroom; when Raul answered "six," Ciavarella sentenced Raul to six months of custodial detention. (Compl. ¶¶ 122-124.)

Raul spent several weeks in the Luzerne County facility before it closed, at which time Ciavarella transferred Raul to the Lackawanna County juvenile detention facility. (Compl. ¶¶ 131-134.) On December 16, 2002, after spending one week at the Lackawanna County facility, Raul again appeared before then-Judge Ciavarella and was summarily transferred to the Adelphoi Treatment Facility, which was hundreds of miles from Raul's parents' home. (Compl. ¶¶ 137-141.) After six weeks at Adelphoi, Raul was brought before Ciavarella again; Raul was transferred to Clearbrook Lodge, where he spent three (3) months before being released and placed on probation in May 2003. (Compl. ¶¶ 145-157.) Raul was not represented by counsel at any of the hearings regarding his transfer between facilities.

4

(Compl. ¶¶ 133, 139, 148, 156.)

Thereafter, Raul missed his 8:00 P.M. curfew and was summarily ordered by Ciavarella to spend three (3) days in PACC for violation of his probation. (Compl. ¶¶ 158-159.) In 2004, Raul's probation officer, Officer Bliche, took a urine sample from Raul. (Compl. ¶ 161.) Raul was later advised that he had failed the test and that PCP and methamphetamine had been found in his urine sample; Plaintiffs allege that Raul did not ingest those drugs and that Juvenile Probation switched urine samples and/or falsely reported test findings in order to ensure Raul's detention. (Compl. ¶¶ 163-166.) Defendant Ciavarella sent Raul to PACC for violating his probation by failing the drug test. (Compl. ¶ 165.) Between 2002 and 2005, Plaintiffs Bruce and Iraida Clark, Raul's parents, paid three thousand, eight hundred thirty-seven dollars and fifty cents ($3,837.50) to Luzerne County for Raul's incarceration and probation, including having Mrs. Clark's wages and unemployment benefits garnished. (Compl. ¶¶ 167-168.) Plaintiffs allege that "Raul has suffered great emotional distress and financial harm as a result of the actions of the Defendants." (Compl. ¶ 170.)

On October 27, 2009, Raul's November 4, 2002 disposition was expunged pursuant to 18 Pa.C.S.A. § 9123(a)(3), which provides for expungement of juvenile records if the juvenile has not been convicted of a felony, misdemeanor or adjudicated delinquent for five (5) years. (Doc. 88, Ex. C.) On October 29, 2009, the Pennsylvania Supreme Court adopted the Third Interim Report and Recommendations of Special Master Judge Arthur E. Grim; the Pennsylvania Supreme Court ordered that all juvenile adjudications and consent decrees entered by Ciavarella between January 1, 2003 and May 31, 2008 were tainted, and, therefore, would be vacated. (Doc. 88, Ex. D.)

### III.    PROCEDURAL HISTORY

On December 24, 2009, Plaintiffs filed the instant Complaint. (Doc. 1.) The Complaint asserted causes of action for violation of 42 U.S.C. § 1983 for violating the Plaintiffs' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution against Mr. Conahan, Mr. Ciavarella, Juvenile Probation, and Ms. Brulo (Count I), violation of 42 U.S.C. § 1983 for violating the Plaintiffs' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution against Juvenile Probation (Count II), violation of 42 U.S.C. § 1983 for violating the Plaintiffs' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution against Powell, PACC, WPACC, Mericle, Mericle Construction, Inc., Zappala, Pinnacle, Barbara Conahan, Cindy Ciavarella, Beverage Marketing of PA, Inc., Vision Holdings, LLC, Mid-Atlantic Youth Services Corp. ("MAYS"), and Powell Law Group (Count III), violation of civil RICO provisions against all defendants (Count IV), conspiracy to violate RICO against Conahan, Ciavarella, Powell, Mericle, Mericle Construction, PACC, WPACC, Zappala, Pinnacle, Mrs. Conahan, Mrs. Ciavarella, Beverage, MAYS, Powell Law Group and John Doe Defendants 1-10 (Count V), false imprisonment against all defendants (Count VI), and intentional infliction of emotional distress against all defendants (Count VII).

Defendants Zappala, WPACC, MAYS, and Juvenile Probation were voluntarily dismissed from this action. (Docs. 9, 52.) On May 3, 2010, Pinnacle filed an Answer to Plaintiffs' Complaint. (Doc. 65.) Motions to dismiss were filed by Defendants Mark A. Ciavarella, Jr. (Doc. 24), Michael T. Conahan (Doc. 28), Sandra Brulo (Doc. 59), Robert K. Mericle and Mericle Construction, Inc. (Doc. 68), PA Child Care, LLC ("PACC") (Doc. 70), Robert J. Powell and Vision Holdings, LLC (Doc. 72), and Barbara Conahan and Cindy

6

Ciavarella (Doc. 78). These motions have been fully briefed and are currently ripe for disposition.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted.  Dismissal is appropriate only if, accepting as true all the facts alleged in the complaint, a plaintiff has not pleaded "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), meaning enough factual allegations "'to raise a reasonable expectation that discovery will reveal evidence of'" each necessary element, *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556); *see also Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) (requiring a complaint to set forth information from which each element of a claim may be inferred).  In light of Federal Rule of Civil Procedure 8(a)(2), the statement need only "'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'"  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555).  "[T]he factual detail in a complaint [must not be] so undeveloped that it does not provide a defendant [with] the type of notice of claim which is contemplated by Rule 8."  *Phillips*, 515 F.3d at 232; *see also Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007).

In deciding a motion to dismiss, the Court should consider the allegations in the complaint, exhibits attached to the complaint, and matters of public record.  *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).  The Court may also consider "undisputedly authentic" documents when the plaintiff's claims are

based on the documents and the defendant has attached copies of the documents to the motion to dismiss. *Id.* The Court need not assume the plaintiff can prove facts that were not alleged in the complaint, *see City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 263 & n.13 (3d Cir. 1998), or credit a complaint's "'bald assertions'" or "'legal conclusions,'" *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir. 1997) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429-30 (3d Cir. 1997)). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009).

When considering a Rule 12(b)(6) motion, the Court's role is limited to determining if a plaintiff is entitled to offer evidence in support of her claims. *See Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). The Court does not consider whether a plaintiff will ultimately prevail. *See id.* A defendant bears the burden of establishing that a plaintiff's complaint fails to state a claim. *See Gould Elecs. v. United States,* 220 F.3d 169, 178 (3d Cir. 2000).

### DISCUSSION

Before delving into the specific motions by various defendants, this Court must first address two jurisdictional concerns that loom over the entirety of this case. Once those issues have been disposed of, the Court will discuss the pending motions.

### I.    *HECK v. HUMPHREY*

The Supreme Court has repeatedly held that a plaintiff cannot bring a cognizable claim pursuant to 42 U.S.C. § 1983 if a judgment in favor of the plaintiff "would necessarily imply the invalidity of his conviction or sentence," unless the plaintiff can demonstrate that the conviction or sentence has been invalidated. *Edwards v. Balisok*, 520 U.S. 641, 643

8

(1997) (quoting *Heck v. Humphrey*, 512 U.S. 477, 487 (1994)). Thus, this Court must first determine whether Plaintiffs' § 1983 claims would necessarily imply the invalidity of Raul's conviction or sentence, and then determine whether Raul's conviction or sentence has been invalidated.

### A.    Necessarily Implies Invalidity

As to Plaintiffs' Fifth, Sixth and Fourteenth Amendment claims, although the precise contours of those claims are unclear at this stage of the proceeding, those claims necessarily will imply the invalidity of the underlying juvenile conviction and sentences. Essentially, Plaintiffs are claiming that Defendants' failure to ensure that Raul was provided with adequate procedural safeguards led to his being wrongfully adjudicated delinquent and then later adjudicated as being in violation of his probation. These procedural defects, if established, would necessarily imply the invalidity of Ciavarella's adjudication of delinquency. *See, e.g.*, *Edwards*, 520 U.S. at 646-48.

To the extent that Plaintiffs are challenging the conditions of Raul's confinement pursuant to the Eighth Amendment, such as being put in a six-by-six cell or being confined to his cell for twenty-three hours per day (Compl. ¶¶ 130, 136), these claims do not call into question the validity of the underlying juvenile proceedings. Therefore, they do not require a favorable termination to proceed. *See Torres v. Fauver*, 292 F.3d 141, 149-50 (3d Cir. 2002) (holding that favorable termination rule does not apply where plaintiff challenges conditions, rather than fact or duration, of confinement).

### B.    Favorable Termination

In this case, there are several instances where Raul was adjudicated delinquent

9

and/or sentenced for violation of probation. First, there was the original hearing in which Raul was adjudicated delinquent on November 4, 2002. This adjudication was ultimately expunged on October 27, 2009, because Raul had gone five (5) years with being convicted of a felony, misdemeanor, or adjudication of delinquency, as per Pennsylvania statute. Next, there were the two probation violations that occurred some time after 2003 that resulted in Ciavarella ordering Raul to be detained at PACC. These decisions regarding probation violations were later vacated by the Pennsylvania Supreme Court when, on October 29, 2009, it ordered that all juvenile adjudications made by Ciavarella between 2003 and 2008 were tainted and should be vacated. As will be discussed below, these different dispositions lead this Court to come to different conclusions regarding favorable termination.

### 1.    October 27, 2009 Expungement

In *Gilles v. Davis*, 427 F.3d 197, 202 (3d Cir. 2005), the plaintiff, while videotaping his partner's inflammatory preaching on a university campus, was arrested and charged with disorderly conduct, resisting arrest, and failure of disorderly persons to disperse; he then entered the Accelerated Rehabilitative Disposition ("ARD") program, which permits expungement of the criminal record after successful completion of a probationary term. After completing this probationary period and having his record expunged, Plaintiff brought a § 1983 action claiming that the arresting officers and various university administrators had violated his First Amendment rights. *Gilles*, 427 F.3d at 208-09.

The Third Circuit Court of Appeals held that completion of the ARD program was not a favorable termination under *Heck*, reasoning that the ARD program is a court-supervised compromise that "imposes several burdens upon the criminal defendant not consistent with innocence," including a probationary period during which a violation of the program's terms may result in prosecution. *Id.* at 211-212. Therefore, participation in the ARD program barred

10

plaintiff's claim. *Id.* at 212.

Similarly, expungement of a juvenile's record pursuant to 18 Pa.C.S.A. § 9123(a)(3), is a statutorily created compromise where a juvenile will not be hounded by youthful indiscretions if he or she does not commit any crimes or delinquent acts for five years following final discharge. This is a burden that is not consistent with innocence of the underlying crimes, but rather a "period of observation" to ensure that the juvenile is not a repeat offender and, therefore, should not be eternally haunted by his or her juvenile record. *See Gilles*, 427 F.3d at 211 (quoting *Singleton v. City of New York*, 632 F.2d 185, 194 (2d Cir. 1980)). In fact, such expungement does *not* indicate anything regarding the juvenile's culpability *vis a vis* the underlying delinquent acts. Therefore, expungement pursuant to 18 Pa.C.S.A. § 9123(a)(3) is not a favorable termination for purposes of *Heck*. As such, the expungement of the acts relating to Raul's November, 4, 2002 adjudication have not been favorably terminated, and he cannot recover any claims relating to actions taken arising from that hearing.

### 2.    October 29, 2009 Expungement

Defendants argue that *Kossler v. Crisanti*, 564 F.3d 181 (3d Cir. 2009), stands for the proposition that a favorable termination must be indicative of actual innocence. While it is true that *Kossler* does stand for this proposition, it is unclear whether *Kossler*, which very explicitly limited its holding to the facts of that case, applies with equal force to § 1983 claims that are brought under a claim other than malicious prosecution. *See Kossler*, 564 F.3d at 187, 192. Assuming without deciding that *Kossler* does require an indication of actual innocence, the Third Circuit Court of Appeals went on to list six (6) ways in which a plaintiff may indicate his innocence: 1) discharge by a magistrate at a preliminary hearing, 2) the refusal of a grand jury to indict, 3) the formal abandonment of the proceedings by the

prosecutor, 4) the quashing of an indictment or information, 5) acquittal, or 6) a final order in favor of the accused by a trial or appellate court. *Id.* at 187-88 (citing *Donahue v. Gavin*, 280 F.3d 371, 383 (3d Cir. 2002)).

In the instant case, the adjudications of probation violations that occurred after January 1, 2003 were vacated by the Pennsylvania Supreme Court's order of October 29, 2009. Thus, Raul was the beneficiary of a final order in favor of the accused by an appellate court, which is one of the terminations of a criminal proceeding that indicates innocence. As Raul has received a favorable termination of these adjudications, he is not barred by *Heck* and may bring actions pursuant to § 1983 for any injury arising from the actions taken against him after January 1, 2003.

## II.    INJURY TO BUSINESS OR PROPERTY

In order to have standing to bring a RICO claim pursuant to 18 U.S.C. § 1962(c), as Plaintiffs do here, Plaintiffs must plead injury to his business or property and that Defendants proximately caused such injury. *Pappa v. Unum Life Ins. Co. of America*, No. 3:07-cv-0708, 2008 WL 744820, at *8 (M.D. Pa. March 18, 2008). A injury "by nature of mental distress" is not sufficient to claim damage to business or property. *Id.* (citing *Zimmerman v. HBO Affiliate Group*, 834 F.2d 1163, 1169 (3d Cir. 1987)). The phrase "business or property" has been held by the Supreme Court, in construing the Clayton Act, to exclude personal injury. *Id.* (citing *Reiter v. Sonotone*, 442 U.S. 330, 339 (1979)). Mental distress, emotional distress, and harmed reputations do not constitute injury to business or property sufficient to confer standing on a RICO plaintiff. *Id.* at *8-9; *Zimmerman*, 834 F.2d at 1169. Furthermore, injury for RICO purposes requires proof of concrete financial loss, not mere injury to an intangible property interest. *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000) (citing *Steele v. Hospital Corp. of Am.*, 36 F.3d 69, 70 (9th Cir. 1994)).

While Mr. and Mrs. Clark have sufficiently pled injury to property in the form of the money paid and the wages that were garnished to pay for Raul's incarceration and probation, Plaintiffs have only alleged that Raul suffered "great emotional distress" and "financial harm." Clearly, the emotional harm claim is not sufficient to meet the injury to business or property standard. Furthermore, while "financial harm" may not sufficiently plead business or property injury, Plaintiffs argue in their brief that the injuries Raul is claiming include loss of earning capacity based on education that he missed while in custodial detention. However, this is not the type of concrete monetary lost envisioned by *Maio*. While a loss of actual employment might be sufficient, allegations of lost earnings and/or decreased earning capacity is not sufficient to support a civil RICO claim. *Magnum v. Archdiocese of Philadelphia*, No. 06-CV-2589, 2006 WL 3359642, at *3 (E.D. Pa. Nov. 17, 2006). Therefore, Raul has not alleged that he has suffered an injury to business or property, and does not have standing to bring a claim pursuant to civil RICO. Thus, Counts IV and V will dismissed as to Raul, but will remain as to Mr. and Mrs. Clark.

## III.    DEFENDANT CONAHAN

Defendant Conahan moves to dismiss Plaintiff's Complaint, claiming that he cannot be sued due to absolute judicial immunity in his role as judge and absolute legislative immunity for his role as a budget-maker while acting as President Judge. This Court shall address each of these arguments below.

### A.    Judicial Immunity

This Court has previously had the opportunity, now on two occasions, to examine the doctrine of absolute judicial immunity in a very similar factual scenario in *Wallace v. Powell*, No. 3:09-cv-286, 2009 WL 4051974, at *3-4 (M.D. Pa. Nov. 20, 2009) and *Dawn v. Ciavarella*, 3:10-cv-0797, 2010 WL 3122858, at *3-5 (M.D. Pa. Aug. 9, 2010). Those cases

arose from the same set of circumstances, alleging that Conahan and Ciavarella had denied the juvenile plaintiffs their Constitutional rights as part of the scheme to divert juvenile offenders to the newly constructed PACC and WPACC facilities in return for kickbacks. *E.g., Wallace*, 2009 WL 4051974, at *1-2. Defendants Conahan and Ciavarella moved to dismiss based on absolute judicial immunity in those cases as well. *Id.* at *1.

For judicial immunity to apply, only two requirements must be met: 1) jurisdiction over the dispute, and 2) a judicial act. *Id.* at *7.  As to the first, a judge is not immune only when he has acted in the "clear absence of all jurisdiction." *Stump v. Sparkman*, 435 U.S. 349 (1978) (citation omitted). As to the second prong, judicial immunity extends only to "judicial acts," not administrative, executive, or legislative ones. *Id.* at 360-61.

"[T]he scope of the judge's jurisdiction must be construed broadly where the issue is the immunity of the judge." *Stump*, 435 U.S. at 356 (citation omitted). The fact that the judge was incorrect about the status of jurisdiction or that there were procedural errors causing the judge to act without jurisdiction does not satisfy the requirements for defeating immunity. *Gallas v. Supreme Court of Pennsylvania*, 211 F.3d 760, 771 (3d Cir.2000).

In determining whether an act is judicial, "it is appropriate to consider 'the nature of the act itself, *i.e.*, whether it is a function normally performed by a judge,' and 'the expectations of the parties, *i.e.*, whether they dealt with the judge in his official capacity.'" *Wallace*, 2009 WL 4051974, at *7 (quoting *Stump*, 435 U.S. at 362). "Acts which are traditionally done by judges include issuing orders, resolving cases and controversies, making rulings, and sentencing criminal defendants. Other actions such as sending a fax, or hiring and firing subordinates, have been found to be administrative, rather than judicial, acts. Note, however, that even if an act is not judicial, there may be still be immunity if the act is legislative or executive in nature." *Id.*

14

In *Wallace*, this Court held that the allegations that Conahan and Ciavarella did not act as impartial judges, failed to advise juveniles of their right to counsel, and failed to determine whether guilty pleas were knowing and voluntary, while "egregious, unjustifiable judicial behavior," did not "make out a case for the absence of jurisdiction." *Wallace*, 2009 WL 4051974, at *7. Thus, as to their courtroom behavior, both Conahan and Ciavarella were held to have jurisdiction.

In this case, Plaintiff alleges that Conahan ordered various juveniles to be placed in the new juvenile facilities as part of a scheme to ensure that the facilities were lucrative. (*See, e.g.,* Compl. ¶ 58.) As to this type of courtroom behavior, Conahan clearly had jurisdiction.

However, many of the actions allegedly taken by Conahan were not judicial acts that would confer absolute judicial immunity. To the extent that Plaintiff makes allegations regarding Conahan's disposition of other juvenile cases before him in his role as judge, those are judicial acts and Conahan has immunity. However, the vast majority of activity alleged against Conahan was taken outside his role as judicial officer. In fact, most of the allegations against Conahan, as they relate to Raul specifically, were taken outside of the court room. The agreements entered into by Conahan with Mericle, Ciavarella and Powell, any budget decisions made by Conahan as President Judge, or any of advocacy for building WPACC and PACC are non-judicial acts that are not subject to absolute judicial immunity. *See Wallace*, 2009 WL 4051974, at *8 (delineating judicial and non-judicial acts taken by Conahan). Therefore, Conahan's motion to dismiss is granted regarding any actions he may have taken in delinquency determinations of other minors in furtherance of the conspiracy and other judicial acts. However, the remaining claims against Conahan fall outside of the realm of judicial acts and he cannot be shielded by judicial immunity for these actions. The

motion will be denied as to these actions.

### B.    Legislative Immunity

Conahan also argues that he is subject to legislative immunity for all budgetary actions he took in his role as President Judge. This Court was presented with a similar argument by Conahan in *Wallace* and *Dawn*. In *Wallace*, this Court held:

> There appears to be no legal basis for the argument that the president judge has the legislative power to control and administer even a portion of the county budget. As the Plaintiffs argue in their brief in opposition, "Pennsylvania law does not vest a president judge with the power to create, vote on, or sign into law a county budget." (Doc. 282 at 67.) The cases which address the interaction between the president judge and the county commissioners instead suggest that the president judge makes budget recommendations to the commissioners, but that the commissioners must make the final spending allocations. *See, e.g., Lavelle v. Koch*, 532 Pa. 631, 617 A.2d 319 (Pa.1992) (president judge seeking to compel commissioners to disperse funds); *Becket v. Warren*, 497 Pa. 137, 439 A.2d 638 (Pa.1981) (same). This type of political lobbying is distinct from legislative activity. Because Conahan's activity with respect to the Luzerne County budget was not legislative in nature, I find that absolute legislative immunity does not apply.

*Wallace*, 2009 WL 4051974, at *11.

This Court also found this reasoning dispositive in *Dawn*. 2010 WL 3122858, at *5. The reasoning in *Wallace* applies with equal force to the instant case, just as it did in *Dawn*. Conahan lacked the general policy-making power that would imbue his actions with legislative immunity. As such, Conahan's motion will be denied with regard to his legislative immunity arguments.

## IV.    DEFENDANT CIAVARELLA

Defendant Ciavarella also argues that absolute judicial immunity shields him from Plaintiff's allegations. In this case, Ciavarella acted with jurisdiction, as he was the judge that presided over Raul's juvenile case and subsequent probation violations. Regarding the judicial acts prong of the test, some of Ciavarella's alleged actions are covered by judicial immunity, while others are not. Ciavarella's court room actions in adjudicating and

sentencing juveniles are precisely the type of judicial act that is protected by the doctrine of judicial immunity. Clearly then, any of the court room activity that Ciavarella engaged in in the disposition of Raul's case, during the adjudication hearings, sentencing, probation hearings, or other in-court actions, are also covered by absolute judicial immunity. As for to the other allegations, such as Ciavarella's role in the conspiracy to build the juvenile detention centers and receive kickbacks, those allegations are extra-judicial activity that is not protected by absolute judicial immunity. Therefore, Ciavarella's motion will be granted in part and denied in part. It will be granted for all judicial acts, such as 2the dispositions of juvenile proceedings, including Raul's, and denied as to all other allegations.

## V.    DEFENDANT BRULO

The factual allegations against Defendant Brulo are that she 1) recommended that Raul and other juveniles be detained in order to lend the orders of Conahan and Ciavarella with a brush of legitimacy, 2) altered probation reports and drug tests in order to have Raul and other children placed in detention, and 3) concocted "bogus" probation violations to ensure that Raul and other juveniles were placed in detention. (Compl. ¶ 232.) The majority of Plaintiffs' allegations focus on Brulo's general involvement in the scheme in order to detain the juveniles of Luzerne County, but do not allege that Brulo did anything to Raul specifically. (*See* Compl. ¶¶ 66, 83, 84.) However, Plaintiffs do allege that Brulo's actions affected Raul. (Compl. ¶ 232.) Defendant Brulo argues that she is shielded from liability due to sovereign immunity, quasi-judicial immunity, and qualified immunity.[1] Brulo also argues about the merits of the claims brought against her. This Court will address the federal causes of action against Brulo in this section, and discuss the state law claims against all Defendants,

---

[1]      Defendant Brulo also argues that she cannot be sued in her official capacity. Plaintiffs conceded this point at oral argument and all the causes of action against Brulo will be treated as though they are brought against her in her personal capacity.

including Brulo, later in this opinion.

### A.     Sovereign Immunity

Brulo argues that the state law claims against her should be dismissed due to sovereign immunity pursuant to 42 PA. CONST. STAT. ANN. § 8521. Sovereign immunity is only available to state employees while they are acting within the scope of their duties. 1 PA. CONST. STAT. ANN. § 2310. The probation department is an arm of the state, and its employees are state actors, making them subject to sovereign immunity. *See Haybarger v. Lawrence County Adult Probation and Parole*, 551 F.3d 193, 198 (3d Cir. 2008). Conduct of an employee is within the scope of employment when it is of a kind and nature that the employee is employed to perform, it occurs substantially within the authorized time and space limits, and the action is prompted, at least in part, by a purpose to serve the employer. *Larsen v. State Employees' Retirement System*, 553 F. Supp.2d 403, 420 (M.D. Pa. 2008).

In the instant case, Defendant Brulo is not entitled to sovereign immunity because the alleged acts are not within the scope of her employment. Although the scope of employment is often a question of fact, the scope of probation officers is set out by statute in 42 PA. CONST. STAT. ANN § 6304. Thus, this Court can determine whether, as a matter of law, the allegations in the Complaint fall outside that scope. Altering drug tests, changing recommendations as part of a scheme to ensure the detention of juveniles, and concocting fake probations violations to have juveniles placed in custody are not the type of conduct that juvenile probation officers are hired to perform. As such, the allegations fail to fall within the first prong of the scope of employment test, and, therefore, Defendant Brulo's actions cannot be shielded by sovereign immunity. The motion to dismiss on the ground of sovereign immunity will be denied.

**B.    Quasi-Judicial Immunity**

Absolute immunity is available to government actors that are performed in their "quasi-judicial" role for conduct that is "intimately associated with the judicial phase of the criminal process." *Kulwicki v. Dawson*, 969 F.2d 1454, 1463 (3d Cir. 1992); *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976).  In determining whether to grant such immunity, courts must take a functional approach, focusing on "the nature of the function performed, not the identity of the actor who performed it and evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of that function." *Stankowski v. Farley*, 487 F. Supp.2d 543, 552 (M.D. Pa. 2007) (quoting *Light v. Haws*, 472 F.3d 74, 78 (3d Cir.2007)), *aff'd*, 251 Fed. Appx. 743 (3d Cir. 2007). However, where a government actor is acting in his or her investigative or administrative capacity, those actions are only protected by qualified immunity, not absolute quasi-judicial immunity. *Kulwicki*, 969 F.2d at 1463. Probation officers enjoy quasi-judicial immunity for participation in the preparation of pre-sentence reports. *Stankowski*, 487 F. Supp.2d at 552-53.

In this case, Defendant Brulo is subject to absolute quasi-judicial immunity regarding her actions stemming from her sentencing recommendations. These activities are intimately associated with the judicial phase of the juvenile proceedings; as noted above, there is precedent in this district for holding that such activities are subject to immunity. *See id.* However, the other actions alleged against Brulo, such as altering drug tests, or conjuring up fake probation violations, were taken in her investigative role as a probation officer. As such, these activities are not subject to quasi-judicial immunity. Therefore, Brulo's motion to dismiss is granted for all her actions regarding sentencing recommendations and denied as to the other activities.

### C.    Qualified Immunity

Brulo argues that the remaining activity is protected by qualified immunity. Qualified immunity protects government officials from suit for conduct that does not violate a clearly established statutory or constitutional right of which a reasonable person would be aware. *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

The remaining factual allegations are that Brulo altered reports and drug tests and "concocted bogus probation violations" to have Raul and other juveniles placed in detention. (Compl. ¶ 232.) Undoubtedly, an objectively reasonable person would know that it is a violations of constitutional rights to falsify court documents and drug tests to ensure that juvenile offenders are placed in custodial detention. Therefore, Brulo is not entitled to qualified immunity for these actions, and the motion to dismiss will be denied on that count.

### D.    Section 1983

Defendant Brulo argues that Plaintiffs have failed to allege any personal involvement in a § 1983 violation against Raul. Section 1983 provides redress for individuals whose constitutional rights are violated by governmental actors.  "To establish liability under 42 U.S.C. § 1983, a plaintiff must show that the defendants, acting under color of law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained injury." *Elmore v. Cleary*, 399 F.3d 279, 281 (3d Cir. 2005). Brulo, as employee of Juvenile Probation, was acting under color of state law for all the conduct alleged in the Complaint. She instead argues that Plaintiffs have not alleged a violation of rights by Brulo.

While Brulo is correct that the main thrust of the Complaint is aimed at alleging Brulo's general association with the scheme to incarcerate juveniles, there are sufficient allegations specific to Raul to allow the § 1983 claim to survive a motion to dismiss. As noted above, the

actual count for § 1983 violations against Brulo (Count I) contains allegations that all of the conduct that Brulo engaged in was done "to have Raul and other children" placed in detention. While discovery may uncover that Brulo was not actually personally involved with Raul's case in any way, that is not an appropriate inquiry at this stage. Instead, looking solely to the allegations in the Complaint, Plaintiffs have sufficiently alleged conduct by Brulo that would constitute a § 1983 violation against Plaintiffs.

Defendant also argues that Mr. and Mrs. Clark lack standing to bring causes of action pursuant to § 1983. This argument will be discussed at length in the next section of this opinion. The forthcoming discussion regarding standing of Mr. and Mrs. Clark to bring § 1983 claims applies with equal force to Mrs. Brulo's motion.

### E.    RICO

Plaintiffs' Complaint alleges that Conahan, Ciavarella, Powell, PACC, WPACC, Mericle, Mericle Construction, Zappala, Pinnacle, Mrs. Conahan, Mrs. Ciavarella, Beverage, Visions, MAYS, and Powell Law Group ("RICO Defendants") formed an enterprise to engage in a pattern of racketeering activity. (Compl. ¶¶ 251-253.) While the Complaint includes Brulo in the caption for the RICO claims (Counts IV and V), it does not contain any mention of her in the substantive paragraphs of those claims. Plaintiffs incorrectly state in their brief that Ms. Brulo is named in paragraph 251 of the Complaint. She is not. As such, Plaintiffs have failed to bring a RICO claim against Defendant Brulo and her motion to dismiss will be granted as to Counts IV and V of the Complaint.

### VI.    REMAINING MOVING DEFENDANTS' FEDERAL CLAIMS

### A.  Section 1983

#### 1.    Under Color of State Law

Generally, to satisfy the under color of state law prong, the defendant must have

"exercised power possessed by virtue of state law and made possible only because wrongdoer is clothed with authority of state law." *David v. City and County of Denver*, 101 F.3d 1344 (10th Cir. 1996). The parties do not dispute remaining Defendants could not independently act under color of state law.[2] Instead, Plaintiffs allege that because the remaining moving Defendants conspired with Conahan and Ciavarella, who acted under color of state law, that they may be held liable. Plaintiffs are correct that "a private party who willfully participates in a joint conspiracy with state officials to deprive a person of a constitutional right acts 'under color of state law' for purposes of § 1983.'" *Abbott v. Latshaw*, 164 F.3d 141, 147-48 (3d Cir. 1998) (quoting *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980)).

Defendants argue that Plaintiffs fail to sufficiently allege that they were part of a conspiracy to violate Plaintiffs' rights. "'To demonstrate a conspiracy under § 1983, a plaintiff must show that two or more conspirators reached an agreement to deprive him or her of a constitutional right 'under color of law.'" *Williams v. Fedor*, 69 F. Supp.2d 649, 666 (M.D. Pa. 1999) (quoting *Parkway Garage, Inc. v. City of Phila.*, 5 F.3d 685, 700 (3d Cir. 1993)). Plaintiffs allege that the remaining Defendants intentionally, deliberately, and maliciously deprived Raul of his Fifth, Sixth, Eighth and Fourteenth Amendment rights by conspiring with Conahan and Ciavarella to participate in bribery schemes, routinely place juvenile offenders in custodial detention for minor offenses, create a system where juveniles were not advise of their right to trial or counsel, and interfere with Juvenile Probation's ability to recommend probation rather than detention. (Compl. ¶ 248.) But this conclusory allegation by itself is insufficient; Plaintiffs must provide factual allegations to support their claims, as per *Twombly*.

---

[2]    "Remaining Defendants" are Mericle, Mericle Construction, PACC, Powell, Vision, Mrs. Conahan, and Mrs. Ciavarella.

As to Mericle and Powell, the Plaintiffs outline at length the factual allegations as to each as to their interactions with Conahan and Ciavarella. (Compl. ¶¶48-53, 79-81,182-211.) And because Mericle and Powell are alleged to be owners, operators, officers, and of shareholders of Mericle Construction, Inc., PACC, and Vision, Plaintiffs also provide sufficient factual allegations against those entities.[3]

As to Mrs. Conahan and Mrs. Ciavarella, however, Plaintiffs' factual allegations are significantly more limited. Plaintiffs allege that Mrs. Conahan and Mrs. Ciavarella were owners and operators of Pinnacle, an entity involved in the payment of kickbacks and hiding of funds. (Compl. ¶13.) While this allegation would be enough to bind Pinnacle for any actions by Mrs. Conahan or Mrs. Ciavarella, the inverse is not necessarily true, *i.e*, conduct by the entity, Pinnacle, through its agents or apparent agents, would not necessarily bind the wives as owners and operators of the entity. Furthermore, Plaintiffs allege that while Mrs. Conahan and Mrs. Civarella *owned* Pinnacle, that their husbands *controlled* Pinnacle during the conspiracy. (Compl. ¶¶ 197, 199.) Plaintiffs provide no further factual allegations that the wives agreed, assisted, knew of, or otherwise participated in the alleged conspiracy beyond owning and operating an entity used by the conspiracy. This allegation alone fails to provide sufficient factual basis for Plaintiffs' bare legal conclusion that Mrs. Conahan and Mrs. Ciavarella were part of the alleged conspiracy. Therefore, as to Mrs. Conahan and Mrs. Ciavarella, they did not act under color of state law, and their motions to dismiss will be granted. As to the other remaining Defendants, I find that Plaintiffs sufficiently allege a conspiracy with state actors, and thus their motions to dismiss on this ground will be denied.

---

[3] Defendants argue that the *Monell* standard requiring a policy or custom by an entity applies to these private entities as it would to public entities. I need not address this issue because Mericle and Powell are clearly alleged to be in positions of policy-making authority. Thus under either *respondeat superior* or the *Monell* standard, there are sufficient factual allegations against these entities.

### 2.    Violation of Federal Constitutional Right

Plaintiffs must be broken into two groups when considering the violation of federal constitutional rights in this case.  First, this Court must consider the alleged violations of Raul's Fifth, Sixth, Eighth and Fourteenth Amendment rights.  The precise contours of these claims are slightly unclear at this stage of the litigation, but seem to be for violations of Raul's substantive and procedural due process rights, his right to counsel, his right to an impartial tribunal, his right against involuntary guilty pleas, and his right to be free from cruel and unusual punishment. The second group consists of Raul's parents, Mr. and Mrs. Clark. Notably, Mr. and Mrs. Clark may not bring claims for damages based upon violations of Raul's rights, but instead must bring claim for violations of their own constitutional rights. *See O'Malley v. Brierley*, 477 F.2d 785, 789 (3d Cir. 1973) (party may not bring claim based on the violation of another's rights).  I will consider the allegations of Raul and his parents separately.

### a.    Raul's Claims

Defendants do not dispute that the juvenile plaintiffs sufficiently allege that their constitutional rights were violated by Ciavarella.  Instead, Defendants argue that Ciavarella's conduct, not their conduct, caused Raul's injuries and that his actions were beyond the scope of the alleged conspiracy.  As discussed above there are sufficient factual allegations to support Plaintiffs' allegations that Defendants, except for Mrs. Conahan and Mrs. Ciavarella, conspired not only to construct the juvenile facilities, but to ensure that those facilities remained full and financially viable by violating the rights juvenile offenders like Raul. While Plaintiffs will ultimately have the burden of establishing the scope of the conspiracy, an evaluation of the strength of Plaintiffs' evidence is inappropriate at this juncture. It is sufficient that Plaintiffs allege that the purposes of the conspiracy included the

deprivation of the juveniles' rights.[4]  Therefore, Plaintiffs have sufficiently plead a conspiracy involving the remaining Defendants that deprived Raul of his constitutional rights, and their motions to dismiss will be denied on this count.

### b.    Mr. and Mrs. Clark's Claims

Mr. and Mrs. Clark, as noted above, cannot use violations of Raul's constitutional rights to make out a claim that *their* rights were violated. *O'Malley*, 477 F.2d at 789. As such, several of the alleged constitutional violations necessarily fail. First, Mrs. and Mrs. Clark cannot bring a claim for violations of the Sixth Amendment's right to counsel. Supreme Court precedent makes it clear that " a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him." *Kirby v. Illinois*, 406 U.S. 682, 688 (1972) (citations omitted). Because Mr. and Mrs. Clark never had any adversary proceedings taken against them, their Sixth Amendment right to counsel never attached, and they cannot bring a § 1983 claim under this theory. Next, Mr. and Mrs. Clark have not made out a cognizable claim pursuant to the Eighth Amendment, which states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The only possible claim that Mr. and Mrs. Clark could have standing to bring is that they were forced to pay excessive fines as a result of Raul's adjudication, incarceration, and probation. Although the Clarks do allege that they had to pay fines arising out of Raul's delinquency proceedings, they do not allege anywhere in the Complaint that those fines were excessive in nature. Thus, Mr. and Mrs. Clark have not sufficiently alleged a cause of action pursuant to § 1983 for violations of the

---

[4] Plaintiffs also may be able to establish "the requisite causal connection . . . not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Pilchesky v. Miller*, Civil Action No. 3:CV-05-2074, 2006 WL 2884445, at *4-5 (M.D. Pa. Oct. 10, 2006) (quoting *Hydrick v. Hunter*, 449 F.3d 978, 991 (9th Cir. 2006), *rev'd on other grounds*, 466 F.3d 676 (9th Cir. 2006)).  In light of the conclusion that Plaintiffs sufficiently allege that the conspiracy covered the alleged constitutional violations, this Court need not decide whether Plaintiffs establish a claim under this standard.

Eighth Amendment.

This leaves only the Fifth and Fourteenth Amendment claims. Again, the exact claims being brought under these constitutional provisions is unclear. It would seem that the only cognizable claims would be 1) that their procedural due process rights were violated when they were deprived of monetary sums as a result of the juvenile adjudications without due process of law and 2) that Defendants violated their substantive due process interest in the family relationship between parent and child.

To establish a cause of action for a procedural due process violation, a plaintiff must first prove that a person acting under color of state law deprived him of a protected property interest; and second, he must show that the procedures available to him failed to provide him with due process of law. *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000). Plaintiffs argue that the Defendants deprived them of monetary sums through fines and garnishment of Mrs. Clark's wages and unemployment benefits.  Defendants argue Mr. and Mrs. Clark are seeking their damages not for violations of their own rights, but vicariously for the violation of Raul's rights.

In, *Stacey v. City of Hermitage*, 178 Fed. Appx. 94 (3d Cir. 2006), plaintiff, along with her son, brought a civil rights action pursuant to § 1983 against the local municipality alleging violations of their constitutional rights arising out of the demolition of plaintiff's home. *Id.* at 98.  The Third Circuit Court of Appeals reversed in part the district court's order granting the defendants' motion to dismiss.  *Id.* at 103.  In doing so, the court permitted the claims of both plaintiffs, noting that the son alleged that he had a Fourth Amendment property interest in private property in the home.  *Id.* at 100.

Like the son in *Stacey*, Mr and Mrs. Clark allege that their own property, namely money they were forced to pay, was taken by the same process which also violated Raul's

rights. At this stage is unclear whether Raul was ordered to pay costs, which were then voluntarily assumed by his parents, or whether Mr. and Mrs. Clark were directly sanctioned as a result of Raul's adjudications in front of Ciavarella. Because the Plaintiffs allege that they were forced to pay the financial requirements, through wage and benefit garnishment, there are sufficient allegations at this stage that the Mr. and Mrs. Clark were directly harmed at the same time as Raul. Therefore, Mr. and Mrs. Clark have sufficiently alleged that their own property was taken by the Defendants' conduct, and thus Mr. and Mrs. Clark sufficiently allege their procedural due process claim.[5]

To sufficiently state a due process claim for interference with the parent-child relationship, a plaintiff must allege deliberate conduct that the defendant sought to harm that relationship. *Chambers ex rel. Chambers v. School Dist. Of Philadelphia Bd. Of Educ.*, 587 F.3d 176, 192 (3d Cir. 2009). While the Plaintiffs' sufficiently allege a conspiracy to violate the juveniles' rights by placing them in facilities, Plaintiffs' provide no explicit allegations that the Defendants' specifically acted with the intent to harm the Clarks' relationship with Raul, or vice versa. Although placing juveniles into the Defendant facilities would be disruptive to that relationship, Plaintiffs' allegations fall short of alleging the type of deliberate conduct aimed specifically at the relationship that states a claim for due process violations. Therefore, Defendants' motion to dismiss this claim will be granted on substantive due process claims brought by the Clarks.

Plaintiffs' Complaints fail to provide sufficient factual allegations that Mrs. Conahan and Mrs. Ciavarella acted as part of the alleged conspiracy to violate the Juvenile Plaintiffs' rights. Because Mrs. Conahan and Mrs. Ciavarella are not alleged to be state actors

---

[5] While it is unclear at this time what type of process was due to the Mr. and Mrs. Clark, or whether they had any opportunity to be heard or appeal the allegedly improper adjudications, the Defendants do not argue this issue, and therefore, I need not consider it at this time.

themselves, the motions of Mrs. Conahan and Mrs. Ciavarella will be granted and Count III of the Complaint will be dismissed as to Mrs. Conahan and Mrs. Ciavarella. As to Raul's claims, the remaining portions of Defendants' motions to dismiss his § 1983 claims will be denied. As to Mr. and Mrs. Clark's claims, Defendants motion will be granted on the Sixth Amendment, Eighth Amendment, and Fourteenth Amendment substantive due process claims, but denied as to the Fourteenth Amendment procedural due process claim.

### B.    Civil RICO

The Racketeer Influenced and Corrupt Organizations Act ("RICO") contains both criminal and civil consequences for violative conduct.  18 U.S.C. § 1961, *et seq.*  RICO makes it unlawful to corruptly engage in a pattern of racketeering activity via an enterprise engaged in interstate commerce.  *Id.* § 1962 (listing prohibited activities). In addition to criminal penalties, RICO authorizes "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court . . . ." *Id.* § 1964(c).  Plaintiffs bring causes of action alleging that Defendants violated § 1962(c), and that Defendants violated § 1962(d).[6] Section 1962(c) provides: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." *Id.* § 1962(c).  Section 1962(d) makes in unlawful to conspire to violate the other subsections of § 1962.  *Id.* § 1962(d).  Defendants argue that the Plaintiffs lack standing to make RICO claims, that they have not pled sufficient distinctiveness between the "persons" and the "enterprise," that they have not pled an enterprise that exists separate from the racketeering activities, that they do not sufficiently

---

[6]     Although Plaintiff do not specify that Count V is brought pursuant to § 1962(d), this Court assumes that "conspiracy to commit RICO" is a § 1962(d) claim.

and that they do not sufficiently allege a RICO conspiracy under subsection (d). This Court will consider each of these arguments in turn.

### 1. Standing

The Third Circuit Court of Appeals has noted that there are two distinct parts of the standing requirement of a civil RICO action: (1) that the plaintiff suffered an injury to business or property and (2) that the injury was proximately caused by the defendant's RICO violation. *Maio v. Aetna, Inc.*, 221 F.3d 472 (3d Cir.2000). As noted above, Mr. and Mrs. Clark have sufficiently pled injury to business or property, but Raul has not; therefore, Raul does not have standing to bring claims pursuant to RICO.

To have standing to bring civil RICO claims, however, Mr. and Mrs. Clark's injuries must also have been proximately caused by the underlying predicate acts. At common law, proximate cause was the demand for some direct relation between the injury asserted and the injurious conduct alleged. *Holmes v. Securities Investor Protection Corp.*, 503 US. 258, 268 (1992). Proximate cause, however, "is a flexible concept that does not lend itself to a black-letter rule that will dictate the result in every case." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.s. 639, 128 S.Ct. 2131, 2142 (2008). "[T]he compensable injury flowing from a [RICO violation] 'necessarily is the harm caused by the predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise.'" *Anza v. Ideal Steel Supply Corp.* at 457 (quoting *Sedmia, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985)). When considering whether an alleged injury is sufficiently direct, the Supreme Court has looked to three underlying justifications for the requirement of proximate causation: (1) difficulty in calculating the amount of a plaintiff's damages attributable to remote violations; (2) avoiding the need to apportion damages amongst different "levels" of plaintiffs and to avoid    multiple

recoveries; and (3) the general interest in deterrence is already served where other plaintiffs with more direct injuries may assert claims. *Holmes*, 503 U.S. at 269-70. Applying these considerations, the Supreme Court has addressed civil RICO's proximate cause requirement several times in recent years.

In *Anza*, the plaintiff brought a civil RICO claim against a competing business. *Id*. at 454. The plaintiff alleged that the underlying pattern of racketeering activity was the submission of fraudulent tax returns which gave the competitor an advantage and caused lost profits for the plaintiff. *Id*. The Court rejected the argument that the proximate causation requirement was satisfied merely because the defendant's alleged aim was to increase its own market share at the expense of the plaintiff. *Id*. at 460-61 (citing *Associated Gen. Contractors*, 459 U.S. at 537). Instead, the Court looked to the predicate acts and determined that the direct victim of the fraud was the state that lost tax revenue as a result of the filings, not the plaintiff. *Id*. at 458. In confirming this conclusion, the Court discussed the difficulty in calculating what portion, if any, of the plaintiff's lost profits were caused by the competitor's tax fraud. *Id*. at 258-59. And while acknowledging that there was no risk of multiple recovery, the Court noted that the immediate victim, the state, would be able to vindicate its rights with its own claim, satisfying the law's objective of deterrence without the need for more "indirect" actions such as the plaintiff's. *Id*. at 460. The Court ultimately held that the plaintiff's alleged injury was not proximately caused by the RICO violations, and thus that the plaintiff had no standing to bring its claim. *Id*. at 461.

In *Bridge*, the county treasurer's office held public auctions to sell tax liens on delinquent taxpayers' property. *Id*., 128 S.Ct. at 2135. Instead of bidding a set monetary amount, prospective buyers bid in percentage penalties the property owner would have to pay the bidder in order to clear the lien. *Id*. As a result of stiff competition for these liens,

most parcels attracted multiple bidders willing to accept the lowest possible penalty, namely zero percent. *Id.* To resolve ties, the county allocated parcels on a rotating basis. *Id.* To avoid allowing a party to receive a disproportionate number of liens via the rotation, the county had implemented a "Single, Simultaneous Bidder Rule" requiring each party to submit bids in its own name and prohibiting the submission of other simultaneous bids for the same parcel by having agents of that party also submit bids. *Id.* The plaintiff alleged that defendant had fraudulently violated the "Single, Simultaneous Bidder Rule" by submitting multiple bids via proxies or agents, thereby obtaining an unequal share of the tax liens. *Id.* at 2136.

While the holding of the Court focused on the issue of whether first-party reliance is required for a RICO claim predicated on mail fraud, the Court addressed the requirement of proximate causation in the course of its opinion. *Id.* at 2141-45. The Court stated that the plaintiff's alleged injury, the loss of valuable liens, was the direct result of the defendant's fraud. *Id.* at 2144. It distinguished *Anza*, stating "there are no independent factors that account for respondents' injury, there is no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violation, and no more immediate victim is better situated to sue." *Id.*

Most recently, in *Hemi Group, LLC v. City of New York*, 130 S. Ct. 983 (2010) (plurality opinion), the Supreme Court considered the issue of proximate cause in an action relating to the sale of cigarettes in New York City. *Id.* at 986. New York State and the City of New York each are permitted under New York law to tax the sale of cigarettes. *Id.* at 987. When purchasers buy cigarettes from in-state vendors, those vendors are responsible for charging, collecting, and remitting these taxes. *Id.* However, when cigarettes are sold by out-of-state vendors, the vendor need only file a report with the state listing the name, address, and quantity of cigarettes purchased so that the taxes may be collected. *Id.*

The defendant in *Hemi Group* was an out-of-state vendor who allegedly failed to provide the buyers' information to New York State. *Id.* As a result, the information was never passed along to New York City, depriving the city its ability to collect its portion of the taxes. *Id*. New York City brought a RICO action against the defendant, alleging as its harm the lost tax income as a result of defendant's mail and wire fraud in failing to submit buyer information. *Id.* 987-88.

In a plurality opinion, four justices held that New York City's theory of causation was "far too indirect." *Id.* at 989. They noted that the conduct directly responsible for the harm was the *customers* failure to pay taxes, and that the fraud only made enforcement more difficult. *Id. at* 990. The four justices joining the plurality stated that the disconnect was even more significant than in *Anza* because the defendant in *Hemi Group* allegedly defrauded New York State, who then passed on insufficient information to New York City, which made it easier for the taxpayers to cause the harm. *Id.* The *Hemi* plurality also rejected the dissent's argument that RICO's proximate causation requirement should turn on forseeability, rather than on the directness of the relationship between the predicate act and the harm. *Id.* at 991. They also rejected New York City's argument that the defendant's acts should be characterized as a systemic scheme to defraud tax revenue, stating "the City cannot escape the proximate cause requirement merely by alleging that the fraudulent scheme embraced all those indirectly harmed by the alleged conduct. Otherwise our RICO proximate cause precedent would become a mere pleading rule." *Id.* The opinion also distinguished *Bridge*, stating that in that case each time the fraud occurred a legitimate bidder was directly harmed and only those plaintiffs, not the county, were harmed. *Id.* at 992.

Applying this precedent to the present case, it is necessary to begin with the alleged

predicate acts in violation of RICO. *Anza*, 547 U.S. at 461 (central question is whether the alleged RICO violation led directly to the plaintiff's injuries). Plaintiffs alleged predicate acts may be considered in two categories. First, Plaintiffs allege that the Defendants committed mail and wire fraud by deceptively hiding the sums paid to Conahan and Ciavarella, "thereby hiding said income from the United States Internal Revenue Service." (Compl. ¶¶ 210, 258.) These predicate acts cannot be said to be the proximate cause of the Plaintiffs' injuries because it would be extremely difficult to calculate how the hiding of income caused the alleged monetary damages to the Plaintiffs and, more importantly, there are also more direct victims of this conduct. Namely, the Complaint alleges that the United States Internal Revenue Service was defrauded from successfully levying and collecting taxes on this taxable income. Therefore, these allegations cannot support Plaintiffs' claims.

Plaintiffs also allege that Defendants' committed honest services fraud, a specific type of mail fraud, as a RICO predicate act, which deprived "the citizens of Luzerne County and of the Commonwealth of Pennsylvania of their right to the honest services of Defendants Conahan and Ciavarella." (Compl. ¶¶ 210, 257.) This allegation necessarily relates to the payment of kickbacks to Conahan and Ciavarella, in return for favorable judicial adjudications. *Skilling v. United States*, 130 S.Ct. 2896, 2931 (2010) ("we now hold that § 1346 criminalizes *only* the bribe-and-kickback core"). Specifically, Plaintiffs allege that the payments to Ciavarella directly resulted in the monetary sanctions that Plaintiffs were forced to pay through wage and unemployment benefit garnishment. The mere fact that the Plaintiffs may have been the target of the predicate acts, however, is not enough. *Anza*, 547 at 460-61 (citing *Associated Gen. Contractors*, 459 U.S. at 537). Similarly, it is not sufficient that the harm suffered by Plaintiffs was foreseeable. *Hemi*, 130 S.Ct. 991. Plaintiffs must instead have been directly harmed by the predicate acts.

After reviewing the recent Supreme Court cases, it appears that the instant case is most analogous to the facts of *Bridge* where the government was defrauded, but where each act of fraud directly caused economic harm to Plaintiffs. Considering the "directness" articulated by the Supreme Court, the underlying justifications for the proximate cause requirement do not compel a finding that Mr. and Mrs. Clark's injuries were not proximately caused by Defendants' alleged RICO violations. Unlike the injuries in *Anza* and *Hemi*, the injuries suffered by the Plaintiffs in the case at bar are substantially more concrete; in fact, Plaintiffs have alleged the *precise* amount they paid as a result of Defendants' actions. Similarly, there is no concern about apportioning damages or multiple recovery, as no other group of Plaintiffs suffered this type of economic harm. Finally, when considering the deterrent interest there are no other parties better suited to bring these claims because it was Plaintiffs.

Defendants argue that there is a more immediate victim, namely the Commonwealth of Pennsylvania and the citizens of Luzerne County, who were deprived of the honest services of their judicial officer. However, the statutory codification of honest services fraud, 18 U.S.C. § 1346, specifically states that honest services fraud includes "a scheme or artifice to deprive another of the intangible rights of honest services." Even if the group most directly affected by Conahan and Ciavarella were the people of Pennsylvania or Luzerne County, that injury would be necessarily intangible. In order to serve the deterrence goals articulated in the Supreme Court's proximate cause jurisprudence, it would be imprudent to hold that the only group whose injuries were proximately caused by honest services fraud is a group that suffered no tangible injury and is not in a position to bring suit. It is analogous to *Bridge*, where the government, although most directly connected to the fraud, did not suffer any tangible injury and would not be able to maintain a civil RICO action. The loss of the "honest

services" of a judicial officer cannot be said to be the same type of concrete injury as the loss of tax income suffered in *Anza* and *Hemi*. Thus, there is no more directly injured group of plaintiffs than plaintiffs like Mr. and Mrs. Clark that could equally serve the deterrence purposes underlying civil RICO.

A civil RICO action brought by Mr. and Mrs. Clark also better achieves the other goals stated by the Supreme Court in setting out the factors underlying proximate cause. Calculating and apportioning the damages as to the value of judicial services *vis a vis* the citizens of Luzerne County as whole would be logistically infeasible. Ultimately, as was the case in *Bridge*, while the government may have been defrauded, the economic impact was felt immediately by the Plaintiffs each time conduct occurred. Because Plaintiffs allege an economic injury proximately related to the predicate acts of honest services fraud, they have standing to bring civil RICO claims.

### 2.    Violation of § 1962(c)

In *United States v. Irizarry*, 341 F.3d 273 (3d Cir. 2003), the Third Circuit Court of Appeals described the requirements for establishing a violation of this section, stating:

> To establish a § 1962(c) RICO violation, the government must prove the following four elements: (1) the existence of an enterprise affecting interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated in, either directly or indirectly, in the conduct or the affairs of the enterprise; and (4) that he or she participated through a pattern of racketeering activity.

*Id.* at 285 (quotation and citation omitted).

### a.    Enterprise

Defendants argue that Plaintiffs have not sufficiently alleged an association-in-fact enterprise because 1) the "persons" and the "enterprise" alleged are not sufficiently distinct and 2) the enterprise is not alleged to have existed separate and apart from the alleged

conspiracy. Plaintiffs have alleged that Conahan, Ciavarella, Powell, PACC, Mericle, Miracle Construction, Mrs. Conahan, Mrs. Ciavarella, and Vision are "persons" within the meaning of 18 U.S.C. § 1961(3). (Compl. ¶ 251.) Plaintiffs also allege that these Defendants formed an enterprise within the meaning of § 1961(4).

RICO defines "person" as including "any individual, partnership, corporation, association, or other legal entity." Clearly, the group of individuals and legal entities alleged to have committed RICO violations are, in fact, "persons" as defined by § 1961(3). "Enterprise" includes a "group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). However, associations-in-fact have been read liberally to include an enterprise consisting of individuals and corporate entities associating with one another. *See United States v. Console*, 13 F.3d 641, 652 (3d Cir. 1993). Here, Plaintiffs have alleged a sufficiently distinct enterprise from the "persons" who form that enterprise. Specifically, the "enterprise" here is an association-in-fact enterprise comprised of the aforementioned individuals and other legal entities.

In *United States v. Turkette*, 452 U.S. 576 (1981), the Supreme Court set forth three factors for establishing such a RICO enterprise: (1) 'an ongoing organization, formal or informal," (2) that "the various associated function as a continuing unit," and (3) that the enterprise exists "separate and apart from the pattern of activity in which it engages." *See Pappa v. Unum Life Ins. Co. Of America*, No. 3:07-CV-0708, 2008 WL 744820, at *10 (citations omitted). While Defendants are correct Plaintiffs will ultimately need to establish each of these factors, at this early juncture it is sufficient to merely to allege the existence of an association-in-fact enterprise. *Pappa v. Unum Life Ins. Co. Of America*, 2008 WL 744820, at *11(citing *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 789 (3d Cir.1984)). While Defendants' arguments that the enterprise did not exist apart from

36

the racketeering activity may have merit, Plaintiffs need not satisfy these requirements at this stage. Because Plaintiffs sufficiently allege that an association-in-fact enterprise existed, they have satisfied the pleading requirements of this element at this stage.

### b.    Participation in the Enterprise

A plaintiff must also establish that the defendants were associated with and participated in the "operation or management" of the enterprise to bring a cause of action pursuant to civil RICO. *Reves v. Ernest & Young*, 507 U.S. 170, 184 (1993). In order for a Defendant "to conduct or participate" in the affairs of a RICO enterprise, a defendant must, in some capacity, direct the affairs of the enterprise. *Id.* at 178-79. A defendant will not be liable simply because he provides services that benefit the enterprise; instead, there "must be a nexus between the person and the conduct in the affairs of an enterprise. The operation or management test goes to that nexus. In other words, the person must knowingly engage in 'directing the enterprise's affairs' through a pattern of racketeering activity." *University of Maryland at Baltimore,* 996 F.2d 1534, 1539 (3d Cir. 1993). That does not necessarily mean that a defendant must have a managerial position in the enterprise, but only that he or she "knowingly further[s] the illegal aims of the enterprise by carrying out the directives of those in control." *United States v. Parise*, 159 F.3d 790, 796 (3d Cir. 1998).

Here, Mrs. Ciavarella, Mrs. Conahan, and PACC argue that Plaintiffs have not sufficiently alleged participation in the enterprise. Turning first to Mrs. Conahan and Mrs. Ciavarella, the Complaint does not contain any allegations that Mrs. Ciavarella and Mrs. Conahan did anything to participate in the enterprise. As discussed above, Plaintiff's allege that they were owners and operators of Pinnacle, but that the entity was controlled by their husbands to engage in wire and mail fraud. Without more, the Complaint is devoid of any allegations that Mrs. Ciavarella or Mrs. Conahan were personally involved in taking any

action that would constitute knowingly advancing the illegal aims of the alleged association-in-fact.

Although *respondeat superior* liability may be applied under RICO where it is not otherwise prohibited by the statute, *Petro-Tech, Inc. v. Western Co. of North America*, 824 F.2d 1349, 1358 (3d Cir. 1987),[7] PACC argues that it should not be held liable for Powell's actions because he was acting outside of the scope of his employment as an agent for PACC. Conduct is within the scope of employment if a) it is the kind that the employee is employed to perform, b) it occurs substantially within the authorized time and space limits, and c) it is actuated, at least in part, by a purpose to serve the master. *CNA v. United States*, 535 F.3d 132, 146 (3d Cir. 2008). However, all of these inquiries are factual questions that are not properly determined at the motion to dismiss stage. Without a developed factual record, it is impossible to know the scope and contours of Powell's relationship with PACC. While his activities here might well be outside that scope, it is too early for this Court to make that determination and the motion to dismiss will be denied.

### 3.    Conspiracy under § 1962(d)

Plaintiffs allege that all Defendants participated in a conspiracy to violation § 1962(d). As stated above, Plaintiffs sufficiently allege that all Defendants, except Mrs. Conahan and Mrs. Ciavarella, participated in a conspiracy which included conduct in violation of § 1962(c). Therefore, the motions to dismiss of Mrs. Conahan and Mrs. Ciavarella will be granted, and the remaining motions will be denied.

---

[7]

This Court recognized that *Petro-Tech* ultimately held that *respondeat superior* liability under § 1962(c) was foreclosed "insofar as it would make the enterprise liable for RICO violations which victimized it." *Id.* at 1359. However, this case is readily distinguishable from *Petro-Tech*; in that case, plaintiff was trying to hold the defendant corporation liable as a participant in the RICO activity while at the same time alleging the corporation was the RICO enterprise being corrupted. In this case, PACC is not the enterprise for purposes of the RICO violation but is instead only alleged to be a "person" who participated in the association-in-fact.

_____C.    **Punitive Damages**

Defendants Mericle, Mericle Construction, Powell, and Vision also argue that Plaintiffs have failed to allege a factual basis for their § 1983 punitive damages claims.  It is clear that in certain circumstances punitive damages may be awarded for violations of civil rights. *Cochetti v. Desmond*, 572 F.2d 102, 105 (3d Cir. 1978).  The test for determining whether punitive damages should be awarded for civil rights violations is whether Defendants acted with actual knowledge that they were violating a federally protected right or with reckless disregard for whether they were doing so. *Cochetti*, 572 F.2d at 106.  While Defendants again dispute whether the conspiracy was intended to violate Plaintiffs' rights, as stated above Plaintiffs sufficiently allege that Defendants Mericle and Powell and, therefore Mericle Construction and Vision, were involved in the conspiracy to intentionally violate Plaintiffs' rights in furtherance of making PACC and WPACC profitable ventures for the conspirators. Defendants' request to dismiss claims for punitive damages will be denied.

_____**VII.**    **STATE LAW CLAIMS AGAINST ALL DEFENDANTS**

**A.    Count VI: False Imprisonment**

In Count VI of the Complaint, Plaintiffs allege that all Defendants conspired to falsely imprison Raul and that Mr. and Mrs. Clark have suffered injury as a result of Raul's false imprisonment. It is unclear from the face of the Complaint whether this is a cause of action under civil conspiracy or simply a cause of action for false imprisonment. However because Plaintiffs have disclaimed a cause of action under civil conspiracy, this Court will treat this as a cause of action solely for false imprisonment. (*See* Doc. 89 at 29 n.4.)

First and foremost, Mr. and Mrs. Clark cannot recover under a theory of false imprisonment because they do not allege that they were ever detained. A claim of false imprisonment under Pennsylvania law requires: "(1) the detention of another person, and (2)

the unlawfulness of such detention." *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994). An actor is liable for false imprisonment if "(1) he acts intending to confine the other or a third person within boundaries fixed by the actor and (2) his act directly or indirectly results in such a confinement of the other, and (3) the other is conscious of the confinement or is harmed by it." *Crivellaro v. Pa. Power and Light Co.*, 24 Pa.D.&C.3d 590, 595 (Pa. Com. Pl. 1982).

Defendants argue that the false imprisonment claims are barred by the statute of limitations. The statute of limitations for claims of false imprisonment in Pennsylvania is two (2) years. 42 Pa. Cons. Stat. Ann. § 5524(1). Generally, the statute of limitations begins to run "when the plaintiff knew or should have known of the injury upon which its action is based." *Sameric Corp. of Del., Inc.  v. City of Phila*., 142 F.3d 582, 599 (3d Cir. 1998). Because Plaintiffs allege that they were aware of their detentions, the statute of limitations on each claim would ordinarily have started running on the date each was released. *See Martin v. Red Lion Police Dept.*, 146 Fed. Appx. 558, 561 (3d Cir. 2005) (statute of limitations began upon release from hospital or at least when aware of nature of treatment therein).

Plaintiffs argue that the statute of limitations should be equitably tolled until January 2009, when the U.S. Attorney filed a criminal information outlining the Defendants' alleged conspiracy. First, they argue that the "discovery rule" should toll the statute of limitations. "The purpose of the discovery rule has been to exclude from the running of the statute of limitations that period of time during which a party who has not suffered an immediately ascertainable injury is reasonably unaware he has been injured, so that he has essentially the same rights as those who have suffered such an injury." *Fine v. Checcio*, 870 A.2d 850, 858 (Pa. 2005) (citation omitted).  While it may be true that Raul did not know of the

*conspiracy* until that date, the discovery rule acts to toll the statute of limitations until the *injury* is known. In this case, the alleged injuries arise from the imprisonment, which Plaintiffs allege were known from the time of incarceration. Therefore, the discovery rule is inapplicable here.

Plaintiffs also argue that the statute of limitations should be equitably tolled because of Defendants' intentional fraud or concealment of the facts relating to Raul's causes of action. "A party relying on this doctrine will be entitled to a tolling of the Statute of Limitations by proving that there has been either intentional or unintentional deception by the Defendant, and the statute will be tolled until the Plaintiffs would, through the exercise of reasonable diligence, have discovered the fraudulent concealment." *Piccolini v. Simon's Wrecking*, 686 F. Supp. 1063, 1074 (M.D. Pa. 1988) (internal citations omitted). "The Plaintiff, however, must prove such fraud or concealment by clear, precise, and convincing evidence." *Id.* (citing *Ritter v. Theodore Pendergrass*, 514 A.2d 930, 935 n. 8 (1986)). Plaintiffs sufficiently allege that Defendants intentionally acted to conceal their conspiracy from Plaintiffs and others. Concealment of the conspiracy may have prevented Plaintiffs from bringing the present cause of action. Ultimately, Plaintiffs will be required to prove the alleged fraud or concealment in order to equitably toll the statute of limitations. But, considering only the allegations in the complaint, the Court holds that equitable tolling might be appropriate here and will deny Defendants' motion to dismiss.

Defendants also argue that Plaintiffs have failed to state a claim upon which relief can be granted. Defendants argue that Plaintiffs have failed to sufficiently allege that Raul's detention lacked probable cause. When detention is in the form of an arrest, to show the unlawfulness of that detention, Plaintiff must show "that the process used for the arrest was void on its face or that the issuing tribunal was without jurisdiction; it is not sufficient that the

charges were unjustified." *Strickland v. Univ. of Scranton*, 700 A.2d 979, 984-85 (Pa. Super. 1997). In order to consider the claims of false imprisonment and false arrest collectively, however, the confinement must be "inextricably intertwined with the unlawful arrest." *Gagliardi v. Lynn*, 285 A.2d 109, 128 (1971). Plaintiffs do not allege that Raul's arrests were unlawful or that the arresting officials were part of the conspiracy, thus it cannot be said that the arrest and confinement were "inextricably intertwined." Therefore, Plaintiffs need not allege a lack of probable cause to state a claim for false imprisonment.

As such, Raul has clearly stated a claim for false imprisonment against PACC and Powell, who were responsible for his detention following his probation violations. Furthermore, false imprisonment claims "can lie against one who instigated an arrest or imprisonment through his influence on a third party." *Gilbert v. Feld*, 788 F. Supp. 854, 862 (E.D. Pa. 1992). However, the only party that instigated the false imprisonment of Raul was Ciavarella when he issued an order confining Raul to PACC. As noted above, that type of in-court activity is shielded by absolute judicial immunity; therefore, Raul does not have a cause of action against Ciavarella for false imprisonment. The remaining defendants have not been alleged to be directly involved in the imprisonment of Raul or instigating the imprisonment of Raul; the Complaint fails to state a claim against these Defendants, although they may be liable for civil conspiracy, as discussed below.

Thus, the motion to dismiss the false imprisonment claim will be granted as to Mrs. and Mrs. Clark, denied as to Raul for PACC and Powell, and granted as to Raul for the remaining Defendants.

### B.    Count VII: IIED

"To prove a claim of intentional infliction of emotional distress, the following elements must be established: (1) the conduct must be extreme and dangerous; (2) it must be

intentional or reckless; (3) it must cause emotional distress; (4) that distress must be severe." *Hoy v. Angelone*, 691 A.2d 476, 482 (Pa. 1997). Extreme and outrageous conduct is conduct which is "so outrageous in character, and so extreme in degree, as to go beyond all possibly bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized society." *Strickland v. Univ. of Scranton*, 700 A.2d 979, 987 (Pa. Super. Ct. 1997). Generally, "the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'outrageous'!" *Id.* Furthermore, "in order to state a claim under which relief can be granted for the tort of intentional infliction of emotional distress, the plaintiffs must allege physical injury." *Hart v. O'Malley*, 647 A.2d 542, 554 (Pa. Super. 1994); *see also Mann v. Brenner*, No: 1:06-cv-1715, 2008 WL 4491950, at *7 (M.D. Pa. Sept. 30, 2008).

In the instant case, Mr. and Mrs. Clark have not alleged that they suffered any type of physical injury. Raul has only alleged that he suffered "great emotional distress." Plaintiff argues that this is a sufficient allegation of physical injury to survive a motion to dismiss. Although allegations of emotional distress can be sufficient to support a claim for infliction of emotional distress, Plaintiffs' bare allegations on this matter are not sufficient to state a cause of action intentional infliction of emotional distress. *Compare Behm v. Luzerne County Children and Youth Policy Makers*, 172 F. Supp.2d 575, 588 (M.D. Pa. 2001) (dismissing intentional infliction of emotional distress claim for failure to allege physical injury), *with Frank v. Smith*, No. 3:09-cv-596, 2009 WL 5214978, at *4 (M.D. Pa. Dec. 29, 2009) (holding that allegation of "severe emotional distress, causing [plaintiff] to obtain both medical and psychiatric advice, medication, obtain ongoing counseling, subjecting her to therapy and deep depression" sufficient to defeat motion to dismiss). Here, Plaintiffs have not sufficiently alleged physical injury to make out a claim for intentional infliction of emotional distress, and

this count of the Complaint will be dismissed.

## **CONCLUSION**

For the various reasons discussed above the motions of Mr. Conahan, Mr. Ciavarella, Ms. Brulo, Mr. Mericle, Mericle Construction, PACC, Powell, and Vision will be granted in part and denied in part, and the motion of Mrs. Conahan and Mrs. Ciavarella will be granted.


August 25, 2010                                      /s/ A. Richard Caputo
Date                                                 A. Richard Caputo
                                                     United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

RAUL CLARK, BRUCE CLARK, and
IRAIDA CLARK,

      Plaintiffs,

                          CIVIL ACTION NO. 3:09-CV-2535

        v.

MICHAEL T. CONAHAN, et al.,

                          (JUDGE CAPUTO)

      Defendants,

## ORDER

**NOW**, this  25th  day of August, 2010, **IT IS HEREBY ORDERED** that:

(1)    Defendant Mark Ciavarella's Motion to Dismiss (Doc. 24) is **GRANTED in part and DENIED in part** as follows:

    (a)    Defendant Ciavarella's motion on judicial immunity is **GRANTED** only for the courtroom adjudications and sentences imposed. The remainder of Defendant Ciavarella's motion on judicial immunity is **DENIED.**

    (b)    Defendant Ciavarella's motion to dismiss is **DENIED** as to Count I for Claims brought by Bruce and Iraida Clark for violations of Procedural Due Process occurring **on or after** January 1, 2003, and **GRANTED** as to Count I for the remaining claims.

    (c)    Defendant Ciavarella's motion to dismiss is **GRANTED** as to Count I for claims brought by Raul Clark for Fifth Amendment, Sixth Amendment, and Fourteenth Amendment claims for activities occurring **before** January 1, 2003, but **DENIED** for all Eighth Amendment claims and **DENIED** for all Fifth Amendment, Sixth Amendment, and Fourteenth Amendment claims for activities occurring **on or after** January 1, 2003.

    (d)    Defendant Ciavarella's motion to dismiss is **GRANTED** as to Counts IV and V for claims brought by Raul Clark, but **DENIED** as to Counts IV and V for claims brought by Bruce and Iraida Clark

    (e)    Defendant Ciavarella's motion to dismiss is **GRANTED** as to Counts VI and VII.

(2)    Defendant Michael T. Conahan's Motion to Dismiss (Doc. 28) is **GRANTED in part and DENIED in part** as follows:

    (a)    Mr. Conahan's motion on judicial immunity is **GRANTED** only for the

        courtroom adjudications and sentences imposed. The remainder of Mr. Conahan's motion on judicial immunity is **DENIED.**

(b)      Mr. Conahan's motion on legislative immunity is **DENIED**.

(c)      Defendant Conahan's motion to dismiss is **DENIED** as to Count I for Claims brought by Bruce and Iraida Clark for violations of Procedural Due Process occurring **on or after** January 1, 2003, and **GRANTED** as to Count I for the remaining claims.

(d)      Defendant Conahan's motion to dismiss is **GRANTED** as to Count I for claims brought by Raul Clark for Fifth Amendment, Sixth Amendment, and Fourteenth Amendment claims for activities occurring **before** January 1, 2003, but **DENIED** for all Eighth Amendment claims and **DENIED** for all Fifth Amendment, Sixth Amendment,  and Fourteenth Amendment claims for activities occurring **on or after** January 1, 2003.

(e)      Defendant Conahan's motion to dismiss is **GRANTED** as to Counts IV and V for claims brought by Raul Clark, but **DENIED** as to Counts IV and V for claims brought by Bruce and Iraida Clark

(f)      Defendant Conahan's motion to dismiss is **GRANTED** as to Counts VI and VII.

(3)      Defendant Sandra Brulo's Motion to Dismiss (Doc. 59) is **GRANTED in part and DENIED in part** as follows:

(a)      Ms. Brulo's motion on quasi-judicial immunity is **GRANTED** only for activity regarding pre-sentence recommendations. The remainder of Brulo's motion on sovereign immunity, qualified immunity and quasi-judicial immunity is **DENIED.**

(b)      Defendant Brulo's motion to dismiss is **DENIED** as to Count I for Claims brought by Bruce and Iraida Clark for violations of Procedural Due Process occurring **on or after** January 1, 2003, and **GRANTED** as to Count I for the remaining claims.

(c)      Defendant Brulo's motion to dismiss is **GRANTED** as to Count I for claims brought by Raul Clark for Fifth Amendment, Sixth Amendment, and Fourteenth Amendment claims for activities occurring **before** January 1, 2003, but **DENIED** for all Eighth Amendment claims and **DENIED** for all Fifth Amendment, Sixth Amendment,  and Fourteenth Amendment claims for activities occurring **on or after** January 1, 2003.

(d)      Defendant Brulo's motion to dismiss is **GRANTED** as to Counts IV, V, VI, and VII.

(4)      Defendants Mericle Construction and Robert K. Mericle's Motion to Dismiss (Doc. 68) is **GRANTED in part and DENIED in part** as follows:

(a)      Defendant Mericle Construction and Robert K. Mericle's motion to dismiss is **DENIED** as to Count III for Claims brought by Bruce and Iraida Clark for violations of Procedural Due Process occurring **on or after** January 1, 2003, and **GRANTED** as to Count III for the remaining claims.

(b)      Defendant Mericle Construction and Robert K. Mericle's motion to

dismiss is **GRANTED** as to Count III for claims brought by Raul Clark for Fifth Amendment, Sixth Amendment, and Fourteenth Amendment claims for activities occurring **before** January 1, 2003, but **DENIED** for all Eighth Amendment claims and **DENIED** for all Fifth Amendment, Sixth Amendment, and Fourteenth Amendment claims for activities occurring **on or after** January 1, 2003.

(c)     Defendant  Mericle Construction and Robert K. Mericle's motion to dismiss  is **GRANTED** as to Counts IV and V for claims brought by Raul Clark, but **DENIED** as to Counts IV and V for claims brought by Bruce and Iraida Clark

(d)     Defendant  Mericle Construction and Robert K. Mericle's motion to dismiss is **GRANTED** as to Counts VI and VII.

(e)     Defendant  Mericle Construction and Robert K. Mericle's motion to dismiss punitive damages will be **DENIED**.

(5)     Defendant PACC's Motion to Dismiss (Doc. 70) is **GRANTED in part and DENIED in part** as follows:

(a)     Defendant PACC's motion to dismiss is **DENIED** as to Count III for Claims brought by Bruce and Iraida Clark for violations of Procedural Due Process occurring **on or after** January 1, 2003, and **GRANTED** as to Count III for the remaining claims.

(b)     Defendant PACC's motion to dismiss is **GRANTED** as to Count III for claims brought by Raul Clark for Fifth Amendment, Sixth Amendment, and Fourteenth Amendment claims for activities occurring **before** January 1, 2003, but **DENIED** for all Eighth Amendment claims and **DENIED** for all Fifth Amendment, Sixth Amendment, and Fourteenth Amendment claims for activities occurring **on or after** January 1, 2003.

(c)     Defendant PACC's motion to dismiss is **GRANTED** as to Counts IV and V for claims brought by Raul Clark, but **DENIED** as to Counts IV and V for claims brought by Bruce and Iraida Clark

(d)     Defendant PACC's motion to dismiss is **DENIED** as to Count VI as to false imprisonment claims made by Raul and **GRANTED** as to Count VI for claims made for false imprisonment by Bruce and Iraida Clark and **GRANTED** as to Count VII.

(6)     Defendants Vision Holdings and Robert Powell's Motion to Dismiss (Doc. 72) is **GRANTED in part and DENIED in part** as follows:

(a)     Defendant Vision Holdings and Robert Powell's motion to dismiss is **DENIED** as to Count III for Claims brought by Bruce and Iraida Clark for violations of Procedural Due Process occurring **on or after** January 1, 2003, and **GRANTED** as to Count III for the remaining claims.

(b)     Defendant Vision Holdings and Robert Powell's motion to dismiss is **GRANTED** as to Count III for claims brought by Raul Clark for Fifth Amendment, Sixth Amendment, and Fourteenth Amendment claims for activities occurring **before** January 1, 2003, but **DENIED** for all Eighth Amendment claims and **DENIED** for all Fifth Amendment, Sixth

Amendment, and Fourteenth Amendment claims for activities occurring **on or after** January 1, 2003.

(c)    Defendant Vision Holdings and Robert Powell's motion to dismiss is **GRANTED** as to Counts IV and V for claims brought by Raul Clark, but **DENIED** as to Counts IV and V for claims brought by Bruce and Iraida Clark

(d)    Defendant Vision Holdings and Robert Powell's motion to dismiss is **DENIED** as to Count VI as to false imprisonment claims made by Raul against Defendant Powell and **GRANTED** as to Count VI for claims made for false imprisonment by Bruce and Iraida Clark against Powell, **GRANTED** as to all false imprisonment claims against Defendant Vision, and **GRANTED** as to Count VII.

(e)    Defendant Vision Holdings and Robert Powell's motion to dismiss punitive damages will be **DENIED**.

(7)    Defendants Barbara Conahan and Cindy Ciavarella's Motion to Dismiss (Doc. 78) is **GRANTED**.


                                    /s/ A. Richard Caputo
                                    A. Richard Caputo
                                    United States District Judge